**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REDWINE RESOURCES, INC.,** | § | **CASE NO. 10-34041** |
| **BADGER DRILLING COMPANY, LLC** | § | **CASE NO. 10-34046** |
| **WHITE OAKS RESOURCES, LLC** | § | **CASE NO. 10-34054** |
| **REDWINE OIL AND GAS PROPERTIES, LLC** | § | **CASE NO. 10-34052** |
| **REDWINE ROCKIES, LLC** | § | **CASE NO. 10-34053** |
| **REDWINE OIL AND GAS, LLC** | § | **CASE NO. 10-34050** |
| **REDWINE AVIATION, INC.** | § | **CASE NO. 10-34047** |
| **REDWINE KINTA RANCH, LLC** | § | **CASE NO. 10-34051** |
| | § | |
| **DEBTORS** | § | **CHAPTER 11** |
| | § | |
| | § | **JOINT ADMINISTRATION** |
| | § | **REQUESTED** |
| | § | |

**DECLARATION OF LYNDON JAMES IN SUPPORT OF DEBTORS' VOLUNTARY
PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE
AND FIRST DAY MOTIONS**

I, Lyndon James, state:

1.      I am a Senior Director of BBK, Ltd., and I have served as a financial consultant to the above-referenced debtors and debtors-in-possession, collectively the "Debtors" or the "Company").  I have served in this position since March 3, 2009 and I am familiar with the Debtors' day-to-day operations, business affairs, books and records.  I have personal knowledge of the statements set forth herein.

2.      On June 4, 2010 (the "Petition Date"), the Company is filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses as debtors-in-possession.

3.      In order to effectively minimize the adverse effects of a Chapter 11 filing, the Company requested various types of relief in their "First Day" motions and applications filed with this Court.  I am one of the primary parties responsible for implementing Debtors' restructuring efforts and I am authorized to submit this declaration in support of such motions and applications.

4.      In my position as a financial consultant to the Debtors since March 3, 2009, I have personal knowledge about their operations.  I have supervised their business and financial affairs and have participated in strategic planning associated with their ongoing business decisions.  As a result of my first-hand experience and knowledge, and through my review and knowledge of the Company's books and records and other information, including discussions with management, employees, and affiliates, as well as outside professional advisors, I have formed opinions as to the necessity of obtaining the relief sought by the Company in its First Day motions and applications in order to permit it to continue to operate effectively and manage its Chapter 11 cases efficiently.  I believe that there will be significant deleterious effects if the requested relief is not obtained.

5.      I submit this Declaration in support of the emergency motions by the Company seeking entry of the First Day Orders.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the Company's books and records, information conveyed to me by other representatives of the Company, including discussions with managers, other employees, and outside advisors, as well as my experience and knowledge of the Company's operations and financial condition.  I am competent to testify to these matters, and, if I were called as a witness, I would testify to the facts and opinions set forth

below.  Where my opinions relate to legal matters, I have consulted with and am relying upon the advice of the Company's lawyers with respect to such matters.

6.      Part I of this Declaration describes the Company's business and the circumstances leading up the filing of their Chapter 11 petitions.  Parts II through V set forth the relevant facts in support of the Company's emergency First Day Motions.  I have read and reviewed the following First Day motions and all the allegations contained in each such motion are true and correct to the best of my knowledge, information and belief.

# I.
# BACKGROUND

## A.      General Background Regarding the Debtors

7.      The Company commenced its cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on the Petition Date.

### i.      The Debtors' Primary Business

8.      Redwine Resources, Inc. was formed in 1982 by Gary W. Redwine, the sole owner, for the purpose of acquiring oil and gas leases in Oklahoma.  The Debtors' corporate organization structure (the "Corporate Structure") is reflected on Exhibit A, attached hereto.  All of the Debtors are organized as Texas corporations or limited liability companies.[1]

9.      From 1982 to 2005, the Debtors acquired leases, drilled wells, and bought additional interest in oil and gas projects.  The Debtors also added properties in Colorado, New Mexico, Texas, and Wyoming.

10.      The Debtors principal place of operations is in Haskell County, Oklahoma with office in Dallas, Texas.  Redwine Resources, Inc. is the primary operating company of the eight

---

[1]  The Corporate Structure also reflects two entities that are not debtors in these bankruptcy cases.  The non-debtor entities were either dissolved or have no assets or property, or ever had any assets or property.

Debtors and it is in the business of exploring for and producing oil and natural gas, with the bulk of the assets being natural gas reserves. The holding company, Redwine Oil and Gas Properties, LLC, borrowed funds from the primary lender, Bank of America, N.A. ("Bank of America" or the "Secured Lender") and loaned and/or contributed capital to the other Debtors. Redwine Resources collects and disburses funds for the operating expenses, payroll expenses, and other general and administrative expenses of the Debtors. As discussed more fully below, through a series of amendments and forbearances to the loan agreements with the primary lender, all of the Debtors have guaranteed the debt owed to Bank of America, and their co-obligations are secured by all, or substantially, all of their assets.

### ii. The Debtors' Expansion

11. In 2004 the Debtors formed White Oak Resources, LLC for the purpose of mining for gold and other minerals in New Mexico. Funds for this investment were advanced from Redwine Resources, Inc. The mining venture was abandoned in 2006 due to a lack of mining success. A small amount of mining equipment remains as assets in this venture.

12. In 2005, the Debtors expanded its oil and gas interests into the Rocky Mountains, primarily Colorado and Wyoming, and also into Indiana. The Debtors expanded as a result of the lack of oil and gas exploration opportunities in and around the Debtors' producing fields in Oklahoma. By 2007, the Debtors had acquired a substantial amount of unexplored acreage in the Rocky Mountains. At this time in the industry, oil and gas drilling rigs were in great demand. In order to meet the exploration obligations of the leases in the Rocky Mountains, the Debtors purchased three drilling rigs in the name of Badger Drilling Company, LLC ("Badger"). The funds for the purchase of the drilling rigs were borrowed from Bank of America and two other banking entities (the "Rig Lenders").

13.     At the same time, the Debtors began exploration activities on two large leasehold properties, one in Colorado and one in Wyoming. The Debtors attempted to bring in partners to share in the risks and costs of these two projects, but were not successful in attracting new investors in the projects.. As a result, the exploration costs to the Debtors were much more than planned.

**B.     The Debtors' Capital Structure and Events Leading to Chapter 11**

**i.     The Debtors' Capital Structure**

14.     Generally speaking, the Debtors incurred their primary secured debt pursuant to that certain Loan Agreement with Bank of America dated April 30, 2003 (the "2003 Loan Agreement"). Since that time, as a result of the Debtors' expansion efforts followed by their financial difficulties, as described below, the 2003 Loan Agreement has been amended by a First Amendment to Loan Agreement dated as of April 30, 2005 (the "2005 Amendment"), as amended by a Second Amendment to Loan Agreement dated as of September 23, 2006 (the "2006 Amendment"), as amended by a further Second Amendment to Loan Agreement dated as of November 15, 2007 (the "2007 Amendment"), as amended by the Amended and Restated Credit Agreement dated as of September 9, 2008 (the "2008 Amended and Restated Credit Agreement"), as amended by the First Amendment and Forbearance to the Credit Agreement dated as of September 18, 2009 (the "2009 Amendment and Forbearance"), and as amended by the First Amendment to First Amendment and Forbearance to the Credit Agreement and Consent dated as of March 25, 2010 (the "2010 Amendment and Forbearance") (collectively, the "Pre-Petition Credit Agreement"). As of the Petition Date, the Debtors owe Bank of America the aggregate amount of not less than $42,304,522.53 pursuant to the Pre-Petition Credit Agreement, consisting of unpaid principal in the amount of not less than $41,011,324.97, accrued but unpaid

interest in the amount of not less than $129,361.93, default interest in the amount of not less than $1,163,835.63, plus other unpaid fees, costs, expenses, and all other Obligations (as defined in the Pre-Petition Credit Agreement) (collectively, the "Pre-Petition Indebtedness").

15.     The Pre-Petition Indebtedness is guaranteed by all of the Debtors pursuant to the 2009 Amendment and Forbearance.   The Pre-Petition Indebtedness is secured by all or substantially all of the Debtors' assets pursuant to, *inter alia*, (i) deeds of trust in favor of Bank of American in, *inter alia,* all of the Debtors' mineral interests in certain mortgaged properties; and (ii) the assignment and grant of security interest in all property of the Debtors (and non-debtor Gary Redwine Oil & Gas, LLC) dated September 18, 2009 (the "2009 Security Agreement").

16.     The Debtors also incurred other secured debt with the Rig Lenders in order to purchase oil and gas drilling rigs in the name of Badger.   As described below, the rigs were surrendered to the Rig Lenders through a deed-in-lieu of debt.   As a result, the Debtors are no longer obligated to the Rig Lenders and the Rig Lenders are not creditors in these bankruptcy cases.

### ii.     Events Leading to Chapter 11

17.     By late Summer or early Fall of 2008, the price of natural gas was declining rapidly.   The decline was primarily caused by the beginning of the recession in the U.S. at that time, which negatively impacted demand for natural gas, and the abundance of supply of natural gas as a result of several years of successful drilling for natural gas in the shale regions of the U.S.   As a result of this severe decline in natural gas prices, the value of the Debtors underlying assets declined to a level far below the amount of debt that the Debtors had undertaken.   As of the Petition Date, natural gas prices remain at very low levels and natural gas supplies continue to be well above demand levels.

18. The collapse of the natural gas market essentially shut off drilling opportunities for Badger and the company suffered heavy losses in years 2007 and 2008. These operating losses were funded by intercompany loans to Badger from Redwine Resources, Inc. who borrowed these funds from Bank of America. In early 2009, Badger entered into a deed-in-lieu of debt agreement with the Rig Lenders on the drilling rig loans and thereby surrendered the three rigs to those lenders. Since that time, the operations of Badger Drilling have been shut down. Very small amounts of assets and liabilities remain with Badger.

19. As a result of these financial difficulties, the Debtors, as described below, have entered into a series of loan amendments and forbearance agreements with Bank of America. Even though the operations of the businesses have been profitable during this period, the severe decline in the price of natural gas has caused the value of the underlying assets which secure the debts to become and remain substantially less than the debt obligations. As a result, the Debtors have sought buyers for all or substantially all of their assets. The Debtors have found one buyer that the Debtors have chosen as a "stalking-horse" and will seek to sell certain of their assets in bankruptcy through Bankruptcy Code Section 363. The pleadings to establish bidding procedures and to begin the sale process will either be filed concurrently with the Debtors' petitions, or shortly thereafter.

## C. General Statement on First Day Pleadings

20. Through its first-day pleadings discussed below, the Company does not ask for remarkable or unreasonable relief. Instead, it merely asks that this Court allow it to maintain the status-quo, and allow it to continue to operate as a profitable business. While the Company certainly plans to make changes in the coming months, forced change at the outset of this

extremely stressful bankruptcy process would be detrimental to the continued operations of the business, and jeopardize the Debtors' sale efforts.

## II.
## FIRST DAY PROCEDURAL MOTIONS

21.     Contemporaneously with the filing of their Chapter 11 petitions, the Debtors filed several emergency procedural motions seeking entry of first day orders that they believe are necessary to enable them to operate in Chapter 11 with a minimum amount of disruption and loss of productivity and goodwill.

### A.     REQUEST FOR EMERGENCY CONSIDERATION OF CERTAIN "FIRST DAY" MATTERS.

22.     Because certain relief requested in the Company's first-day motions requires immediate attention, the Company filed their Request for Emergency Consideration of Certain First-Day Matters.

### B.     EMERGENCY MOTION FOR ORDER DIRECTING JOINT ADMINISTRATION OF CASES.

23.     Joint administration of the Debtors' cases is proper because most of the Company's debts are guaranteed or joint obligations.  Additionally, joint administration is proper because of the Company's ownership structure.  Joint administration for procedural purposes of these cases will avoid considerable unnecessary delay and expense by obviating the need for the Company to file duplicative motions and applications and for the Court to enter duplicative orders in each of these Chapter 11 cases.  Joint administration will also avoid the burdensome necessity of duplicating notices to numerous creditors.  Therefore, as more fully explained in the Company's Motion for Order Directing Joint Administration, joint administration, for procedural purposes only, is proper under the Bankruptcy Code and Rules.

24.     Finally, the Company also requests that the Clerk of this Court make separate docket entries in each of the above-captioned cases substantially as follows:

> The Bankruptcy Court has entered an order in accordance with Federal Rule of Bankruptcy Procedure 1015(b) that provides for the joint administration of the Chapter 11 cases of Redwine Resources, Inc. and its affiliates. The docket in Case No. 10-_____-11 should be consulted for all matters affecting the above-listed cases.

### C.     MOTION TO AUTHORIZE THE DEBTORS TO LIMIT THE BANKRUTPCY RULE 2002 SERVICE LIST.

25.     The Company requests that it be allowed to serve certain Oklahoma governmental agencies on behalf of multiple parties in interest, namely royalty interest owners. As detailed in the applicable motion and attached exhibit, the Company does not have personal addresses for many of the royalty owners on that list. In those cases, the Company sends correspondence to the Oklahoma State Treasurer or the Oklahoma Corporations Commission. It would be a waste of the estates' limited assets to serve these entities the same documents multiple times throughout this case. Without relief on an emergency basis, the Debtors, and other parties in interest, will likely incur substantial additional service costs which will be immediate and irreparable.

### III.
### FIRST DAY RETENTION MOTIONS

26.     Similar to the Company's requests for certain procedural relief on the first day, the Company also requests that this Court allow it to retain certain professionals, consultants and its attorneys on an interim basis as of the Petition Date, allowing it a smooth transition into bankruptcy, and allowing it to protect its interests and operate in the ordinary course once it is in bankruptcy.

### A.     DEBTORS' APPLICATION PURSUANT TO SECTION 327(A) OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING THE EMPLOYMENT OF ROCHELLE MCCULLOUGH LLP AS COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION.

27.     The Company has filed an application with the court to have Rochelle McCullough LLP ("RM") hired as the Company's counsel, all as detailed in the Application for an Order Approving the Employment of Rochelle McCullough LLP as Counsel for Debtors and Debtors-in-Possession.  The Company selected RM to work with them on this filing, and the firm has been working diligently with the Company on the many difficult and complex issues facing it, is well-versed on the unique challenges facing the Company in its efforts to sell assets and reorganize, has proven that it is invaluable in addressing the Company's restructure and reorganization, and is highly qualified to render the legal services which the Company desperately needs at this time.  After due deliberation by the Company, RM is the counsel of choice in the exercise of its business judgment to represent it in its reorganization efforts and bankruptcy filings.  If the Company does not have unfettered and unqualified access to RM as its counsel, and the Company has no legal representative qualified to represent it at hearings during the first twenty (20) or more days of these cases, it is my informed opinion that it would be immediately harmed and that harm would be irreparable.  In my opinion, there is far too much at stake for the Company and its creditors with respect to preserving the value of the Company as a going concern, and a loss of counsel would greatly jeopardize the outcome of this case.  Time is of the essence.  Any time without RM as counsel or having its capacity as counsel challenged would be extremely prejudicial to the Company's interests.

**B.      DEBTORS' APPLICATION FOR ORDER PURSUANT TO SECTION 327(A) AND 328(A) AUTHORIZING THE EMPLOYMENT AND RETENTION OF BBK, LTD. AS FINANCIAL CONSULTANTS FOR DEBTORS AND DEBTORS-IN-POSSESSION.**

28.     As part of its reorganization efforts, the Company initially retained Tatum, LLC on March 3, 2009.  After my transition to BBK, Ltd., the Company engaged BBK, Ltd. as financial consultants per an engagement letter signed May 10, 2010.

29.     BBK, Ltd., has helped and is helping the Company in connection with its financial issues, including assisting the Company with its obligations under the Pre-Petition Credit Agreement, and assisting the Company with the sale of its assets. It is my opinion that the retention of BBK, Ltd., is important to the ability of the Company to achieve a successful sale of its assets as a going concern, to manage its finances, cash flow, and budget,  and to comply with its financial obligations during these bankruptcy cases.  A failure to grant the relief requested would cause the Company to suffer immediate and irreparable harm.

## IV.
## FIRST DAY BUSINESS OPERATIONS MOTIONS

30.     The Company asks for certain first day relief to allow it to continue operating its business in the ordinary course on a postpetition basis.  The relief requested includes allowing the Company to use cash collateral on an interim basis, allowing it to maintain existing bank accounts, business forms, and its current cash management system, and honoring certain pre-petition employee obligations.  In my judgment, this relief is vital to the Company's ability to operate on a going-concern basis post-petition, and will enable it to effectively operate in chapter 11 and achieve a successful sale of its assets.  Conversely, if the Company is not granted the relief it seeks by these motions, it will be susceptible to uncertainties, will have no access to cash to fund its employee or vendor obligations, its cash management system will be thrown into chaos, and certain issues may arise with respect to leases as a result of not paying working interest and/or royalty interest owners.  Because of this, it is extremely important that the relief requested in the motions summarized below be granted on an interim basis.

### A. EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL.

31. The Company needs immediate access to its cash, which may constitute the cash collateral of certain creditors, in order to pay its employees, maintain services, operate and preserve its business, and meet its administrative responsibilities in these Chapter 11 bankruptcy cases. The Company has no source of unencumbered cash with which to operate its business, and therefore cash collateral must be utilized. The use of cash collateral by the Company is necessary on an emergency basis in order to avoid an interruption of its business and the imminent, irreparable harm to its bankruptcy estates that would result from its failure to pay wages and other basic expenses of day-to-day operations.

32. In consideration for the interim use of cash collateral, and as adequate protection for any diminution of the interest of pre-petition secured creditors in the prepetition collateral to which, the Company plans to provide adequate protection in the form of, *inter alia,* replacement liens, super-priority administrative expense claims (if necessary), weekly and monthly reporting, and segregation. The Debtors will also maintain adequate insurance coverage and operation production in relation to the Collateral and timely pay all post-petition taxes assessed and royalties due.

### B. MOTION FOR ORDER AUTHORIZING OF ORDER AUTHORIZING (I) BANKS TO HONOR DEBTORS' REPRESENTATIONS; (II) DEBTORS TO MAINTAIN EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM, AND MODIFY AS NECESSARY; AND (III) DEBTORS TO CONTINUE USE OF PREPETITION CHECK STOCK

33. Like any similarly-sized company, the Company maintains significant stock of certain per-printed business forms and checks. Because they were all printed on a prepetition basis, none of these forms have the annotation "Debtor-in Possession," and the case number, printed on them as required by the U.S. Trustee Guidelines. As it would be extremely expensive,

and disruptive for the Company to have all such pre-printed business forms and checks re-printed with the moniker "Debtor-in-Possession" affixed thereon, the Company proposes to stamp the same on each set of checks and/or forms until the Company's supply of pre-printed forms runs out. The Company requests that the Court approve this procedure as being in the best interests of its bankruptcy estate. To the extent the Company's software to print checks and other business forms, and it has the ability to print "Debtor-in-Possession" and the case number on all such checks and forms following the Petition Date, it will do so.

34. Further, as described in the applicable motion, the Company operates in a complex financial environment where it, among other things, collects royalty and working interest owner payments from production of its existing properties. Accordingly, the Company requests authority to continue to use its existing cash management system without being required to open new or additional bank accounts, or change its operating relationships with any of its subsidiaries. Because its operations are complex, and because maintaining its business relationships is so critical at this juncture, requiring the Company to alter its cash management system would greatly harm its ability to reorganize. The Debtors also request the authorization to modify its cash management system as needed. One such modification that will be needed and is required by Bank of America for use of cash collateral is the opening of a bank account to be established post-petition will hold all Suspended Royalty Payments (as defined in the order approving the Debtors' use of cash collateral). This account, the "<u>Suspended Royalty Account</u>", will be a blocked account opened at Bank of America, N.A., and all funds deposited into this account will not be withdrawn or disbursed absent further order from the Court.[2]

---

[2] Pre-petition, the Debtors disputed, and continue to dispute, the payment of certain royalties based upon issues of title. The Debtors did not have a separate account to hold such royalty payments. Post-petition, the Suspended

**V.**
**FIRST DAY BUSINESS CONTINUITY MOTIONS**

35.     Through its first-day pleadings discussed below, the Company does not ask for remarkable or unreasonable relief.  Instead, it merely asks that this Court allow it to maintain the status-quo, giving it time to, *inter alia,* sell its assets.

36.     The Company must continue business-as-usual operations to preserve the value of the estates' assets and maximize the sale price of its assets.  To maintain such operations, the Company requires immediate relief on several different, but interrelated fronts.  Such relief is absolutely necessary to the survival of the Company, and any attempt to postpone such relief would only serve to harm the value of the bankruptcy estates and jeopardize its sale efforts.

**A.     MOTION TO HONOR PREPETITION COMPENSATION AND BENEFITS OF EMPLOYEES.**

37.     Through the Company's Motion to Honor Prepetition Compensation and Benefits of Employees (the "Employee Motion"), the Company requests that this Court enter an Order, authorizing it to pay (i) various employee-related prepetition obligations to, or for the benefit of, currently active employees, including claims for (A) salary, wages, and vacation and reimbursement of expenses, and (B) employee benefits, including health insurance.

38.     The Company employs approximately 22 employees, and all are critical to the operations of the Company and who are needed to successfully sell the Debtors' assets as a going concern in these bankruptcy cases.

**1.      Employee Wages, Salaries, and Benefits**

---

Royalty Account will be funded on a monthly basis with the amounts owed on account of the Suspended Royalty Payments.

39.     As discussed in more detail in the Employee Motion, the employees have been paid weekly in arrears.  The Debtors last paid employees for wages and salaries earned through the Petition Date.  As a result, as of the Petition Date, all employees should be paid current.  Out of an abundance of caution, if any employee has not been his or her regular wages and salary through the Petition Date, the Company requests authority to pay any such prepetition amounts.

40.     The Company also provides its Employees with certain other Employee Benefits, as more fully discussed in the Employee Motion, including medical, dental, and prescription drug benefits, paid vacation, sick leave, and cellular telephone reimbursement.  The Company requests, through the Employee Motion, that it be allowed to honor its benefits obligations to its Employees in the ordinary course of business as of the Petition Date.  Any delay or failure to pay these benefits would irreparably impair the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Company's relationship with the employees when the employees' support and extra efforts are critical to these chapter 11 cases.  The Company cannot risk the substantial damage to their businesses that would likely result.  Further, if these benefit programs are not continued, the employees will suffer undue hardship, and possibly, serious financial difficulties.

### 2.     Payroll Deductions.

41.     In the ordinary course, the Company also collects from each Employee's regular wages, and remits to the appropriate authorities, certain amounts for Employee Benefit coverage and certain federal, state and local taxing obligations.  As of the Petition Date, the Company may have collected, but not remitted, certain Payroll Deductions and Benefit Deductions, and maintains that such funds are not property of the estate.  Regardless, out of an abundance of caution, the Company requests, through the Employee Motion, that it be allowed to remit such

funds to the proper parties, and further requests the authority to collect and continue to remit such Payroll and Benefits Deductions in the ordinary course of business on a postpetition basis.

**B.   DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO HONOR CERTAIN PRE-PETITION OBLIGATIONS TO WORKING INTEREST OWNERS, ROYALTY INTEREST OWNERS, JOINT INTEREST OPERATORS, AND MECHANICS AND MATERIALMEN; AND TO CONTINUE SUCH PAYMENTS POST-PETITION IN THE ORDINARY COURSE OF BUSINESS.**

42.     In the ordinary course of its business, the Debtors (i) receive production proceeds from oil and gas wells in Texas, Oklahoma and certain of the other above-referenced states; and (ii) receive invoices from (A) joint interest operators of natural gas wells pursuant to joint operating agreements for the Debtors' share of expenses related to the wells' operations, and (B) certain other mechanics or materialmen who provide goods, services, or labor on the wells.

43.     In accordance with its customary practice, the Debtors disbursed amounts due to working interest and royalty interest owners pre-petition, and paid joint interest operators and mechanics and materialmen for services and expenses.

44.     In my opinion, it is critical that the Debtors remain current with their obligations, consistent with their pre-petition practices, to working interest owners, royalty interest owners, joint interest operators, and mechanics and materialmen, in order to maximize the Company's chances to effectively reorganize. The failure to pay the working interest owners or royalty interest owners may result in defaults under the Debtors oil and gas leases, which are the principal assets of the Debtors' estates. Further the failure to pay all of these constituencies could result in the creation of liens under the applicable state laws. Further, the Debtors seek authority to continue paying working interest, royalty interest owners, joint interest operators, and mechanics and materialmen, in the ordinary course of business on a post-petition basis.

**C.    DEBTORS' EMERGENCY MOTION FOR ORDER (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES ON ACCOUNT OF PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE**

45.    Several utility companies provide the Debtors with traditional utility services (the "Utility Companies"), such as telephone, communications services, electricity, water, gas, and other similar services that are necessary for the continued operation of the Debtors' daily operations.  A list of the all identified Utility Companies for the Debtors is attached to the motion as an exhibit.  In some case, the Debtors have paid a security deposit to the Utility Company.

46.    Uninterrupted utility service is critical to the Debtors' ability to operate and maintain the value of their businesses and to maximize value for the benefit of the creditors.  The Debtors cannot operate their businesses without utility service.  Should any Utility Company refuse or discontinue service, the Debtors would be forced to cease or limit operations.  Such an interruption would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtors.

**D.    DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTORS TO PAY PREPETITION SALES, USE, PROPERTY, PRODUCTION, AND OTHER TAXES AND RELATED OBLIGATIONS**

47.    In the ordinary course of business, and as part of their operations, the Debtors incur, or collect, various taxes, including sales and use taxes, production taxes, employment taxes, and other taxes.  Before the Petition Date, the Debtors generally paid all undisputed taxes in a timely fashion in accordance with and subject to applicable grace periods, if any.  The Debtors believe they are current on all taxing obligations, and that most of the taxes the Debtors will pay post-petition will arise post-petition.  But, some of the taxes that are due post-petition may be on account of pre-petition activity.  For example, the Debtors pay "severance and

production" taxes on the extraction of gas, and such amounts are usually a percentage of revenues. At least the first payment post-petition on account of these taxes will be for the extraction of gas pre-petition. As a result, the Debtors seek authority to pay all undisputed taxes as they come due, on account of pre-petition or post-petition activity, in the ordinary course. Lawsuits to collect taxes would be extremely distracting for the Debtors and their management. It is therefore in the best interest of the Debtors' estate to eliminate the possibility of such issues or distractions, by authorizing the Debtors to pay these taxes post-petition.

E.     **DEBTORS' EMERGENCY MOTION FOR AUTHORIZATION TO MAINTAIN INSURANCE FINANCING AND INSURANCE POLICIES AND TO PAY CERTAIN PRE-PETITION INSURANCE-RELATED OBLIGATIONS DEBTORS TO PAY PREPETITION SALES, USE, PROPERTY, PRODUCTION.**

48.     In the ordinary course of business, the Company must maintain certain different types of insurance, including insurance for property, casualty, equipment, general commercial liability, automobile, airplane, oil and gas, workers' compensation, and pollution.

49.     The premiums for the Company's property, casualty, and equipment insurance policies are financed through a premium financing arrangement with Premium Financing Specialists, Inc.. As of the Petition Date, the balance due under the Premium Financing Agreement is $14,790.80, and the final payment will be due on October 18, 2010. In the ordinary course of business Redwine Resources, Inc. makes monthly payments of $2,958.16 through the premium financing arrangement.

50.     Through the Company's Motion for Authorization to Maintain Insurance Financing and Insurance Policies and to Pay Certain Pre-Petition Insurance Related Obligations, the Company seeks authority to continue to make payments under its premium financing

arrangement, and to continue making payments in the ordinary course on all of the Company's insurance policies.

51.     The payment of these amounts is necessary for the Company to perform its duties as a debtor-in-possession, which I am informed and understand include maintaining adequate and appropriate insurance.  In addition, the payment of such amounts is necessary to permit the Company to continue to comply with applicable regulations and contractual obligations that are essential to the operation of the Company's business.  Moreover, the payment of these amounts will enhance the value of the Company on a going-concern basis and enhance the Company's estate.

52.     Accordingly, it is critical that the Company be permitted to pay the insurance premiums under the premium financing arrangement and to pay all other insurance premiums in the ordinary course of business.  Absent such authority, the Company will suffer immediate and irreparable harm.

### F.     DEBTORS' EMERGENCY MOTION FOR AUTHORIZATION TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS

53.     A list of the Critical Vendors utilized by the Debtors is attached to the motion as Exhibit A.  Each of the Critical Vendors provides critical and necessary services to the Debtors. The Debtors have analyzed the list of Critical Vendors and believe the list to reflect only those vendors whose goods and services are of great necessity on a going-forward basis.  In each instance, the failure to pay the Critical Vendors for their goods and services would likely result in severe disruption or even cessation of certain operations, thereby undermining certain of the Debtors' ongoing operations, revenues derived therefrom, and efforts to sell their assets.

54.     The payment of the Critical Vendors is necessary to preserve the value of the Debtors' businesses and operations.   The Debtors are substantially current on prepetition invoices.

55.     Further, because some of the Critical Vendors are single service providers, many of who operate in remote locations, the ability of the Debtors to procure alternate providers would be extremely difficult if not impossible.   Should any of the Critical Vendors delay or cease providing their goods and services, even on a temporary basis, the Debtors' businesses could be greatly disrupted and harmed.   Therefore, the Debtors must provide payment to all Critical Vendors to avoid economic harm and preserve the value of the bankruptcy estates.

FURTHER AFFIANT SAYETH NOT.

_____
Lyndon James

STATE OF TEXAS        )
                                   )
COUNTY OF DALLAS    )

SWORN TO AND SUBSCRIBED BEFORE ME this 4th day of June, 2010, by Lyndon

James who is personally known to me and who did take an oath.

_____
Notary Public, State of Texas

My Commission Expires: __5/7/2011__



MARTHA H. SPAULDING
Notary Public, State of Texas
My Commission Expires
May 07, 2011