Michael R. Rochelle
State Bar No.17126700
Chris B. Harper
State Bar No. 09025500
Eric M. Van Horn
State Bar No. 24051465
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182
F: (214) 953-0185

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REDWINE RESOURCES, INC.** | § | **CASE NO. 10-34041** |
| **BADGER DRILLING COMPANY, LLC** | § | **CASE NO. 10-34046** |
| **WHITE OAK RESEROUCES, LLC** | § | **CASE NO. 10-34054** |
| **REDWINE OIL AND GAS PROPERTIES LLC** | § | **CASE NO. 10-34052** |
| **REDWINE ROCKIES, LLC** | § | **CASE NO. 10-34053** |
| **REDWINE OIL AND GAS, LLC** | § | **CASE NO. 10-34050** |
| **REDWINE AVIATION INC.** | § | **CASE NO. 10-34047** |
| **REDWINE KINTA RANCH, LLC** | § | **CASE NO. 10-34051** |
| | § | |
| **DEBTORS** | § | **CHAPTER 11** |
| | § | |
| | § | **JOINT ADMINISTRATION** |
| | § | **REQUESTED** |

**DEBTORS' MOTION FOR AUTHORIZATION OF:**
**(I) BID PROCEDURES FOR SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY AND**
**RESIDUAL ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE (III) FORM OF**
**NOTICES; (IV) PROCEDURES RELATING TO ASSUMPTION/ASSIGNMENT AND/OR**
**TRANSFER BY AGREEMENT OF CERTAIN CONTRACTS; (V) BID PROTECTIONS;**
**AND (VI) FOR OTHER RELIEF**

TO THE HONORABLE BARBARA J. HOUSER, CHIEF UNITED STATES BANKRUPTCY
JUDGE:

The above-referenced Debtors (collectively, the "Debtors") hereby file this Motion for

Authorization of: (i) Bid Procedures for Sale of Primary Assets, Kinta Ranch Property and

Residual Assets; (II) Scheduling Hearing to Consider Sale; (III) Form of Notices; (IV) Procedures

Relating to Assumption/Assignment and/or Transfer by Agreement of Certain Contracts; (V) Bid Protections; and (VI) For Other Relief (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

## I. JURISDICTION AND VENUE

1.      This Court (the "Bankruptcy Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a) and 1334.

2.      The Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested here are sections 105, 363, 365 and 503(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. PROCEDURAL BACKGROUND

4.      On June 4, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby initiating the above-referenced cases with the Bankruptcy Court (collectively, the "Bankruptcy Cases").  Currently pending in each of the Bankruptcy Cases is a motion for joint administration of the Bankruptcy Cases under Case No. 10-34041.

5.      As of the date hereof, no Committee of Unsecured Creditors has been appointed in the Bankruptcy Cases.

## III. SUMMARY OF RELIEF REQUESTED

6.      The Debtors intend to sell substantially all of their assets (collectively, the "Assets"), comprised of the Primary Assets, the Kinta Ranch Property and the Residual Assets (all more fully described below), in one or more sales (the "Sales") following the solicitation of bids and an auction in relation to those Assets for which competing qualified bids are timely received from qualified bidders.  In connection with the Sales, the Debtors also intend to assume and assign certain executory contracts and unexpired leases to the purchaser(s) in such Sales (collectively, the "Assigned Agreements").  By and through this Motion, and in furtherance of the sales effort, the Debtors respectfully request entry of an order substantially in the form of the proposed order attached here as **Exhibit "A"** (the "Sale Procedures Order"):

a)      Approving bid procedures in the form of Exhibit "1" to the proposed Sale Procedures Order (the "Bid Procedures");

b)      Scheduling a date, time and place for a hearing on the Debtors' Sale Motion (as defined below) (the "Sale Hearing");

c)      Establishing a deadline for the filing of objections to the Sale Motion (the "Sale Objection Deadline");

d)      Approving procedures for the provision of notice to non-debtor counterparties to Assigned Agreements (collectively, the "Contract Counterparties") of the Debtors' intention to assume and assign the Assigned Agreements, of the Cure Amounts (as defined below), if any, proposed by the Debtors in connection therewith, and of opportunity and method by which Contract Counterparties may object to assumption/assignment and/or the Cure Amounts proposed (collectively, the "Cure Procedures");

e)      Establishing a deadline (the "365 Objection Deadline") for the filing of objections by Contract Counterparties to the assumption/assignment of the Assigned Agreements (an "Assignment Objection") and Cure Amounts proposed (an "Cure Amount Objection");

f)      Approving the form and manner of notice for the provision of notice to parties in interest of the Bid Procedures, Auction, the Sale Hearing, the Sale Objection Deadline, the proposed assumption and assignment or transfer by agreement of Assigned Agreements and the Cure Amounts (if any) associated therewith, and the 365 Objection Deadline (collectively, the "Notice Procedures");

g)     Approving Bid Protections (as defined below) afforded to the Stalking Horse Bidder (as defined below) in connection with the Stalking Horse Bidder's execution of a binding agreement to acquire the Primary Assets and the Kinta Ranch Property, subject to the possible submission of higher and better bids for such Assets;

h)     Approving procedures for the sale of Residual Assets of *de minimis* value, on a relative basis, for which the Debtors fail to receive acceptable bids during the sales process under the Bid Procedures (the "*De Minimis* Sales Procedures"); and

i)     Waiving the automatic fourteen (14) day stay provided by Bankruptcy Rules 6004 and 6006, to the extent applicable to the Sale Procedures Order, so that the order is effective and enforceable immediately upon entry on this Court's docket.

## IV. THE PROPOSED SALE OF ASSETS

7.     As explained in greater detail in the Declaration of Lyndon James in Support of Debtors' Voluntary Petition Under Chapter 11 of Title 11 of the United States Code and First Day Motions [Docket No. 17] (the "James Declaration"), between 1982 and 2005, the Debtors acquired various oil and gas leases, drilled wells, and purchased certain additional interests in oil and gas projects in Oklahoma, Colorado, New Mexico and Wyoming. Redwine Oil and Gas Properties, LLC is a holding company. Redwine Resources, Inc. is the primary operating company of the eight Debtors and it is in the business of exploring for and producing oil and natural gas, with the bulk of the assets being natural gas reserves. The remaining Debtors were organized for the purpose of acquiring particular assets and/or conducting specific operations, as explained in the James Declaration.

8.     The Debtors have contemporaneously, or will shortly hereafter, file their Motion for Order Authorizing Sale, Approving Model APA, Approving Assumption and Assignment, and Authorizing *De Minimis* Sales (the "Sale Motion"), pursuant to which the Debtors are requesting approval of the Sales of Assets (following the sales process contemplated under the Bid

Procedures), approving assumption and assignment of the Assigned Agreements, and requesting related relief.

9. As discussed in the Sale Motion, prior to the Petition Date, the Debtors explored the possibility of a restructuring of their indebtedness to the major secured creditor in these cases, Bank of America, N.A. (the "Secured Lender"), a reorganization of their businesses, and the sale of their Assets. When gas prices failed to improve markedly by year-end 2009, the Debtors shifted their full attention to the possible sale of their Assets, engaged in discussions with various possible purchasing entities, and solicited expressions of interest for the acquisition of the Assets. The Sale Motion provides additional detail regarding the Debtors' Marketing Efforts.[1]

10. Ultimately, only one party – Longroad Capital Partners III, L.P. ("Longroad" or the "Stalking Horse Bidder") – stepped forward with a firm proposal, and Debtors Redwine Resources, Inc.; Redwine Oil and Gas Properties, LLC; Redwine Rockies, LLC; Redwine Oil and Gas, LLC; and Redwine Kinta Ranch, LLC (collectively, the "Pending Sale Debtors") and Longroad have entered into an Asset Purchase and Sale Agreement, dated as of June 8, 2010 (the "Stalking Horse APA"), for the Pending Sale Debtors' sale, and Longroad's purchase, of the Primary Assets (a majority of the Assets – which are defined in the Stalking Horse APA as the "Purchased Assets") and Kinta Ranch Property, subject to the terms and conditions of the Stalking Horse APA, the possibility of a higher and better offer under the sales process proposed under the Bid Procedures, and approval of the Court. A copy of the Stalking Horse APA is attached hereto as **Exhibit "B"**.[2]

---

[1] Capitalized terms shall have the same meanings ascribed to them in the Bid Procedures unless otherwise defined herein.

[2] While attached hereto as an exhibit, the Stalking Horse APA is not being served on parties in connection with service of this Motion due to its length. However, any party in interest may obtain an electronic copy of the Stalking Hose APA by submitting a written request to counsel for the Debtors.

11.     As discussed in the Sale Motion, the Debtors have marketed their Assets for sale in a manner calculated to bring the best and highest return for creditors.  The Debtors propose to sell the Primary Assets, Kinta Ranch Property and remaining Assets (referred to as the "Residual Assets") (each such Asset or category of Assets referred to herein as a "Sale Item") at an open, no-reserve auction (the "Auction") following the Bid Procedures summarized herein and detailed in Exhibit "1" to the proposed Sale Procedures Order.  In connection therewith and by virtue of, and in accordance with, the Stalking Horse APA, the Debtors propose to appoint Longroad as the "stalking horse" bidder for the Primary Assets and Kinta Ranch Property, thereby subjecting Longroad's agreement to higher and better bids.

12.     For any Residual Assets which are not sold at Auction or included in a closing, the Debtors propose to conduct *de minimis* sales below $500,000.00 (the "*De Minimis* Sales") without further order of the Bankruptcy Court in accordance with the procedures proposed here.

## V. PROPOSED SALE PROCEDURES

13.     The Debtors propose to conduct the Auction at the offices of Rochelle McCullough, LLP, 4500 Republic Center, 325 North St. Paul St., Dallas, Texas, 75201, on a date to be set by the Court approximately thirty to forty-five days after the approval of the procedures sought by this Motion.

14.     At the conclusion of the Auction, the Debtors will select the highest and best final bid for Asset lot (the "Successful Bid" and the bidder making such bid, the "Winning Bidder") and the second highest and best bid (each a "Cover Bid" and the bidder making such bid, a "Backup Bidder") for each Sale Item.

15.     Following the Auction, the Debtors will provide notice of the Successful Bid and Cover Bid to any Committee which has been appointed, Longroad and each Qualified Bidder (as

defined below) that participates in the Auction. The Debtors will also seek approval of the proposed transaction(s) at the Sale Hearing. Upon Bankruptcy Court approval, the Successful Bidder will be required to comply with the Bid Procedures and proceed to a closing at a time and place agreed to with the Debtors.

16. On account of Longroad's commitment to purchase the Primary Assets and Kinta Ranch Property and to subject the agreement to the sales process established under the Bid Procedures, the Debtors have agreed to provide specific Bid Protections to Longroad described below.

17. If the Debtors fail to receive a Qualified Bid submitted by a Qualified Bidder for the Primary Assets and Kinta Ranch Property (other than the agreement of Longroad), or the bids received by the Debtors are otherwise unacceptable, the Debtors reserve the right to cancel the Auction with respect to such Assets and seek approval at the Sale Hearing of the Stalking Horse APA with Longroad. If there are no acceptable bids received for the Residual Assets, the Debtors seek authority to conduct *de minimis* sales for any unsold Residual Assets under the *De Minimis* Sales Procedures.

## VI. PROPOSED BID PROCEDURES

18. The Debtors and their professionals have designed the Bid Procedures described below to both (a) subject the Stalking Horse APA to higher and better offers and a possible Auction, and (b) solicit bids for the Residual Assets, with a possible Auction. Accordingly, the Debtors seek the Court's approval of the following Bid Procedures summarized below.[3]

---

[3] To the extent that the following summary conflicts with, or differs from, the procedures as set forth in Exhibit "1" to the proposed Sale Procedures Order, the procedures in Exhibit "1" will control. Moreover, any capitalized term in the summary of the Bid Procedures that is not otherwise defined herein shall have the meaning ascribed to it in the Bid Procedures.

## A.     Assets to Be Sold.

19.     The Debtors are offering the Primary Assets, Kinta Ranch Property and Residual Assets for sale.  In relation to the Primary Assets, the Debtors propose to solicit offers under substantially the same terms and conditions as the Stalking Horse APA, with the exception of the consideration proposed and the bid protections (which will only apply to Longroad) (such form with such exceptions, the "<u>Primary Assets APA</u>").  In relation to the Kinta Ranch Property and Residual Assets, the Debtors propose to solicit offers under substantially the same terms and conditions of an approved form of Asset and Purchase Agreement (the "<u>Model APA</u>").  The Debtors shall retain all rights and title to all assets and related property not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court.

## B.     Notice to Parties.

20.     Within two (2) business days of entry of the Sale Procedures Order, the Debtors will serve a copy of the Sale Procedures Order with exhibits[4] on all entities listed on the current Master Service List, known parties that have or may assert a lien on or security interest in some or all of the Primary Assets, Kinta Ranch Property and Residual Assets, known Contract Counterparties to the Assigned Agreements, and all parties who previously contacted the Debtors and/or their professionals to express a bona fide interest in acquiring some or all of the Primary Assets, Kinta Ranch Property and Residual Assets or otherwise exhibited a realistic intention to participate in the sales process.

---

[4]     Exhibits to the Sale Procedures Order include the Bid Procedures (Exhibit "1"), a proposed Sale and Auction Notice (Exhibit "2"), and proposed Cure Amount Notice (Exhibit "3") which, along with the Sale Procedures Order, provide notice of the place, time and date of the Auction, Sale Hearing and other relevant information required under Bankruptcy Rules 2002, 6004 and 6006.  Together, the Sale Procedures Order and its exhibits provide all necessary information for Interested Parties to participate in the sale process, and include, without limitation, notice of the proposed assumption and assignment or transfer by agreement of Assigned Agreements, the deadline for the submission of objections to the Sale(s), and the deadline for the submission of objections to the assumption/assignment of Assigned Agreements and proposed Cure Amounts.

21.     Within five (5) business days of the entry of the Sale Procedures Order, the Debtors shall cause *The Dallas Morning News*, plus such other local newspapers as may give appropriate additional notice in areas where the Debtors maintain operations, to publish notice of the proposed Sale.  The notice by publication shall provide (i) a general description of the Assets for sale; (ii) the Bid Deadline (as defined below); (iii) the time, date and place of the Sale Hearing; (iv) the Sale Objection Deadline; (v) the 365 Objection Deadline; and (iv) the means by which interested parties may obtain a copy of the Bid Procedures, the Sale and Auction Notice, the Cure Amount Notice and the Sale Motion.

**C.     Bids**

22.     All bids (each a "Bid") on the Primary Assets, Kinta Ranch Property and Residual Assets must be in writing and be accompanied by other required information and documentation (as specified in the Bid Procedures) (collectively, the "Bid Package"), and must be received by the Debtors at the offices of their counsel on or before 12:00 p.m. (CDT), on a date to be set by this Court (the "Bid Deadline"), in order to be treated as timely and qualified.

23.     All Bids shall be for cash (and the possible assumption of certain liabilities), with no financing or further due diligence contingency or condition.

24.     The Debtors reserve the right, after consulting with their professionals and Oversight Parties (comprised of the Secured Lender and its counsel and other professionals, and any committee of creditors appointed by the U.S. Trustee and its counsel and other professions), to accept a credit bid from an Interested Party as part or all of such Interested Party's Bid.

**D.     Qualified Bids.**

25.     In order for a Bid to qualify for consideration (a "Qualified Bid"), the Bidder's Bid Package must include:

a) A written Bid, executed by the Bidder or its duly-authorized representative, setting forth the Assets sought to be acquired by the Bidder, the consideration offered, and the Bidder's commitment to the open and irrevocable nature of the Bid (during the periods of time more fully set forth in the Bid Procedures);

b) Satisfactory financial information demonstrating an ability to close the purchase and perform all ongoing obligations associated therewith;

c) Evidence of requisite internal authorizations and approvals;

d) Specific information required (or potentially required) under the Court's local rules with respect to connections and intentions as to the employment or retention of employees of the Debtors;

e) An executed definitive agreement in substantially the same form as the Primary Assets APA (if the Bid is for the Primary Assets) or the Model APA (if the Bid is for the Kinta Ranch Property and/or some or all of the Residual Assets), along with a redline reflecting any differences between the submitted definitive agreement and such approved form agreements;

f) An executed escrow agreement (the "Escrow Agreement") for the establishment of an escrow account (an "Escrow Account") with Bank of America, N.A., as escrow agent (the "Escrow Agent"), and receipt of the Bidder's Deposit (as defined herein); and

g) A deposit in amount not less than (i) $500,000, in the case of a Bid to purchase the Primary Assets, (ii) $75,000, in the case of a Bid to purchase the Kinta Ranch Property, (iii) such other amount as to be determined by the Debtors in consultation with the Oversight Parties, in the case of a Bid to purchase all or some of the Residual Assets, or (iv) the combined amount of all applicable amounts set out above, in the case of a Bid to purchase any combination of the foregoing categories of Assets (the "Deposit"), which shall be made by cashier's check made payable to the Escrow Agent.

26. In the case of a Bid to purchase the Primary Assets, the Bid must exceed the Purchase Price (as defined in the Stalking Horse APA) by at least the sum of $200,000 more than the maximum amount of the Bid Protections (detailed below). In the case of a Bid to purchase the Kinta Ranch Property, the Bid must exceed the amount of $500,000 and the Bidder must agree to be bound by the terms of a surface use agreement (having terms consistent with the "Surface Use Agreement-Kinta Ranch" as defined and described in the Stalking Horse APA) in the event the Primary Assets are sold to Longroad.

27. Any Interested Party who submits a Bid satisfying all of the necessary requirements for bidding shall be deemed a "Qualified Bidder" and each Bid of such Qualified Bidder shall be deemed a "Qualified Bid". Each Qualified Bidder shall be notified of such designation by the Debtors. Only Qualified Bidders shall be allowed to participate at the Auction. An Interested Party who has timely submitted a written Bid but has failed to satisfy all necessary requirements shall be promptly notified by the Debtors and given an opportunity to promptly cure such defects at the Debtors' sole discretion and satisfaction.

28. By 5:00 p.m. (CDT) on the Bid Deadline, the Debtors shall provide to the Oversight Parties a copy of all Bids received by the Bid Deadline. Thereafter, the Debtors, in consultation with the Oversight Parties, will determine which of those Bids are Qualified Bids and which of the Interested Parties that submitted timely Bids are Qualified Bidders. By approximately 5:00 p.m. (CDT) on the first business day following the Bid Deadline, the Debtors shall provide to the Oversight Parties, counsel for Longroad, and each Interested Party that submitted a timely Bid with a list identifying which of the Interested Parties are Qualified Bidders, a summary of the Qualified Bids, and initial minimum increased Bid requirements ("Bid Increment") for purposes of the Auction.

**E.     The Stalking Horse Bid.**

29. The Debtors have chosen Longroad to act as the "stalking horse" bidder for the Primary Assets and Kinta Ranch Property. For purposes of the Bid Procedures, and on account of Longroad's execution of the Stalking Horse APA, Longroad will constitute a Qualified Bidder and its agreement will constitute a Qualified Bid for all purposes under the Bid Procedures. Under the terms of the Stalking Horse APA, Longroad is required to execute an Escrow Agreement and deposit $500,000 with the Escrow Agent within one (1) business day of entry of the Sale Procedures Order.

30. As explained above, the Debtors have agreed to provide specific Bid Protections to Longroad. Prior to the Petition Date, Longroad spent approximately three months conducting due diligence and negotiating with the Debtors and their advisors, in good faith, in formulating its offer for the Primary Assets and the Kinta Ranch Property and in preparing and negotiating the terms of the Stalking Horse APA. During this period of time, no other potential purchaser agreed to make a binding offer with respect to the Primary Assets or the Kinta Ranch Property. As a condition to Longroad's agreement to execute the Stalking Horse APA and to perform thereunder, Longroad required and the Debtors agreed to provide (subject to court approval) the Bid Protections, which are also included within the Stalking Horse APA.

31. The Debtors request approval of the following protections for the benefit of Longroad as the Stalking Horse Bidder (collectively, the "<u>Bid Protections</u>"):

(a) <u>The Expense Reimbursement</u>. The reimbursement of Longroad's fees, costs, and expenses, up to a maximum of $180,000.00, incurred in (a) investigating and analyzing the Debtors' business, the Primary Assets, the Operating Contracts (as defined in the Stalking Horse APA), the Kinta Ranch Property, the contracts and leases considered for assumption and assignment as Assigned Agreements, the nature and extent of Assumed Liabilities (as defined in the Stalking Horse APA), all schedules and exhibits supplied by the Debtors in connection with the Stalking Horse APA, and all other matters relating to the Stalking Horse APA, the Sale Documents (as defined in the Stalking Horse APA) and the transactions contemplated by the Stalking Horse APA, (b) negotiating, preparing, and reviewing, as applicable, the Stalking Horse APA, all other Sale Documents, and all motions, orders, and other papers related to the Stalking Horse APA, the Sale Documents and the transactions contemplated by the Stalking Horse APA, and (c) pursuing and otherwise facilitating the approval of the Stalking Horse APA and the transactions contemplated by the Stalking Horse APA. In the event that the Transactions (as defined in the Stalking Horse APA) are not consummated on or prior to the Termination Date (August 20, 2010, unless extended by the parties in writing) for any reason other than as a result of a material breach of the Stalking Horse APA by Longroad, Longroad shall be entitled to the Expense Reimbursement, which shall be paid to Longroad in the manner detailed in Section 9.03(c) of the Stalking Horse APA; and

(b) <u>The Termination Fee</u>. The payment of a fee equal to 2.50% of the Purchase Price (as defined in the Stalking Horse APA) in exchange for Longroad's binding commitment under the Stalking Horse APA and its agreement to submit the

Stalking Horse APA to the bidding process established by the Bid Procedures and to participate in any Auction in the event of the submission of one or more competing Qualified Bids by the Bid Deadline. In the event that either: (i) the Stalking Horse APA is terminated by Longroad because (A) Longroad is not selected as the Winning Bidder or the Backup Bidder in any Auction of the Primary Assets and five business days have elapsed since the Auction, or (B) the Debtors consummate an Alternative Transaction or Competing Transaction (as defined in the Stalking Horse APA); or (ii) both (A) the transactions contemplated by the Stalking Horse APA are not consummated on or prior to the Termination Date for any reason other than as a result of a material breach of the Stalking Horse APA by Longroad, and (B) within 12 months after the date of termination of the Stalking Horse APA the Debtors shall consummate an Alternative Transaction or Competing Transaction with a third party at a sale price equal to or in excess of the Purchase Price (whether or not such Alternative Transaction or Competing Transaction was proposed, contemplated or announced before or after the date of termination of the Stalking Horse APA); then Longroad shall be entitled to receive the Termination Fee, which shall be paid to Longroad in the manner detailed in Section 9.03(d) of the Stalking Horse APA.

32. As contemplated by the Stalking Horse APA and proposed under Sale Procedures Order, if the Debtors become obligated to pay the Expense Reimbursement and Termination Fee, then such obligation shall constitute an allowed administrative expense claim under Bankruptcy Code §§ 503(b) and 507(a)(2) and shall be payable without further order of this Court. However, if a Qualified Bidder other than Longroad is selected as the Winning Bidder for the Primary Assets and closes on such transaction, then the Expense Reimbursement and Termination Fee will be payable out of such Qualified Bidder's Deposit upon closing. Moreover, pending a closing of a sale to a party other than Longroad, but for no more than the earlier of thirty (30) days after the date of the Sale Hearing or the Termination Date under the Stalking Horse APA (August 20, 2010, unless extended by the parties in writing), Longroad shall remain obligated under the terms of the Stalking Horse APA.

33. The Bid Protections are the product of good faith, arm's length negotiations between the Debtors and Longroad. In the absence of the Debtors' agreement to the Bid Protections and the inclusion of the Bid Protections within the Stalking Horse APA, Longroad

was unwilling to make a binding offer for the Primary Assets and the Kinta Ranch Property and to enter into the Stalking Horse APA. In fact, approval of the Bid Protection is a condition precedent to Longroad's obligation to close on its purchase of the Primary Assets and the Kinta Ranch Property and, in the event the Bid Protections are not approved by the Court, then Longroad will have the right to immediately terminate the Stalking Horse APA and its obligations thereunder.

**F. The Auction**.

34.     The Auction will be conducted on a date to be set by this Court, at the offices of the Debtors' counsel, Rochelle McCullough, LLP, located at 4500 Republic Center, 325 North St. Paul, Dallas, Texas 75201, provided that there are Qualified Bids other than the Stalking Horse Bid.

35.     If there are no Qualified Bids for the Primary Assets and Kinta Ranch Property other than the Stalking Horse Bid, then no Auction will be conducted as to such Assets and the Debtors will pursue approval of the Sale to Longroad. As to all other Assets, if there are no Qualified Bids or the Bids received by the Debtors are not acceptable, the Debtors reserve the right to cancel the Auction as to such other Assets.

36.     The Auction shall be conducted with all Qualified Bidders in one room on an open basis. The identity of each Qualified Bidder present at the Auction and all material terms of each Increased Bid shall be fully disclosed to all other Bidders at the Auction.

37.     Qualified Bidders who participate at the Auction will be permitted to increase their Bids. The initially required bid increment for an Asset or category of Assets (the "Bid Increment") will be provided prior to the start of the Auction. As the Auction proceeds, the Debtors, in consultation with the Oversight Parties, will thereafter have the right to change subsequently required Bid Increments at any time upon verbal notice to all Qualified Bidders.

38.     Qualified Bidders who increase their Bids above the level to which they have demonstrated financial capability to consummate a transaction to the satisfaction of the Debtors may be required to provide proof of their financial wherewithal prior to the Debtors' acceptance of such an Increased Bid.  All parties are encouraged to pre-qualify to the amount for which they may wish to bid or to bring proof of financial capability at such higher level with them to the Auction.

39.     The Debtors, in their sole discretion, but after consulting with the Oversight Parties, will determine what they consider in their business judgment to be the highest and best Bid for a particular Asset or category of Assets (the Successful Bid), and the next highest Bid below the Successful Bid (the Cover Bid).  Pursuant to the Bid Procedures, the Successful Bid of the Winning Bidder shall remain open, irrevocable and binding on the Winning Bidder until the closing of the sale to the Winning Bidder, and the Cover Bid shall remain open, irrevocable and binding on the Backup Bidder until the earlier of:

a)     The closing of the sale to the Winning Bidder; or

b)     Thirty (30) days after conclusion of Sale Hearing (or the Termination Date, if earlier, only in the case of Longroad).

40.     At the conclusion of the Auction, the Debtors shall provide notice of the identity of the Winning Bidder and Backup Bidder for each particular Asset or group of Assets to all parties in interest involved in the Auction.  For each Qualified Bidder that is neither the Wining Bidder nor the Backup Bidder, the Debtors will promptly, and in accordance with the Escrow Agreement, instruct the Escrow Agent to return such Bidder's Deposit to the Bidder.

**G.     Acceptance of Successful Bids and Closing**.

41.     If the Debtors determine that a Successful Bid is a reasonable Bid that provides the greatest benefit to the estates under the circumstances, then the Debtors may accept that Successful Bid, subject to court approval at the Sale Hearing.  The Debtors propose that the Sale

Hearing be scheduled to take place within two (2) business days after the conclusion of the Auction.

42.     The Debtors further request the establishment of a deadline for objections to the Sale Motion and the Debtors' determination to accept the Successful Bid(s) (the Sale Objection Deadline).  The Debtors further propose that any such objection (a "Sale Objection") must (i) be in writing, (ii) specify the specific grounds for objection, and (iii) be filed with the Bankruptcy Court and served on counsel for the Debtors by no later than the Sale Objection Deadline; and that any Sale Objection failing to comply with such requirements be deemed waived and subject to denial by the Bankruptcy Court on such basis.

**H.     Miscellaneous.**

43.     If a Bidder wishes to make a Bid for the Primary Assets, it will be required to submit its Bid using the terms of the Primary Assets APA.  If a Bidder wishes to make a Bid for either the Kinta Ranch Property alone, the Residual Assets alone, or the two together – without bidding on the Primary Assets – it will be required to submit its Bid using the terms of the Model APA.  If a Bidder is bidding for the Primary Assets <u>and</u> the Kinta Ranch Property and/or the Residual Assets, the Bid for the Primary Assets must be submitted in the form of the Primary Assets APA and Bid for the Kinta Ranch Property and/or Residual Assets must be submitted under a separate Model APA, in order to allow the Debtors, Court, and parties in interest to make clear comparison with the Stalking Horse APA, although a Bid for the Primary Assets and Kinta Ranch Property (but not for any of the Residual Assets) may be made under a single form of Primary Assets APA.

44.     All Interested Parties are entitled to request reasonable and appropriate due diligence information (data room, inspection of assets, etc.) subject to appropriate confidentiality

procedures, including the execution of the Confidentiality Agreement acceptable to the Debtors prior to any disclosure of such information.

45.     All Qualified Bids, Successful Bids, and Cover Bids are subject to final approval and acceptance by the Debtors, in consultation with the Oversight Parties.

46.     While the Debtors will consult with the Oversight Parties on the matters noted above, if any disagreement or dispute arises, the Debtors in their sole discretion and in exercise of their business judgment will make the final determination on all matters related to the Bid Procedures and the Sales.

47.     A party's participation in the sales process outlined herein shall constitute:

   a)     Consent by such party to be subject to the jurisdiction of the Bankruptcy Court in connection with matters relating to the Bid Procedures and sale process for all purposes; and

   b)     An acknowledgment of the party's review, understanding and acceptance of the Bid Procedures.

## VII. *De Minimis* Sales

48.     If any Residual Assets remain unsold after the conclusion of the bidding process and Auction, the Debtors propose to sell them on an ongoing piecemeal basis for the best and highest price in a manner calculated to maximize value for the estates at a minimum of administrative expense.  To this end, the Debtors request that the Court approve the following procedures for the sale of such Residual Assets.

49.     Upon reaching an agreement for the sale of a Residual Asset for less than $500,000.00 (a "*De Minimis* Sale"), the Debtors and the proposed purchaser shall enter into a *De Minimis* Sale Agreement (each, a "*De Minimis* Sale Agreement").

50.     Upon execution of a *De Minimis* Sale Agreement, the Debtors will file with the Court a notice ("*De Minimis* Sale Notice") proposing approval of their entry into such *De Minimis* Sale Agreement, which notice shall include:

    a)    A copy of the *De Minimis* Sale Agreement;

    b)    A declaration from the Debtors or their advisors setting forth the factual predicate describing the benefits of the proposed *De Minimis* Sale; and

    c)    A proposed form of order approving the *De Minimis* Sale Agreement (the "*De Minimis* Sale Order").

51.     Such Debtors' Notice will be served by overnight mail and/or email on

    a)    The Office for the United States Trustee;

    b)    The Oversight Parties; and

    c)    Parties listed on the Master Service List including any parties requesting notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

52.     The Notice Parties shall have three (3) business days from the date of service of the *De Minimis* Sale Notice to object in writing to the proposed *De Minimis* Sale (the "*De Minimis* Sale Objection Deadline"), which objection (the "*De Minimis* Sale Objection") must set forth with specificity why the *De Minimis* Sale is not reasonable and does not provide the greatest possible benefit to the estates under the circumstances.

53.     If no *De Minimis* Sale Objection is received by the *De Minimis* Sale Objection Deadline, the Debtors shall file a notice of no objection to the proposed *De Minimis* Sale and shall have the authority to close the proposed *De Minimis* Sale without further approval of the Bankruptcy Court.  The Debtors shall file a notice with the Bankruptcy Court every thirty (30) days of all *De Minimis* Sales completed within the prior 30-day period and set forth the terms of such sales.

54.     If a timely *De Minimis* Sale Objection be received, the Debtors will schedule an expedited hearing with the Court for approval of the proposed *De Minimis* Sale.

# VIII.  PROCEDURES TO ADDRESS ASSUMPTION/ASSIGNMENT
## OF ASSIGNED AGREEMENTS

## A.    Assumption and Assignment or Transfer by Agreement of Assigned Agreements

55.    The Debtors do not believe that their oil and gas leases are, in themselves, executory contracts or unexpired leases.

56.    In the majority of states where courts have addressed this issue, those courts have ruled that oil and gas leases are not unexpired leases or executory contracts subject to section 365 of the Bankruptcy Code.  *See In re Clark Res.*, 68 B.R. 358, 359 (Bankr. N.D. Okla. 1986) (ruling that, under Oklahoma law, oil and gas leases are not unexpired leases or executory contracts because they are in the nature of an estate in real property having a nature in fee); *River Prod. Co., Inc. v. Webb (In re Topco, Inc.)*, 894 F.2d 727, 739-40 (5th Cir. 1990) (stating that "Texas oil and gas lease are neither true leases nor executory contracts"); *In re Fredrick Petroleum Corp.*, 98 B.R. 762, 767 (Bankr. S.D. Ohio 1989) (ruling that, under Ohio law, oil and gas leases were not "leases of non-residential real property"); *In re Hanson Oil Co.*, 97 B.R. 468, 470-72 (Bankr. S.D. Ill. 1989) (ruling that, under Illinois law, oil and gas leases are not ordinary leases but convey a freehold estate and, as a result, section 365 of the Bankruptcy Code does not apply).[5]

57.    However, the Debtors believe that certain Assigned Agreements related to the Assets do constitute executory contracts.  For instance, the Debtors are aware of Joint Operating Agreements ("JOAs") that are related to certain of the Assets.  Courts have held that JOAs are executory contracts subject to section 365 of the Bankruptcy Code.  *See Wilson v. TXO Prod.*

---

[5]    However, the Debtors are aware of at least one state – Louisiana – where conflicting court decisions make it less than clear whether an oil and gas lease is an unexpired lease, an executory contract, or an interest in real rights.  *Compare Texaco Inc. v. Louisiana Land & Exploration Co.*, 136 B.R. 658, 668 (Bankr. M.D. La. 1992) (ruling that, under Louisiana law, mineral leases are executory contracts subject to section 365 of the Bankruptcy Code) *with In re WRT Energy Corp.*, 202 B.R. 579, 583-4 (Bankr. W.D. La. 1996) (considering and rejecting the analysis in *Texaco Inc. v. Louisiana Land & Exploration Co.* and ruling that oil and gas leases are neither executory contracts nor unexpired leases and, instead, "vest the lessee with real rights").  Debtors have no Louisiana oil and gas leases and, therefore, believe that the conflicting law in that state is not relevant to the case at bar.

*Corp., (In re Wilson)*, 69 B.R. 960, 963 (Bankr. W.D. Tex. 1987). The Debtors propose to assume and assign, or otherwise transfer by agreement, these types of Assigned Agreements to the Winning Bidder(s).

58.     In addition to the Assigned Agreements associated with the Assets, the Debtors are also aware of certain direct or indirect liabilities and claims that relate to the Assets ("Related Liabilities"), which they propose shall be assumed and paid by a Winning Bidder insofar as such Related Liabilities are integrally related to the Assets (*e.g.*, ad valorem and production-related taxes attributable or chargeable to the period following the closing; and expenses incurred in the operation of oil and gas leases and wells that are attributable or chargeable to the period following the closing).

59.     In connection with the assumption and assignment of Assigned Agreements, the Debtors have prepared a schedule (the "Cure List") reflecting all cure, compensation, and reinstatement costs or expenses (if any) that the Debtors believe must be paid to Contract Counterparties under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of such Assigned Agreements (collectively, the "Cure Amounts"). The Cure List will be attached as Exhibit "A" to the proposed Cure Amount Notice attached to the proposed Sale Procedures Order as Exhibit "3."

60.     The Winning Bidder(s) will be responsible for demonstrating adequate assurance of future performance with respect to all obligations under Assigned Agreements proposed to be assigned to the Winning Bidder.

**B. The Procedures to Address Assignment Objections and Cure Amount Objections**

61.     The Debtors propose to serve a notice of the proposed assumption/assignment of Assigned Agreements and accompanying Cure Amounts associated with same by serving the Cure Amount Notice to all known Contract Counterparties to the Assigned Agreements not later

than two (2) business days after the entry of the proposed Sale Procedures Order. The Debtors request that the Court approve the following Cure Procedures for Assignment Objections and Cure Amount Objections.

62.     The Debtors will serve the Cure Amount Notice together with the Cure List, which contains calculation of the Cure Amounts that the Debtors believe must be paid to cure or otherwise remedy all defaults under the Assigned Agreements consistent with Section 365 of the Bankruptcy Code. If no amount is listed on the Cure List, the Debtors believe that there is no Cure Amount required to assume and assign the associated Assigned Agreement. In connection with the sales process, the Debtors will also identify which of the Assigned Agreements is proposed to assigned to each particular Winning Bidder (or Backup Bidder in the event that the sale to the Winning Bidder fails to close) and provide notice of same to the Contract Counterparties.

63.     The Debtors request that Contract Counterparties be required to file and serve any and all Assignment Objection and Cure Amount Objections by a date to be set by this Court as the 365 Objection Deadline. If no Assignment Objection is timely filed, then the Contract Counterparty shall be deemed to have consented to the assumption and assignment of the Assigned Agreement. If no Cure Amount Objection is timely filed, then:

a)      The Cure Amount set forth on the Cure List with respect such Contract Counterparty's Assignment Agreement shall be binding on such Contract Counterparty;

b)      The Contract Counterparty shall be forever barred and estopped from asserting against the Debtors, their estates, and the assignee of the Assigned Agreement that any amount in excess of the Cure Amount identified on the Cure List is due, that any other defaults exist under the Assignment Agreement, or that any other conditions to the assumption and assignment exist; and

c)      That payment to the Contract Counterparty of the Cure Amount identified on the Cure List shall be deemed to constitute satisfaction in full of all obligations required under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned

Agreement, following which the Debtors and their estates shall have no further or continuing liability to the Contract Counterparty under the Assigned Agreement.

64.     The Debtors further propose that each Assignment Objection and Cure Amount Objection must: (i) be in writing; (ii) specify the specific grounds for objection; and (iii) be filed with the Bankruptcy Court and served on counsel for the Debtors by no later than the 365 Objection Deadline.  Moreover, in the case of a Cure Amount Objection, the Debtors propose that Contract Counterparties be required to:

    a)    Specify the amount that the Contract Counterparty asserts is the correct Cure Amount; and

    b)    Provide supporting documentation and other evidence substantiating the asserted Cure Amount.

After receipt of a Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Amount believed by the objecting Contract Counterparty to exist. If, however, the Debtors and the objecting Contract Counterparty cannot consensually resolve the Cure Amount Objection, such objection will be resolved by the Court at the Sale Hearing.

65.     If the Court determines that the proper Cure Amount is greater than the Cure Amount listed on the Cure List, the Debtors or the Winning Bidder may either go forward with assumption and assignment or transfer by agreement of the Assigned Agreement or may remove such agreement from the proposed transaction and the relevant schedule to the operative asset sale and purchase agreement.

66.     The Debtors will be responsible for resolving any dispute over the proposed Cure Amounts with any Contract Counterparty timely filing a Cure Amount Objection.

# IX. BASIS FOR RELIEF REQUESTED

## A. Applicable Legal Standards

67.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Further, section 105(d) of the Bankruptcy Code provides, in pertinent part, that:

> The court, on its own motion or on the request of a party in interest . . . unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, [may] issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically.

11 U.S.C. § 105(d)(2).

68.     Section 363(b)(1) of the Bankruptcy Code permits a debtor to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts authorize the use of estate property outside the ordinary course of business so long as there is a legitimate business justification. *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipner*, 933 F.2d 513, 515 (7th Cir. 1991)); *Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

69.     Once the debtor articulates a valid business justification for a use of estate property under section 363(b)(l), the court reviews the debtor's request under the "business judgment rule," which triggers "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkun,* 488 A.2d 858, 872 (Del. 1985)); *see also Institutional Creditors of Cont'l Air Lines Inc. v. Cont'l Air Lines Inc. (In re Cont'l Air Lines Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986).

70.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management or a debtor from judicial second guessing. *See In re Myers*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that "under normal circumstances the court would defer to the Debtors' judgment so long as there is a legitimate business justification"); *Montgomery Ward*, 242 B.R. at 153.

71.     As part of the sale of property of the estate "other than in the ordinary course of business" under section 363(b) of the Bankruptcy Code, a debtor may induce an interested party to expend the resources necessary to serve as the "stalking horse bidder" by offering that party certain bid protections. Those bid protections take many forms including, without limitation, a break-up or topping fee, expense reimbursement, minimum overbid increments, limitations on the marketing of the assets (for example, a "no shop" or "window shop" clause), bidder qualifications requirements, and short deadlines for competing bidders' due diligence and submission of competing bids. *See COLLIER ON BANKRUPTCY* ¶ 363.2[6] (15th ed. 2009).

72.     Most courts hold that implementing and, if necessary, awarding bid protections to a "stalking horse bidder" is an appropriate exercise of a Debtors' business judgment. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc*., 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating that such procedures "encourage bidding to maximize the value of the debtor's assets); *Cantaxx Gas Storage Ltd. v. Silverhawk Capital Ptns.*, LLC, 2008 U.S. Dist. LEXIS 37803, 17-18 (S.D. Tex. May 8, 2008) (stating that "[b]reak-up and similar fees are common in corporate transaction . . . [s]uch fee provision may . . . enhance the bidding process by creating momentum toward closing the sale"); *In re Food Barn Stores Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objection of the Code [is] to enhance the value of the estate at hand").

**B.** **Approval of the Bid Procedures, Bid Protections, Notice Procedures, Cure Procedures, and *De Minimis* Sales Procedures is Justified under Sections 105(a), 105(d), 363(b) and 503(b) of the Bankruptcy Code**

73.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the Primary Assets, Kinta Ranch Property and Residual Assets.  The Debtors believe that the Bid Procedures are sufficient to encourage bidding for the Primary Assets, Kinta Ranch Property and Residual Assets; are consistent with other procedures previously approved by the Court; and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

74.     The Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the Debtors' interest in minimizing administrative expense to the estates.  The Debtors therefore have valid business justifications for seeking approval of the Bid Procedures at this juncture.

75.     The Debtors believe, in the exercise of their prudent business judgment, that the Bid Procedures and Bid Protections benefit their estates and their creditors and other stakeholders. The Bid Procedures allow the Debtors, through the coordinated efforts of their professionals, to entertain all reasonable Bids for the Primary Assets, Kinta Ranch Property and Residual Assets while giving the estates the added benefit of a firm agreement for sale of the Primary Assets and Kinta Ranch Property.

76.     The Debtors submit that approval of the Bid Protections is appropriate and warranted because: (i) the Bid Protections are necessary to ensure that Longroad will serve as the Stalking Horse Bidder, remain bound to the Stalking Horse APA during the period in which the Debtors solicit other Qualified Bids, and continue to pursue its proposed acquisition of the Primary Assets and the Kinta Ranch Property; (ii) the Bid Protections benefit the estates by

providing the Debtors with an established minimum floor bid for the Primary Assets and the Kinta Ranch Property and the opportunity to consider other potentially higher and better Qualified Bids for the Primary Assets and the Kinta Ranch Property without the risk of loss of Longroad's obligation to purchase such Assets under the terms of the Stalking Horse APA in the event of no other Qualified Bids; (iii) the Bid Protections are fair, appropriate, and commercially reasonable given, among other things, the size and nature of the transactions contemplated by the Stalking Horse APA, the substantial effort and commitment that has been and will be expended by Longroad, and the benefits Longroad has provided to the estates and creditors, including helping to maximize the value of the Primary Assets and the Kinta Ranch Property; and (iv) any amounts that become due and payable to Longroad under the Bid Protections are commensurate with the real and substantial post-petition benefits conferred upon the estates by Longroad.

77. The Debtors believe that the Notice Procedures comply with Bankruptcy Rules 2002, 6004 and 6006, and are reasonably calculated to provide due, adequate and timely notice to all parties in interest of the Bid Procedures, the Auction, the Sale Hearing, the Sale Objection Deadline, the proposed assumption/assignment of Assigned Agreements, and the 365 Objection Deadline. Similarly, the Debtors believe that the Cure Procedures are reasonable and appropriate and consistent with the provisions of Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Cure Procedures have been tailored to provide an adequate opportunity for all Contract Counterparties to Assigned Agreements to raise any objections that they may have to the proposed assumption/assignment and/or to the Cure Amounts proposed by the Debtors in connection therewith.

78. Finally, the Debtors believe that the *De Minimis* Sales Procedures provide a benefit to the estates by allowing the Debtors to gain additional value for the estates without incurring the costs associated with a more traditional sale under Section 363 of the Bankruptcy Code. Further,

under the proposed *De Minimis* Sales Procedures, the estates stand to capture additional benefits by selling the Residual Assets subject to such procedures at a price which provides economic value to the estates that would not otherwise be beneficial if the Debtors were required to incur the administrative expense of filing a motion and holding a hearing on the proposed sale.

79.     Approval of all of the foregoing procedures and protections will greatly assist the Debtors in realizing maximum value for the Primary Assets, Kinta Ranch Property and Residual Assets and minimizing the administrative costs incurred in furtherance of the proposed Sales. Consequently, the Debtors submit that granting the requested relief is appropriate and warranted under the circumstance.

## X. PRAYER

WHEREFORE, the Debtors request entry of an order substantially in the form of the proposed Sale Procedures Order attached hereto as Exhibit "A", thereby:

a)    Scheduling a date, time and place for a hearing on the Sale Motion and proposed Sale(s) of Primary Assets, Kinta Ranch Property and Residual Assets;

b)    Approving the Bid Procedures and Bid Protections, including approval and payment of the Expense Reimbursement and Termination Fee as an administrative claim under Section 503(b) of the Bankruptcy Code (if and to the extent applicable);

c)    Approving the Cure Procedures;

d)    Approving the Notice Procedures;

e)    Approving the *De Minimis* Sales Procedures;

f)    Waiving the automatic fourteen (14) day stay provided under Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable to the order on the Motion, so that the order on this Motion is effective and enforceable immediately upon entry on this Court's docket; and

g)    Granting such other and further relief as is just.

DATED: June 9, 2010.

Respectfully submitted,

**REDWINE RESOURCES, INC., et al., Debtors**

/s/ Michael R. Rochelle
_____

Michael R. Rochelle
State Bar No.17126700
Chris B. Harper
State Bar No. 09025500
Eric M. Van Horn
State Bar No. 24051465
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P:  (214) 953-0182
F:  (214) 953-0185

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION