# EXHIBIT A
BIDDING PROCEDURES ORDER

See Attached

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-34041 |
| | § | |
| REDWINE RESOURCES, INC., *et al.*,[1] | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES, (IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF

CAME ON FOR HEARING the *Debtors' Motion for Authorization of: (I) Bid Procedures for Sale of Primary Assets, Kinta Ranch Property and Residual Assets; (II) Scheduling Hearing to Consider Sale; (III) Form of Notices; (IV) Procedures Relating to Assumption/Assignment and/or Transfer by Agreement of Certain Contracts; (V) Bid*

---

[1] The Debtors and their respective bankruptcy cases are as follows:: Redwine Resources, Inc. (Case No. 10-34041); Badger Drilling Company, LLC (Case No. 10-34046); White Oak Resources, LLC (Case No. 10-34054); Redwine Oil and Gas Properties LLC (Case No. 10-34052); Redwine Rockies, LLC (Case No. 10-34053); Redwine Oil and Gas, LLC (Case No. 10-34050); Redwine Aviation Inc. (Case No. 10-34047); and Redwine Kinta Ranch, LLC (Case No. 10-34051).

*Protections; and (VI) For Other Relief* [Docket No. ____] (the "Motion") filed by the Debtors, and having considered the Motion, the evidence presented, and the representations and arguments of counsel, the Court finds as follows:[2]

1.    On June 4, 2010 (the "Petition Date"), the Debtors filed their petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), thereby initiating their respective bankruptcy cases with the Court.  By order entered on June ___, 2010, the cases are being jointly administered under Case No. 10-_____-___-11 (the "Bankruptcy Case").  Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating and managing their businesses and properties as debtors-in-possession.

2.    The Court has jurisdiction over the Bankruptcy Case and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Bankruptcy Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The Motion was filed on June 7, 2010, and due and sufficient notice of the Motion has been provided as set forth in the Certificate of Service attached to the Motion.  No other or further notice need be provided under the circumstances involved.

4.    As explained in the Motion, the Debtors intend to sell substantially all of their assets (collectively, the "Assets"), comprised of the Primary Assets, the Kinta Ranch Property and the Residual Assets, in one or more sales (the "Sales") following the solicitation of Qualified Bids and an Auction in relation to those Assets for which competing Qualified Bids are timely

---

[2] All capitalized terms not separately defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, then in the Bid Procedures attached hereto as Exhibit 1.

ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY
AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES,
(IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY
AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF – Page 2

received from Qualified Bidders.  Pursuant to the Motion, the Debtors request the approval of the following procedures and protections in connections with such sales effort: (a) approval of the Bid Procedures, in the form of **Exhibit 1** hereto; (b) the scheduling of a hearing (the "Sale Hearing") on the Debtors' separately-filed *Motion for Order Authorizing Sale, Approving Model APA, Approving Assumption and Assignment, and Authorizing De Minimus Sales* [Docket No. ____] (the "Sale Motion"); (c) the establishment of a deadline for the filing of objections to the Sale Motion (the "Sale Objection Deadline"); (d) approval of the Cure Procedures related to the Debtors' proposed assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Agreements") in connection with the Sales; (e) approval of the Notice Procedures, including approval of the form of the Sale and Auction Notice (in substantially the same form as **Exhibit 2** hereto) and the form of the Cure Amount Notice (in substantially the same form as **Exhibit 3** hereto), with respect to the form and manner of providing notice of the Bid Procedures, the Auction, the Sale Hearing, the Sale Objection Deadline, the proposed Cure Amounts (if any) associated with Assigned Agreements, and the deadline for the filing of objections to the assumption and assignment of Assigned Agreements and the Cure Amounts (the "365 Objection Deadline"); (f) approval of the Bid Protections (comprised of the Expense Reimbursement and Termination Fee) afforded to Longroad Capital Partners III, L.P. ("Longroad" or the "Stalking Horse Bidder") in connection with Longroad's execution of a binding agreement to acquire to the Primary Assets and the Kinta Ranch Property (the "Stalking Horse APA"); and (g) approval of the *De Minimus* Sales Procedures in relation to those Residual Assets which are not sold by the Debtors in accordance with the Bid Procedures.

5.     The Debtors have exercised sound business judgment and presented sound business reasons for approval of the Bid Procedures.  The Bid Procedures are fair, reasonable,

and appropriate, and are designed to maximize recoveries and the realization of value by the Debtors' estates (the "Estates") for the Assets. Accordingly, approval of the Bid Procedures is in the best interests of the Estate and creditors.

6.    The Cure Procedures are reasonable and appropriate and consistent with the provisions of Section 365 of the Bankruptcy Code and Fed. R. Bankr. P. 6006. The Cure Procedures have been tailored to provide an adequate opportunity for all non-debtor counterparties to Assigned Agreements (collectively, the "Contract Counterparties") to raise any objections that they may have to the proposed assumption and assignment of their respective Assigned Agreements and/or to the Cure Amounts (if any) proposed by the Debtors in connection therewith.

7.    The Notice Procedures, including the Debtors' proposed use of the Sale and Auction Notice and the Cure Amount Notice and proposed publication of notice in accordance with such procedures, comply with Fed. R. Bankr. P. 2002, 6004 and 6006, and are reasonably calculated to provide due, adequate and timely notice to all parties in interest of the Bid Procedures, the Auction, the Sale Hearing, the Sale Objection Deadline, the proposed assumption and assignment of Assigned Agreements and the Cure Amounts (if any) associated therewith, and the 365 Objection Deadline.

8.    The Debtors have chosen Longroad to act as the "stalking horse" bidder in connection with their sale of the Primary Assets and the Kinta Ranch Property. In this regard, the Debtors have been in a "workout" mode with the Secured Lender since early 2009. At the beginning of the workout period, the parties hoped for a return to more robust gas prices by 2010. During 2009, the Debtors explored the possibility of a restructuring of their indebtedness to the Secured Lenders. The Debtors also discussed the possible purchase of the Secured

ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY
AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES,
(IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY
AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF – Page 4

Lender's position with a number of candidates, but no potential purchaser of the bank debt was able to propose terms acceptable to the Secured Lender.  When prices failed to improve markedly by year-end 2009, it became apparent that financial restructuring would be infeasible and that the only real solution would be a sale of the Assets.  Hence, the Debtors had discussions with various possible purchasing entities and solicited expressions of interest for the acquisition of the Assets.

9.      Prior to the Petition Date, Longroad spent approximately three months conducting due diligence and negotiating with the Debtors and their advisors, in good faith, in formulating its offer for the Primary Assets (the majority of the Assets) and the Kinta Ranch Property and in preparing and negotiating the terms of the Stalking Horse APA.  During this period of time, no other potential purchaser agreed to make a binding offer with respect to the Primary Assets or the Kinta Ranch Property.  As a condition to Longroad's agreement to execute a binding agreement with the Debtors and to perform thereunder, Longroad required and the Debtors agreed to provide (subject to court approval) the Bid Protections, which are also included within the Stalking Horse APA (introduced into evidence at the hearing as Exhibit ____).

10.     Specifically, the Debtors request approval of the following Bid Protections for the benefit of Longroad as the Stalking Horse Bidder:

(a)     The Expense Reimbursement.  The reimbursement of Longroad's fees, costs, and expenses, up to a maximum of $180,000.00, incurred in (a) investigating and analyzing the Debtors' business, the Primary Assets, the Operating Contracts (as defined in the Stalking Horse APA), the Kinta Ranch Property, the contracts and leases considered for assumption and assignment as Assigned Agreements, the nature and extent of Assumed Liabilities (as defined in the Stalking Horse APA), all schedules and exhibits supplied by the Debtors in connection with the Stalking Horse APA, and all other matters relating to the Stalking Horse APA, the Sale Documents (as defined in the Stalking Horse APA) and the transactions contemplated by the Stalking Horse APA, (b) negotiating, preparing, and reviewing, as applicable, the Stalking Horse APA, all other Sale Documents, and all motions, orders, and other papers related to the Stalking Horse APA, the Sale Documents

and the transactions contemplated by the Stalking Horse APA, and (c) pursuing and otherwise facilitating the approval of the Stalking Horse APA and the transactions contemplated by the Stalking Horse APA. In the event that the Transactions (as defined in the Stalking Horse APA) are not consummated on or prior to the Termination Date (August 20, 2010, unless extended by the parties in writing) for any reason other than as a result of a material breach of the Stalking Horse APA by Longroad, Longroad shall be entitled to the Expense Reimbursement, which shall be paid to Longroad in the manner detailed in Section 9.03(c) of the Stalking Horse APA; and

(b)     The Termination Fee. The payment of a fee equal to 2.50% of the Purchase Price (as defined in the Stalking Horse APA) in exchange for Longroad's binding commitment under the Stalking Horse APA and its agreement to submit the Stalking Horse APA to the bidding process established by the Bid Procedures and to participate in any Auction in the event of the submission of one or more competing Qualified Bids by the Bid Deadline. In the event that either: (i) the Stalking Horse APA is terminated by Longroad because (A) Longroad is not selected as the Winning Bidder or the Backup Bidder in any Auction of the Primary Assets and five business days have elapsed since the Auction, or (B) the Debtors consummate an Alternative Transaction or Competing Transaction (as defined in the Stalking Horse APA); or (ii) both (A) the transactions contemplated by the Stalking Horse APA are not consummated on or prior to the Termination Date for any reason other than as a result of a material breach of the Stalking Horse APA by Longroad, and (B) within 12 months after the date of termination of the Stalking Horse APA the Debtors shall consummate an Alternative Transaction or Competing Transaction with a third party at a sale price equal to or in excess of the Purchase Price (whether or not such Alternative Transaction or Competing Transaction was proposed, contemplated or announced before or after the date of termination of the Stalking Horse APA); then Longroad shall be entitled to receive the Termination Fee, which shall be paid to Longroad in the manner detailed in Section 9.03(d) of the Stalking Horse APA.

11.     Such Bid Protections are the product of good faith, arm's length negotiations between the Debtors and Longroad. In the absence of the Debtors' agreement to the Bid Protections and the inclusion of the Bid Protections within the Stalking Horse APA, Longroad was unwilling to make a binding offer for the Primary Assets and the Kinta Ranch Property and to enter into the Stalking Horse APA. In fact, approval of the Bid Protection is a condition precedent to Longroad's obligation to close on its purchase of the Primary Assets and the Kinta Ranch Property and, in the event the Bid Protections are not approved by the Court, then

Longroad will have the right to immediately terminate the Stalking Horse APA and its obligations thereunder.

12.     As demonstrated by the foregoing: (i) the Bid Protections are necessary to ensure that Longroad will serve as the Stalking Horse Bidder, remain bound to the Stalking Horse APA during the period in which the Debtors solicit other Qualified Bids, and continue to pursue its proposed acquisition of the Primary Assets and the Kinta Ranch Property; (ii) the Bid Protections benefit the Estates by providing the Debtors with an established minimum floor bid for the Primary Assets and the Kinta Ranch Property and the opportunity to consider other potentially higher and better Qualified Bids for the Primary Assets and the Kinta Ranch Property without the risk of loss of Longroad's obligation to purchase such Assets under the terms of the Stalking Horse APA in the event of no other Qualified Bids; (iii) the Bid Protections are fair, appropriate, and commercially reasonable given, among other things, the size and nature of the transactions contemplated by the Stalking Horse APA, the substantial effort and commitment that has been and will be expended by Longroad, and the benefits Longroad has provided to the Estates and creditors, including helping to maximize the value of the Primary Assets and the Kinta Ranch Property; and (iv) any amounts that become due and payable to Longroad under the Bid Protections are commensurate with the real and substantial post-petition benefits conferred upon the Estates by Longroad and constitute actual and necessary costs and expenses incurred by the Debtors in preserving the value of the Estates within the meaning of Section 503(b) of the Bankruptcy Code.  Accordingly, approval of the Bid Protections is in the best interests of the Estates and creditors.

13.     Next, the Debtors have exercised sound business judgment and presented sound business reasons for approval of the *De Minimus* Sales Procedures in relation to those Residual

Assets which are not sold by the Debtors in accordance with the Bid Procedures. Such procedures will only apply to those Residual Assets for which no Qualified Bids and/or acceptable Qualified Bids are received by the Debtors through the sales process conducted under the Bid Procedures. Given the nominal value of such Residual Assets on a relative basis, the establishment of a mainstreamed, cost-efficient methodology for the sale of such Assets, on notice as proposed under the procedures, is reasonable and in the best interests of the Estates and the Debtors' creditors.

14.    Finally, given the Debtors' financial condition and the timing contemplated by the Bid Procedures, and given the fact that any Sale of the Assets and any proposed assumption and assignment of the Assigned Agreements (including any disputes related to the Cure Amounts proposed by the Debtors) will be subject to consideration at the Sale Hearing, good and sufficient cause exists for elimination of the 14-day stay provided by Fed. R. Bankr. P. 6004(h) and 6006(d), to the extent applicable to this Order.

Based upon the foregoing and all such other findings and conclusions announced on the record at the hearing, and pursuant to Sections 105, 363, 365 and 503(b) of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9008, it is hereby:

ORDERED that the Motion is granted; it is further

ORDERED that all objections to the relief requested in the Motion, if any, that have not been withdrawn, waived, or settled are hereby overruled in their entirety; it is further

ORDERED that the Bid Procedures are approved, and the Debtors are hereby authorized to solicit Bids for the Assets in accordance with the Bid Procedures and to otherwise take any and all other actions necessary or appropriate to implement the Bid Procedures; it is further

ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY
AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES,
(IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY
AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF – Page 8

ORDERED that the deadline of the submission of Bids on the Assets is hereby fixed as 12:00 noon, prevailing Central Time, on _____, 2010 (the "Bid Deadline").  A Bid will not qualify for consideration by the Debtors unless (i) the Bidder submits a Bid Package (as defined in the Bid Procedures) in compliance with the Bid Procedures, and (ii) the Bid Package is actually received by Debtors' counsel, Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, on or prior to the Bid Deadline.  It is further

ORDERED that the Stalking Horse APA shall constitute and is hereby determined to be a Qualified Bid, and Longroad shall constitute and is hereby determined to be a Qualified Bidder, for all purposes under the Bid Procedures; it is further

ORDERED that in the event of the submission of one or more Qualified Bids for some or all of the Assets in accordance with the Bid Procedures, thereby warranting an Auction with respect to such Assets, the Auction shall be conducted on _____, 2010, at 10:00 a.m., prevailing Central Time, at the offices of Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201.  It is further

ORDERED that the Notice Procedures, and the Debtors' use of the Sale and Auction Notice and Cure Amount Notice for the provision of notice in accordance therewith, are hereby approved.  Within two (2) business days of the entry of this Order, the Debtors shall serve a copy of this Order, along with the Sale and Auction Notice and the Cure Amount Notice, on all parties listed on the current Master Service List, all known parties that have or may assert a lien on or security interest in some or all of the Assets, all known Contract Counterparties to executory contracts and unexpired leases that are or may be Assigned Agreements in connection with the Sales, and all parties who have previously contacted the Debtors and/or their professionals to express a bona fide interest in acquiring some or all of the Assets or otherwise exhibited a

realistic intention to participate in the sale process.  Additionally, within five (5) business days of

the entry of this Order, the Debtors shall cause a notice with respect to the sales process to be

published in the following publications: _____.  Such notice shall

provide the following information: (i) a general description of the Assets for sale; (ii) the Bid

Deadline; (iii) the date, time and place of the Sale Hearing; (iv) the Sale Objection Deadline; (v)

the 365 Objection Deadline; and (vi) the means by which interested parties may obtain a copy of

the Bid Procedures, the Sale and Auction Notice, the Cure Amount Notice and the Sale Motion.

The Debtors' timely compliance with the foregoing Notice Procedures shall constitute proper,

timely, adequate and sufficient notice satisfying the requirements of Sections 363(b), 363(f) and

365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9008.  It is

further

        ORDERED that the Cure Procedures are hereby approved, and the 365 Objection

Deadline is hereby fixed as 5:00 p.m., prevailing Central Time, on _____, 2010.  Any

objection by a Contract Counterparty to the assumption and assignment of its Assigned

Agreement (an "Assignment Objection") or to the Cure Amount set forth on the Cure List

attached to the Cure Amount Notice in relation to such Assigned Agreement (a "Cure Amount

Objection") must (i) be in writing, (ii) specify the specific grounds for objection, and (iii) be filed

with the Court and served on counsel for the Debtors, Rochelle McCullough, LLP, Attn: Michael

R. Rochelle, Esq., 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, by no later than the 365

Objection Deadline.  It is further

        ORDERED that in the absence of a Contract Counterparty's filing and service, on or

before the 365 Objection Deadline, of a written Assignment Objection, such Contract

Counterparty shall be deemed to have consented to the assumption and assignment of the

ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY
AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES,
(IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY
AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF – Page 10

Contract Counterparty's Assigned Agreement in connection with the Sales.  Similarly, in the absence of a Contract Counterparty's filing and service, on or before the 365 Objection Deadline, of a written Cure Amount Objection: (i) the Cure Amount set forth on the Cure List with respect to such Contract Counterparty's Assigned Agreement shall be binding on such Contract Counterparty; (ii) the Contract Counterparty shall be, and is hereby, forever barred and estopped from asserting against the Debtors, the Estates, and the assignee of the Contract Counterparty's Assigned Agreement that any amount in excess of the Cure Amount identified on the Cure List is due, that any other defaults exist under the Assigned Agreement, or that any other conditions to the assumption and assignment of the Assigned Agreement exist; and (iii) payment to the Contract Counterparty of the Cure Amount identified on the Cure List in connection with the assumption and assignment of the Assigned Agreement shall be deemed to constitute satisfaction in full of all obligations required under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Agreement, following which the Debtors and the Estates shall have no further or continuing liability to the Contract Counterparty under the Assigned Agreement.  In the event that a Contract Counterparty files and serves an Assignment Objection or Cure Amount Objection on or before the 365 Objection Deadline, such objection (if not consensually resolved) shall be heard and determined at the Sale Hearing unless hereafter ordered otherwise.  It is further

ORDERED that the Bid Protections afforded to Longroad are hereby approved in all respects, and the amount of the Expense Reimbursement and the Termination Fee, if and to the extent the same become due and owing to Longroad under the Bid Protections, shall constitute and are hereby allowed as claims under Section 503(b) of the Bankruptcy Code.  No other

Bidder shall be entitled to any expense reimbursement or termination, break-up, topping, or similar fee or payment related to the Debtors' sale of the Assets.  It is further

ORDERED that the Sale Objection Deadline is hereby fixed as 5:00 p.m., prevailing Central Time, on _____, 2010.  Any objection to the Sale Motion (a "Sale Objection") must (i) be in writing, (ii) specify the specific grounds for objection, and (iii) be filed with the Court and served on counsel for the Debtors, Rochelle McCullough, LLP, Attn: Michael R. Rochelle, Esq., 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, by no later than the Sale Objection Deadline.  Any Sale Objection failing to comply with such requirements shall be deemed waived and may be denied by the Court on such basis.  It is further

ORDERED that the Sale Hearing to consider approval of the Sale Motion, approval of the Debtors' determination of the Winning Bidder(s) and Backup Bidder(s) under the Bid Procedures, approval of the Sales, and any timely-filed and served Sale Objections, Assignment Objections and Cure Amount Objections shall be conducted on _____, 2010, at _____ __.m., prevailing Central Time, before The Honorable _____, U.S. Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242; it is further

ORDERED that the *De Minimus* Sales Procedures are approved and the Debtors are hereby authorized to pursue the sale of any Residual Assets (if any) for which no Qualified Bids and/or acceptable Qualified Bids are received by the Debtors through the sales process conducted under the Bid Procedures, in accordance with such *De Minimus* Sales Procedures; it is further

ORDERED that, to the extent that Fed. R. Bankr. P. 6004(h) and/or 6006(d) are applicable to this Order, the 14-day stay period provided under such rules is hereby waived and

ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF PRIMARY ASSETS, KINTA RANCH PROPERTY
AND RESIDUAL ASSETS, (II) SCHEDULING HEARING TO CONSIDER SALE, (III) APPROVING FORM OF NOTICES,
(IV) ESTABLISHING PROCEDURES RELATED TO THE ASSUMPTION/ASSIGNMENT AND/OR TRANSFER BY
AGREEMENT OF CERTAIN CONTRACTS, (V) APPROVING BID PROTECTIONS, AND (VI) FOR OTHER RELIEF – Page 12

eliminated, such that this Order shall become immediately effective and enforceable upon entry;

and it is further

     ORDERED that the Court shall retain exclusive jurisdiction over any and all disputes,

claims and other matters that may arise out of or from, or that relate to, the implementation of

this Order.

# # #  END OF ORDER  # # #

<u>Exhibit 1</u>

# **BID PROCEDURES**

Set forth below are the bid procedures (the "**Bid Procedures**") to govern the sale of Leases, Wells, Personal Property, Real Property, Leaseholds, Equipment, Inventory, Fixtures and certain related property (collectively, the "**Assets**") of Redwine Resources, Inc.; Badger Drilling Company, LLC; White Oak Resources, LLC; Redwine Oil & Gas Properties, LLC; Redwine Rockies, LLC; Redwine Oil & Gas, LLC; Redwine Aviation Inc.; and Redwine Kinta Ranch, LLC (collectively, the "**Debtors**") in connection with their pending bankruptcy cases, jointly-administered under Case No. 10-_____ (the "**Bankruptcy Case**") in the U.S. Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). By order of the Bankruptcy Court (the "**Bidding Procedures Order**"), these Bid Procedures have been approved and are applicable to all Bidders and Bids, with any proposed sale(s) of the Assets to be subject to the final approval of the Bankruptcy Court under section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").

## **I.  The Oversight Parties**

The sales process outlined under these Bid Procedures will be conducted by the Debtors, with the assistance of their counsel and other professionals, in consultation with the following parties in interest in the Bankruptcy Case (collectively, the "**Oversight Parties**"): Bank of America, N.A. (the "**Secured Lender**") and its counsel and other professionals; and any committee of creditors appointed by the United States Trustee in the Bankruptcy Case (the "**Committee**") and its counsel and other professionals.

## **II.  "As Is, Where Is"**

The sale of the Assets will be on an "AS IS, WHERE IS" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates, except to the extent set forth in the Primary Assets APA (as defined below) or the Model APA (as defined below), as applicable. Except as otherwise provided in the Primary Assets APA or Model APA (as applicable), all of the Debtors' right, title, and interest in and to the Assets will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "**Transferred Liens**"). The Transferred Liens will attach to the net proceeds of the sale of the Assets, in the order of their priority, with the same validity, force, and effect which they now have against the Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

## **III.  Asset Lots and Transactional Terms**

The Assets have been broken down into three categories: the Primary Assets, the Kinta Ranch Property, and the Residual Assets, each as defined herein.

With respect to the Primary Assets and the Kinta Ranch Property, Debtors Redwine Resources, Inc.; Redwine Oil & Gas Properties, LLC; Redwine Rockies, LLC; Redwine Oil & Gas, LLC; and Redwine Kinta Ranch, LLC (collectively, the "**Pending Sale Debtors**") have entered into an Asset Purchase and Sale Agreement, dated as of June 8, 2010 (the "**Stalking

Horse APA"), with Longroad Capital Partners III, L.P. (the "**Stalking Horse Bidder**"), for the Pending Sale Debtors' sale, and the Stalking Horse Bidder's purchase, of those certain Assets referred to as the "Purchased Assets" in the Stalking Horse APA (collectively referred to herein as the "**Primary Assets**") and those certain real property interests referred to as the "Kinta Ranch Property" in the Stalking Horse APA (referred to herein as the "**Kinta Ranch Property**"). Subject to the submission of a higher and better offer for the Primary Assets and/or the Kinta Ranch Property, and in such event competitive bidding in accordance with these Bid Procedures, and subject to Bankruptcy Court approval, the Pending Sale Debtors intend to consummate the sale of the Primary Assets and the Kinta Ranch Property to the Stalking Horse Bidder.

Separately, the Debtors are offering for sale certain Assets other than the Primary Assets and the Kinta Ranch Property (collectively, the "**Residual Assets**"), subject to competitive bidding in accordance with these Bid Procedures and Bankruptcy Court approval.

Except as otherwise set forth herein, any sale of the Primary Assets to a Bidder other than the Stalking Horse Bidder will be made under the same or substantially identical terms and conditions as the Stalking Horse APA, with the exception of the terms of the consideration set forth in the Stalking Horse APA and with the exception of Sections 9.03(c)-(e) of the Stalking Horse APA (which shall only apply to the Stalking Horse Bidder) (the form of the Stalking Horse APA, as modified by such exceptions, referred to herein as the "**Primary Assets APA**").

Except as otherwise set forth herein, any sale of the Kinta Ranch Property to a Bidder other than the Stalking Horse Bidder will be made under the same or substantially identical terms and conditions as the form Asset and Purchase Agreement approved by the Debtors for such purpose (referred to herein as the "**Model APA**"). Similarly, and except as otherwise set forth herein, any sale of the Residual Assets will be made under the same or substantially identical terms and conditions as the Model APA.

The forms of Primary Assets APA and Model APA may be obtained by any Interested Party (as defined below) in accordance with the instructions set out below.

## IV.  Interested Parties

An "Interested Party" is any person or entity who delivers to the Debtors the following:

a.      An executed confidentiality agreement (the "**Confidentiality Agreement**"), the terms of which shall be substantially consistent with those contained in **Exhibit A** attached hereto;[1]

b.      A completed and executed bidder information sheet, in the form of **Exhibit B** attached hereto, containing such information as to allow the Debtors to adequately identify the person or entity interested in bidding on the Assets and, if the party is an entity, such information as to allow the Debtors to identify the officer(s) or authorized agent(s) who will appear on behalf of the party; and

---

[1] The Debtors retain the right to waive this requirement; provided that any person or entity for whom this requirement is waived will not be entitled to obtain Due Diligence Access (as defined herein) or otherwise obtain any non-public information regarding the Debtors or the Assets.

      c.      Evidence satisfactory to the Debtors and Oversight Parties that such person or entity is reasonably likely to be able to consummate a purchase of those Assets in which the person or entity is expressing interest.

Once the Debtors have received the documents described in paragraphs (a)-(c) above, the Debtors will (i) provide the Interested Party (and its authorized representatives under the terms and conditions of the Confidentiality Agreement) Due Diligence Access (as defined below), (ii) a copy of the Primary Assets APA, if requested, and (iii) a copy of the Model APA, if requested.

DEBTORS' COUNSEL HAS NOT PREPARED ANY OF THE INFORMATION REGARDING THE DEBTORS, OR ANY OF THEIR OPERATIONS, ASSETS OR FINANCIAL CONDITION TO BE PROVIDED TO AN INTERESTED PARTY IN CONNECTION WITH THE PROCEDURES SET FORTH HEREIN.  CONSEQUENTLY, NO REPRESENTATION IS MADE BY THE DEBTORS' COUNSEL REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY, OR COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION WITH THESE BID PROCEDURES AND ALL INTERESTED PARTIES ARE ENCOURAGED TO CONSULT WITH THEIR OWN ADVISORS REGARDING ANY SUCH INFORMATION.

## **V.  Due Diligence**

Provided an Interested Party has executed and returned a Confidentiality Agreement, such Interested Party will, prior to the Bid Deadline (as defined below), be granted access to a physical data room located at the Debtors' primary place of business at 8214 Westchester, Suite 740, Dallas, Texas 75225 ("**Due Diligence Access**") upon delivery, via e-mail transmission, of a written statement (a "**Statement of Interest**") to Lyndon James at lyndon.james14@gmail.com and Michael R. Rochelle at buzz.rochelle@romclawyers.com, containing the following:

      a.      A request for Due Diligence Access; and

      b.      A statement describing the nature and extent of the due diligence the Interested Party wishes to conduct and/or the information the Interested Party wishes to obtain.

Once an Interested Party has been provided with Due Diligence Access, Debtors or Debtors' professionals will attempt to coordinate and comply with all reasonable requests for information set forth in the Statement of Interest and any other reasonable requests for information regarding the Assets that has not been provided through Due Diligence Access.

Notwithstanding anything to the contrary contained in these Bid Procedures, the Debtors may deny Due Diligence Access to any Interested Party if the Debtors, after consulting with the Oversight Parties, believe that the Interested Party has no bona fide intention to submit a bid for any of the Assets or that the Interested Party seeks Due Diligence Access for an improper purpose, including, without limitation, wasting resources of the Debtors' estates, harassing the Debtors, or otherwise disrupting the sales process.

## **VI.  Qualified Bids**

In order for a Bidder's bid to purchase all or certain of the Assets to qualify for consideration, such bid must consist of the following information and items (collectively, a "**Bid**

**Package**") and be delivered to the Debtors' counsel, Rochelle McCullough LLP, at 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, so that it is <u>actually</u> <u>received</u> by said counsel by no later than the Bid Deadline (as defined below):

a.   A written offer (the "**Bid**"), executed by the Bidder or its duly-authorized representative (if an entity), setting forth:

(i) the Assets sought to be acquired by the Bidder (the "**Target Assets**");

(ii) the consideration offered by the Bidder to acquire the Target Assets, and

(iii) the Bidder's commitment that: (y) if the Bidder is selected as the Winning Bidder, the Bid shall remain open and irrevocable until the closing of the sale of the Target Assets to the Bidder; and (z) if the Bidder is selected as the Backup Bidder, then (I) the Bid shall remain open and irrevocable until the earlier of (A) the closing of the sale of the Target Assets to the Winning Bidder or (B) thirty (30) days after conclusion of the Sale Hearing (as defined below), and (II) should the sale of the Target Assets to the Winning Bidder fail to close for any reason and the Debtors notify the Bidder (as the Backup Bidder) prior to the expiration of thirty (30) days after the conclusion of the Sale Hearing (or the Bidder's written notice of withdrawal of the Bid, whichever is later) that the Debtors have elected to sell the Target Assets to the Bidder, then the Bidder shall close within two (2) Business Days of receipt of written notice from the Debtors of their election to sell the Target Assets to the Bidder.

b.   Satisfactory financial information demonstrating an ability to close the transaction proposed under the Bid and to perform all ongoing obligations associated therewith, including, but not limited to, (i) the most recent financial statements of the Bidder (or if the Bidder is an entity recently formed for the purpose of acquiring the Target Assets, current financial statements of the equity holder(s) of the Bidder), and (ii) such other financial disclosure acceptable to, and requested by, the Debtors (including evidence that the Bidder has adequate financing for the transaction, if the transaction will be financed) which demonstrates the financial capability of the Bidder to both consummate the purchase of the Target Assets and provide "adequate assurance of future performance," within the meaning of section 365(f)(2)(B) of the Bankruptcy Code, in relation to any executory contracts and unexpired leases to be assumed and assigned to such Bidder under the proposed transaction.  With respect to the provision of financial statements, if the Bidder (or the equity holder(s) of the Bidder if the Bidder is an entity recently formed for the purpose of acquiring the Target Assets) has financial statements that are audited by outside accountants, the financial statements required hereby shall be the most-recent audited financial statements, and in any event, the financial statements supplied as part of the Bid Package shall include a statement, executed by the Bidder or an authorized representative of the Bidder (if an entity) (or if the Bidder is an entity recently formed for the purpose of acquiring the Target Assets, executed by the equity holder(s) of the Bidder or an authorized representative(s) of the equity holder(s) of the Bidder if an entity(ies)), certifying that the financial statements supplied are true and correct;

c.   Evidence that the Bidder has the requisite internal authorizations and approvals necessary to consummate the proposed transaction without the necessity of obtaining the consent of any other person or entity;

d.  A written statement identifying all of the Bidder's (including its officers, directors, shareholders, general partners, limited partners, managing members, managers, and/or members, as applicable) connections (if any) with the Debtors, the Debtors' creditors, any other party in interest in the Bankruptcy Case, their respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee;

e.  A written statement setting forth any post-closing relationship or connection the Bidder contemplates having with the Debtors (including their officers, directors, shareholders, managing members, and members, as applicable) if the transaction proposed by the Bidder is selected and closes, including a description of the Bidder's plans (if any) to employ or otherwise retain any of the Debtors' employees;

f.  A cashier's check made payable to Bank of America, N.A., as escrow agent (the "**Escrow Agent**"), in an amount not less than (i) $500,000, in the case of a Bid to purchase the Primary Assets, (ii) $75,000, in the case of a Bid to purchase the Kinta Ranch Property, (iii) [TO BE DETERMINED], in the case of a Bid to purchase some or all of the Residual Assets, or (iv) the combined amount of all applicable amounts set out above, in the case of a Bid to purchase any combination of the Primary Assets, Kinta Ranch Property and Residual Assets (in each such case, the "**Deposit**") and an executed escrow agreement with the Debtors and Escrow Agent (the "**Executed Escrow Agreement**") in the same or substantially identical form as the form Escrow Agreement attached as **Exhibit C** hereto (the "**Model Escrow Agreement**").[2]  Among other things, the Executed Escrow Agreement shall provide for the Bidder's forfeiture of the Deposit if (i) the Bidder is determined to be a Qualified Bidder (as defined below) and withdraws its Bid or withdraws any subsequent Increased Bid (as defined below) before the Debtors' announcement of the Winning Bidder and Backup Bidder for the Target Assets, (ii) the Bidder is determined to be the Winning Bidder and (A) attempts to modify or withdraw the Bid or any subsequent Increased Bid without the Debtors' consent before the consummation of the sale contemplated by the Bidder's Agreement (as defined below) or (B) breaches the Bidder's Agreement, or (iii) the Bidder is determined to be the Backup Bidder and attempts to modify or withdraw the Bid or any subsequent Increased Bid prior to the earlier of (A) the closing of the sale of the Target Assets to the Winning Bidder or (B) 30 days after the conclusion of the Sale Hearing.  The Deposit shall be returned to the Bidder if (i) the Bidder is determined not to be a Qualified Bidder, (ii) the Bidder is determined not to be the Winning Bidder or Backup Bidder in relation to the Target Assets, or (iii) the Bidder is otherwise entitled to same in accordance with the terms and conditions of the Executed Escrow Agreement;

g.  An executed definitive asset purchase agreement (the "**Bidder's Agreement**") (i) containing the same or substantially identical terms and conditions as the Primary Assets APA, in the event the Bid is to purchase the Primary Assets, or (ii) containing the same or substantially identical terms and conditions as the Model APA, in the event the Bid is to purchase the Kinta Ranch Property and/or all or

---

2 The Debtors, in consultation with the Oversight Parties, reserve the right, in their sole and absolute discretion, to reject and disqualify any Bidder and/or such Bidder's Bid that is submitted along with an Executed Escrow Agreement that, in form or in substance, is materially different than the form of the Model Escrow Agreement.

some of the Residual Assets.  If the Bidder is submitting a Bid to purchase (i) the Primary Assets and (ii) the Kinta Ranch Property and/or all or some of the Residual Assets, then the Bidder shall submit both a Bidder's Agreement for the Primary Assets containing the same or substantially identical terms and conditions as the Primary Assets APA and a Bidder's Agreement for the Kinta Ranch Property and/or Residual Assets, as applicable, containing the same or substantially identical terms and conditions as the Model APA; *provided, however,* that if the Bidder is submitting a Bid to purchase the Primary Assets and the Kinta Ranch Property (but none of the Residual Assets), then the Bidder may submit a single Bidder's Agreement containing the same or substantially identical terms and conditions as the Primary Assets APA.  In each case, if the Bidder's Agreement is different, in form or substance (other than the terms of the consideration proposed and the insertion of the name of the Bidder), than the Primary Assets APA or Model APA (as applicable), then the Bid Package must also include a "red lined" or otherwise marked copy of the Primary Assets APA or Model APA (as applicable) reflecting all of the differences between the Bidder's Agreement and the Primary Assets APA or Model APA (as applicable).

In addition to the foregoing requirements, the Bid shall not contain terms that are materially more burdensome or conditional than the terms of the Primary Assets APA or Model APA (as applicable), shall not be conditioned on the Bidder obtaining financing or additional due diligence, and shall not entitle the Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment.  Moreover:

(i)    In the case of a Bid to purchase the Primary Assets, the Bid must exceed the Purchase Price (as defined in the Stalking Horse APA) by at least the sum of $200,000 plus the maximum amount of the Expense Reimbursement (as defined in the Stalking Horse APA) plus the amount of the Termination Fee (as defined in the Stalking Horse APA), and due to the numerous other factors that must be considered in comparing and assessing Bids, the Debtors retain the right to determine, in their sole business judgment after consultation with the Oversight Parties, whether the value of the consideration proposed by the Bidder for the Primary Assets exceeds the value of the Stalking Horse Bid (as defined below) by such required overbid amount; and

(ii)    In the case of a Bid to purchase the Kinta Ranch Property, the Bid must exceed the amount of $500,000 and the Bidder must agree to be bound by the terms of a Surface Use Agreement-Kinta Ranch (as defined in the Stalking Horse APA) in the event that the Primary Assets are sold to the Stalking Horse Bidder.

Only those Bidders who submit a Bid Package in compliance with all of the foregoing requirements on or before the Bid Deadline (as defined below) shall be entitled to have their respective Bids (a "**Qualified Bid**") considered by the Debtors (such a Bidder referred to herein as a "**Qualified Bidder**").  Each Qualified Bidder shall be notified of such designation by the Debtors.  A Bidder who timely submits a written Bid but fails to satisfy all of the above requirements shall be promptly notified by the Debtors and given an opportunity to promptly cure such defects to the satisfaction of the Debtors, in their sole discretion.  Only Qualified Bidders shall be allowed to participate at the Auction (as defined below).

## VII.  The Stalking Horse Bid

The Debtors have chosen the Stalking Horse Bidder to act as the "stalking horse" bidder in connection with their sale of the Primary Assets and the Kinta Ranch Property.  In this regard, the Debtors have been in a "workout" mode with the Secured Lender since early 2009.  At the beginning of the workout period, the parties hoped for a return to more robust gas prices by 2010.  During 2009, the Debtors explored the possibility of a restructuring of their indebtedness to the Secured Lenders.  The Debtors also discussed the possible purchase of the Secured Lender's position with a number of candidates, but no potential purchaser of the bank debt was able to propose terms acceptable to the Secured Lender.  When prices failed to improve markedly by year-end 2009, it became apparent that financial restructuring would be infeasible and that the only real solution would be a sale of the Assets.  Hence, the Debtors had discussions with various possible purchasing entities and solicited expressions of interest for the acquisition of the Assets.  The Stalking Horse Bidder spent approximately three months conducting due diligence and working with the Debtors and their advisors in formulating its offer for the Primary Assets (the majority of the Assets) and the Kinta Ranch Property and preparing and negotiating the terms of the Stalking Horse APA.  During this period of time, no other potential purchaser agreed to make a binding offer with respect to the Primary Assets or the Kinta Ranch Property.

The Stalking Horse Bidder is a Qualified Bidder and the terms of the transaction set forth within the Stalking Horse APA (the "**Stalking Horse Bid**") constitutes a Qualified Bid for all purposes under these Bid Procedures.

As a condition to the Stalking Horse Bidder's agreement to execute a binding agreement with the Pending Sale Debtors (the Stalking Horse APA) and to perform thereunder, the Stalking Horse Bidder required, and the Pending Sale Debtors agreed to, the inclusion of terms in the Stalking Horse APA for the reimbursement of the Stalking Horse Bidder's expenses (defined in the Stalking Horse APA and herein as the "**Expense Reimbursement**") and the payment of a break-up fee (defined in the Stalking Horse APA and herein as the "**Termination Fee**") under the conditions outlined in the Stalking Horse APA.  Among other things, if a Qualified Bidder other than the Stalking Horse Bidder closes on a Qualified Bid for the Primary Assets, the Debtors have agreed to pay up to $180,000 in Expense Reimbursement and 2.5% of the Purchase Price (as defined in the Stalking Horse APA) as a Termination Fee, as compensation for (i) the time, energy and resources expended by the Stalking Horse Bidder in, among other things, (A) investigating and analyzing the Debtors' business, the Primary Assets, the Kinta Ranch Property, the contracts of the Debtors considered for assumption and assignment, the nature and extent of the liabilities to be assumed under the transaction, all schedules and exhibits supplied by the Debtors in connection with the Stalking Horse APA, and all other matters relating to the agreement, the related sale documents and the transactions; and (B) negotiating, preparing, and reviewing, as applicable, the Stalking Horse APA, all other sale documents, and all motions, orders (including the Bidding Procedures Order), and other papers related to the Stalking Horse APA, the sale documents and the transactions; and (ii) the Stalking Horse Bidder's agreement to submit the Stalking Horse APA to the bidding process established by these Bid Procedures (as a Qualified Bid) and to participate in an Auction in the event of the submission of a competing Qualified Bid by another Qualified Bidder.  Without approval of the Expense Reimbursement and Termination Fee, the Stalking Horse Bidder would have been unwilling to make its binding offer for the Primary Assets and the Kinta Ranch Property and to enter into the Stalking Horse APA.  Accordingly, the Debtors determined that the Expense Reimbursement and Termination

Fee are necessary and reasonable and have obtained court approval of such protections under the Bidding Procedures Order.

If the Debtors become obligated to pay the Expense Reimbursement and Termination Fee to the Stalking Horse Bidder in connection with a sale of the Primary Assets to another Qualified Bidder, then the Expense Reimbursement and Termination Fee shall constitute allowed administrative expense claims under Bankruptcy Code sections 503(b), and shall be payable without further order of the Bankruptcy Court. Moreover, under the terms of the Stalking Horse APA and Bidding Procedures Order, the Stalking Horse Bidder shall be entitled to payment of the Expense Reimbursement and Termination Fee directly out of such Qualified Bidder's Deposit upon the closing of the sale of the Primary Assets to such Qualified Bidder.

## VIII.  Bid Deadline and Distribution of Qualified Bids

Any Interested Party that desires to submit a Bid shall deliver its Bid Package to Debtors' counsel, Rochelle McCullough LLP, at 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, by no later than **12:00 noon, prevailing Central Time, on _____, 2010** (the "**Bid Deadline**").  A Bid will not be considered by Debtors, and will not qualify as a Qualified Bid, unless the Bid Package is <u>actually</u> <u>received</u> by Debtors' counsel on or prior to the Bid Deadline.

Debtors' counsel shall transmit a copy of all Bids received by the Bid Deadline, via e-mail, to counsel for the Secured Lender and Committee by 5:00 p.m., prevailing Central Time, on _____, 2010.  Thereafter, the Debtors, in consultation with the Oversight Parties, will determine which of the Bids are Qualified Bids submitted by Qualified Bidders.

In the event the Debtors, in consultation with the Oversight Parties, determine that two or more Qualified Bids for the Primary Assets, the Kinta Ranch Property, and/or the Residual Assets have been submitted by Qualified Bidders by the Bid Deadline, then the Debtors will conduct an Auction, as described below, in relation to those Assets for which competing Qualified Bids have been timely submitted.

If no Qualified Bids for the Primary Assets and the Kinta Ranch Property (other than the Stalking Horse Bid) are received by the Bid Deadline, then no Auction will be conducted in relation to such Assets, the Stalking Horse Bidder will be deemed to be the Winning Bidder in relation to such Assets, and the Debtors shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the sale of the Primary Assets and the Kinta Ranch Property to the Stalking Horse Bidder under the terms and conditions of the Stalking Horse APA.  Alternatively, if no Qualified Bids for the Primary Assets (other than the Stalking Horse Bid) are received by the Bid Deadline, but the Debtors receive a Qualified Bid for the Kinta Ranch Property (other than the Stalking Horse Bid) and elect to exclude the Kinta Ranch Property from the transactions contemplated by the Stalking Horse APA in accordance with the provisions of the Stalking Horse APA, then no Auction will be conducted in relation to the Primary Assets, the Stalking Horse Bidder will be deemed to be the Winning Bidder in relation to the Primary Assets, and the Debtors shall request at the Sale Hearing that the Bankruptcy Court approve the sale of the Primary Assets to the Stalking Horse Bidder under the terms and conditions of the Stalking Horse APA.

After the Debtors determine which Bids are Qualified Bids submitted by Qualified Bidders, all Qualified Bids of Qualified Bidders, along with the Debtors' determination as to the

value of such Bids and the discount, if any, that they are applying to such Bids as a result of any changes made by a Bidder to the Primary Assets APA or Model APA (as applicable) under the Bidder's Agreement, or otherwise, will be made available to each Qualified Bidder to allow each Qualified Bidder adequate notice and opportunity to (a) discuss any questions or comments about any Qualified Bids with the Debtors, and (b) prepare a revised, improved Increased Bid (as defined below) prior to the Auction.

Notwithstanding the foregoing, if the Debtors, in consultation with the Oversight Parties, determine in their discretion that there are either no Qualified Bids for the Assets (other than the Stalking Horse Bid) or that the Bids received by the Debtors (other than the Stalking Horse Bid) are otherwise not acceptable, then the Debtors reserve the right to cancel the Auction, with the Stalking Horse Bidder deemed to be the Winning Bidder for the Primary Assets and the Kinta Ranch Property, and the Debtors will seek approval of the Stalking Horse APA as well as Court authority to conduct *de minimis* sales for the Residual Assets, under the terms and conditions described in the Bidding Procedures Order and Sale Motion, after the sale of the Primary Assets and the Kinta Ranch Property to the Stalking Horse Bidder.

## IX.  The Auction

In the event that an auction is conducted in relation to some or all of the Assets, the auction will be conducted on _____, 2010, at 10:00 a.m., prevailing Central Time, at the offices of the Debtors' counsel, Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201 (the "**Auction**").

The Debtors, in consultation with the Oversight Parties, will conduct the Auction in the manner they determine will result in the highest, best, or otherwise financially superior offer(s) for the Assets.  In conducting the Auction, the following procedures (collectively, the "**Auction Procedures**") shall apply:

a.     Qualified Bidders who participate at the Auction will be permitted to increase their Bids (each such increased Bid, an "**Increased Bid**").  The initial amount of increased consideration required for a successive Increased Bid for a particular Asset(s) (the "**Bid Increment**") will be provided to Qualified Bidders prior to the start of the Auction.  Thereafter and at any time during the Auction, the Debtors reserve the right, in consultation with the Oversight Parties, to change the Bid Increment required for successive Increased Bids upon verbal notice to all Qualified Bidders.

b.     With respect to the Primary Assets and the Kinta Ranch Property, the Stalking Horse Bidder shall be entitled to submit successive Increased Bids, and shall be entitled to credit bid the sum of the Expense Reimbursement and Termination Fee in submitting Increased Bids.

c.     Qualified Bidders who submit an Increased Bid above the level to which they have demonstrated financial capability to consummate a transaction to the satisfaction of the Debtors may be required to provide proof of their financial wherewithal prior to the Debtors' acceptance of such an Increased Bid.  All Bidders are encouraged to pre-qualify to the amount for which they may wish to bid or to bring proof of financial capability at such higher level with them to the Auction.

    d.      All incremental Increased Bids shall be made and received in one room, on an open basis, and all Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each such Qualified Bidder and all material terms of each Increased Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

    e.      The Qualified Bidder with the highest and best final Bid for a particular Asset(s) at the close of the Auction (the "**Successful Bid**"), as determined by the Debtors in consultation with the Oversight Parties, shall be the "**Winning Bidder**" in relation to such Asset(s). The Qualified Bidder having the next highest Bid below the Successful Bid of the Winning Bidder for the Asset(s) (the "**Cover Bid**"), as determined by the Debtors in consultation with the Oversight Parties, shall be the "**Backup Bidder**" in relation to such Asset(s). The Successful Bid shall remain open, irrevocable and binding on the Winning Bidder until the closing of the sale of the Asset(s) subject to such Bid to the Winning Bidder. The Cover Bid shall remain open, irrevocable and binding on the Backup Bidder until the earlier of (i) the closing of the sale of the Asset(s) subject to such Cover Bid to the Winning Bidder or (ii) thirty (30) days after conclusion of the Sale Hearing (as defined below). Notwithstanding anything to the contrary herein, in no event shall the Stalking Horse Bidder be obligated to close on its purchase of the Primary Assets and the Kinta Ranch Property after the Termination Date (as defined in the Stalking Horse APA).

    f.      At the conclusion of the Auction, the Debtors shall provide notice of the identity of the Winning Bidder and the Backup Bidder for each particular Asset or group of Assets to all parties in interest.

    g.      For each Qualified Bidder that is neither a Winning Bidder nor a Backup Bidder, the Debtors will promptly, and in accordance with the Bidder's Executed Escrow Agreement, instruct the Escrow Agent to return the Bidder's Deposit to the Bidder.

The Debtors, in consultation with the Oversight Parties, may adopt such other Auction Procedures that, in the Debtors' reasonable judgment, will best promote the goal of a fair and competitive bidding process consistent with these Bid Procedures and any applicable Bankruptcy Court orders (including the Bidding Procedures Order). In formulating and instituting such other Auction Procedures (if any), such additional Auction Procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder.

## X.  Sale Hearing

If the Debtors determine, in consultation with the Oversight Parties, that a Successful Bid is a reasonable bid that provides the greatest benefit to the Debtors' estates under the circumstances, then the Debtors may accept that Successful Bid; provided that parties in interest will have until 5:00 p.m., prevailing Central Time, on _____, 2010, to object to the Debtors' determination to accept the Successful Bid by filing an objection with the Bankruptcy Court setting forth, with specificity, why the amount of the Successful Bid being objected to is not reasonable and does not provide the greatest benefit to the estates (a "**Sale Objection**").

The Debtors have filed a motion for approval of their sale of the Assets, subject to the completion of the sales process set out in these Bid Procedures (the "**Sale Motion**").   An evidentiary hearing to confirm the results of the sales process, to confirm the results of the Auction (if applicable), and on all of the other relief requested in the Sale Motion (the "**Sale Hearing**") shall be held before the Bankruptcy Court within two (2) business days after the conclusion of the Auction, unless ordered otherwise by the Bankruptcy Court.

If a Sale Objection is not timely filed with the Bankruptcy Court, then the Debtors may close on the Successful Bid in accordance with the Bidder's Agreement (as modified by any Increased Bid at the Auction), upon approval from the Bankruptcy Court.  If a Sale Objection is timely filed, the Sale Objection will be resolved by the Bankruptcy Court at the Sale Hearing.

## XI.  Miscellaneous

A party's participation in the sales process outlined herein shall constitute: (i) consent by such party to be subject to the jurisdiction of the Bankruptcy Court, for all purposes, in connection with any and all matters relating to the sale of the Assets and these Bid Procedures; and (ii) the party's acknowledgment of its review, understanding and acceptance of all of the Bid Procedures outlined herein.

**EXHIBIT A**
[CONFIDENTIALITY AGREEMENT]

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "*Agreement*") is hereby entered into by and between Redwine Resources, Inc.; Badger Drilling Company, LLC; White Oaks Resources, LLC; Redwine Oil & Gas Properties, LLC; Redwine Rockies, LLC; Redwine Oil & Gas, LLC; Redwine Aviation, Inc.; and Redwine Kinta Ranch, LLC, each a Texas corporation or Texas limited liability company (collectively, "*Redwine*"), and _____, a _____ corporation ("*Recipient*") (Redwine and Recipient herein collectively referred to as the "*Parties*"), to evidence the Parties' agreement, effective as of _____, 2010, with respect to Redwine's disclosure of certain Confidential Information (as defined herein below) to Recipient in connection with Recipient's evaluation of the possibility of a business transaction between the Parties pursuant to which Recipient would acquire certain of Redwine's assets (a "*Transaction*").

## 1.     Restrictions and Obligations

(a)     Recipient recognizes and acknowledges that, during the course of Recipient's evaluation of a Transaction, Recipient will receive Confidential Information from Redwine, and that such information is proprietary to and the property of Redwine.  Recipient agrees to take all reasonable precautions against disclosure of the Confidential Information to third persons, except as expressly authorized herein.  Without limiting the foregoing, Recipient shall take at least those measures that it takes to protect its own most highly confidential information.

(b)     Recipient may disclose the Confidential Information to its officers, directors, agents, employees, prospective financing sources, and representatives, including financial and legal advisors, on a need-to-know basis in connection with evaluating the Transaction (collectively, "*Representatives*").     Representatives shall be informed by Recipient of the confidential nature of the Confidential Information and shall be directed by Recipient to treat the Confidential Information confidentially.  Recipient agrees to be responsible for the actions of its Representatives and for any breach of the terms of this Agreement by such a Representative.  Recipient agrees not to disclose any Confidential Information, except as required in connection with Recipient's evaluation of a Transaction with Redwine or as required by law, provided that if such disclosure is required by law, Recipient shall give Redwine prompt written notice of such requirement prior to such disclosure and assist Redwine in protecting the Confidential Information from public disclosure.

(c)     Upon Redwine's written request or, if earlier, upon Recipient's and/or Redwine's determination not to proceed with a Transaction, Recipient shall return to Redwine or destroy all materials in the possession, or under the control, of Recipient that contain Confidential Information, including any reports, analyses, memoranda and other materials that were prepared by Recipient, or any of its Representatives, and that include or were based on Confidential Information.  If Recipient elects to destroy such information, it shall promptly certify in writing to Redwine that Recipient has destroyed all such information in accordance with this Agreement.

## 2.     Definition of Confidential Information

(a)     "*Confidential Information*" means information, knowledge or data that is nonpublic, confidential or proprietary in nature that is disclosed to or made known to Recipient by Redwine in connection with, as a consequence of, or by virtue of Recipient's evaluation of a Transaction with Redwine, including, without limitation, Redwine's business operations, financial statements, services, products, formulas, pricing strategies, computer programs and

systems, trade secrets, inventions, processes, research and development, work performed or to be performed for customers or prospects, customer records, current or prospective customers, prospects, lists of employees and salary information, marketing plans and strategies, forecasts, budgets, compilations, data, studies and other similar material.  Such information shall be deemed Confidential Information regardless of whether disclosed orally, in writing or in any other form or medium (including without limitation electronic or computer-based data) and includes without limitation information obtained by meeting with representatives of Redwine and all notes, analyses, compilations, forecasts, reports, studies or other materials (in whatever form, whether documentary, computer storage or otherwise) prepared by Recipient or its Representatives that contain or otherwise reflect such information.

(b)     Recipient acknowledges that Redwine has spent significant time, effort, and money to develop the Confidential Information, which Redwine considers vital to its business and goodwill.  Recipient also acknowledges that the Confidential Information has been or will be communicated to or acquired by Recipient in the course of evaluation of a Transaction with Redwine, and Redwine desires to proceed with the possibility of a Transaction with Recipient only if, in doing so, it can protect its Confidential Information and goodwill.

**3.**     **Exclusions from Confidential Information**.  The Parties agree that Confidential Information shall not include any information to the extent that the information: (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by Recipient or its Representatives, (ii) is or becomes available to Recipient on a non-confidential basis from a source which is entitled to disclose it to Recipient, (iii) is in Recipient's rightful possession prior to receipt from Redwine and was not subject to any obligation of confidentiality, or (iv) is or was independently developed by Recipient without using the Confidential Information received from Redwine.

**4.**     **Injunctive Relief; Enforcement**.   It is hereby understood and agreed that damages shall be an inadequate remedy in the event of a breach by Recipient of any of the foregoing covenants and that any such breach by Recipient will cause Redwine great and irreparable injury and damage.  Accordingly, Recipient agrees that Redwine shall be entitled, without waiving any additional rights or remedies otherwise available to Redwine at law or in equity or by statute, to injunctive and other equitable relief in the event of a breach or intended or threatened breach by Recipient of any of said covenants.  In the event of litigation relating to this Agreement, the non-prevailing Party shall reimburse the prevailing party for its costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with such litigation.

**5.**     **NO WARRANTY**.  ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS."  REDWINE MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY OR COMPLETENESS.

**6.**     **No License**.  All Confidential Information of Redwine and copies thereof are, and will remain, exclusively owned by Redwine.  All items and information prepared by Recipient incorporating or derived from any part of the Confidential Information of Redwine will also be considered Confidential Information of Redwine and owned exclusively by Redwine.  Nothing in this Agreement is intended to grant any rights to Recipient under any patent, mask work right or copyright of Redwine, nor shall this Agreement grant to Recipient any rights in or to the Confidential Information of Redwine except as expressly set forth herein.

7.    **Miscellaneous**.

(a)    *No Obligation*.   Nothing herein shall obligate either Party to proceed with any transaction between them, and each Party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning a Transaction.

(b)    *Governing Law*.   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

(c)    *Severability*.   In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such provision(s) had never been contained herein, provided that such provision(s) shall be curtailed, limited or eliminated only to the extent necessary to remove the invalidity, illegality or unenforceability.

(d)    *Waiver*.   No waiver by Redwine of any breach by Recipient of any of the provisions of this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other provisions hereof.   No such waiver shall be effective unless in writing and then only to the extent expressly set forth in writing.

(e)    *Entire Agreement*.   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter contained herein.   Neither this Agreement nor the disclosure or receipt of the Confidential Information or any other activity contemplated hereunder shall constitute, or imply, any promise or intention by either Party to enter into any type of business transaction or relationship with the other party.   This Agreement may be amended only by a subsequent written agreement executed by both Parties.

(f)    *No Assignment*.   This Agreement is non-assignable, and none of the rights conferred hereby may be assigned or transferred by Recipient to any third party.

(g)    *Warranty of Authority*.   Each of the signatories hereto hereby warrants that he/she is fully authorized to execute this Agreement on behalf of the Party for whom he/she is signing.

(h)    *Counterparts*.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.   The exchange of copies of this Agreement and of signature pages by facsimile transmission or other electronic means shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.   Signatures of the parties transmitted by facsimile or other electronic means shall be deemed to be their original signatures for any purpose whatsoever.

**IN WITNESS WHEREOF**, the undersigned representatives of the Parties have executed this Agreement effective as of the date first written above.


<u>**REDWINE:**</u>

Redwine Resources, Inc.                          Badger Drilling Company, LLC

By:_____              By:_____
   Name:                                            Name:
   Title:                                             Title:

White Oaks Resources, LLC                        Redwine Oil & Gas Properties, LLC

By:_____              By:_____
   Name:                                            Name:
   Title:                                             Title:

Redwine Rockies, LLC                             Redwine Oil & Gas, LLC

By:_____              By:_____
   Name:                                            Name:
   Title:                                             Title:

Redwine Aviation, Inc.                           Redwine Kinta Ranch, LLC

By:_____              By:_____
   Name:                                            Name:
   Title:                                             Title:

<u>Address for Notices to Redwine</u>:
8214 Westchester Drive, Suite 740
Dallas, Texas 75225
Fax:_____


<u>**RECIPIENT:**</u>

                                  <u>Address for Notices to Recipient:</u>
                                  _____
                                  _____
By:_____              Fax:_____
   Name:
   Title:

**EXHIBIT B**
[BIDDER INFORMATION SHEET]

## BIDDER INFORMATION SHEET

The following information is hereby provided by the Interested Party (as defined below) in accordance with the Bid Procedures approved by order of the U.S. Bankruptcy Court for the Northern District of Texas in Case No. 10-_____ (jointly administered) (the "**Bid Procedures**").  Unless separately defined herein, all capitalized terms shall have the meanings assigned to them in the Bid Procedures.

**INTERESTED PARTY'S NAME**:

_____ ("**Interested Party**")

**INTERESTED PARTY'S ADDRESS**:

_____

_____

_____

**AUTHORIZED OFFICER(S)/AGENT(S):***
*such individuals as have been authorized to act on behalf of Interested Party
in communicating with the Debtors on matters regulated by the Bid Procedures.

Name: _____     Name: _____

Title: _____     Title: _____

Phone: _____     Phone: _____

Fax: _____     Fax: _____

[add additional names and contact information as appropriate]

## ACKNOWLEDGMENT

By signing below, the undersigned (as the Interested Party or as the representative of the Interested Party authorized to execute and submit this Bidder Information Sheet on behalf of the Interested Party) hereby (i) represents that Interested Party has a bona fide interest in submitting a Bid to the Debtors for the purchase of all or some of the Debtors' Assets, and that Interested Party is hereby submitting this executed Bidder Information Sheet to request Due Diligence Access and to participate in the sales process established under the Bid Procedures; (ii) acknowledges that the undersigned has reviewed and understands all of the Bid Procedures and that Interested Party accepts and agrees to be bound by all of the Bid Procedures; and (iii) acknowledges Interested Party's consent to be subject to the jurisdiction of the Bankruptcy Court, for all purposes, in connection with any and all matters relating to the sale of the Assets and the Bid Procedures.

Dated:_____     _____

[signature]

Title:_____

**EXHIBIT C**
[MODEL ESCROW AGREEMENT]

{To Be Supplemented}

<u>Exhibit 2</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-34041 |
| | § | |
| REDWINE RESOURCES, INC., et al., | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

**Notice of (A) Bid Procedures; and (B) Auction for Sale of Primary Assets,
Kinta Ranch Property and Residual Assets Free and Clear of Liens,
<u>Claims, Encumbrances and Interests</u>**

**PLEASE TAKE NOTICE** on June 4, 2010, each of Redwine Resources, Inc.; Badger Drilling Company, LLC; White Oak Resources, LLC; Redwine Oil and Gas Properties LLC; Redwine Rockies, LLC; Redwine Oil and Gas, LLC; Redwine Aviation Inc.; and Redwine Kinta Ranch, LLC (collectively, the "**<u>Debtors</u>**") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**") with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**<u>Court</u>**"). By order of the Court, the Debtors' bankruptcy cases are being jointly administered under Case No. 10-34041 (the "**<u>Bankruptcy Case</u>**").

**PLEASE TAKE FURTHER NOTICE** that, in relation to the Bankruptcy Case, the Debtors are pursuing the sale of Leases, Wells, Personal Property, Real Property, Leaseholds, Equipment, Inventory, Fixtures and certain related property (collectively, the "**<u>Assets</u>**"), free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests. In furtherance of such effort, on _____, 2010, the Court entered an *Order (I) Approving Bid Procedures for the Sale of Primary Assets, Kinta Ranch Property and Residual Assets, (II) Scheduling Hearing to Consider Sale, (III) Approving Form of Notices; (IV) Establishing Procedures Related to the Assumption/Assignment and/or Transfer by Agreement of Certain Contracts, (V) Approving Bid Protections, and (VI) For Other Relief* (the "**<u>Sale Procedures Order</u>**"), pursuant to which the Court approved the Bid Procedures attached hereto.

**PLEASE TAKE FURTHER NOTICE** that the Bid Procedures include specific bid requirements, bidder qualifications, and auction procedures which shall govern the Debtors' sale of the Assets. In the event of any inconsistency between the Bid Procedures and the summary description of such procedures contained in this Notice, the terms and conditions of the Bid Procedures shall control.[1] Among other things, the Bid Procedures set out specific categories of Assets (referred to as the Primary Assets, the Kinta Ranch Property and the Residual Assets) and describe the requirements that must be satisfied in order for a Bid to qualify as a Qualified Bid for particular Assets and for a Bidder to qualify as a Qualified Bidder. <u>Accordingly, parties having an interest in submitting a Bid for the purchase of some or all of the Assets should carefully read the Bid Procedures.</u>

---

[1] In this regard, unless separately defined herein, all defined terms shall have the meanings ascribed to such terms in the Bid Procedures.

PLEASE TAKE FURTHER NOTICE that the deadline for the submission of Bids and Bid Packages to the Debtors is **12:00 noon, prevailing Central Time, on _____, 2010** (the "**Bid Deadline**").

PLEASE TAKE FURTHER NOTICE that if two or more Qualified Bids are submitted by Qualified Bidders for the Primary Assets, the Kinta Ranch Property, or some or all of the Residual Assets, and such Qualified Bids are timely received by the Bid Deadline, then with respect to the Assets for which such Qualified Bids have been received, the Debtors shall conduct an Auction.  The Auction shall take place on **_____, 2010, at 10:00 a.m., prevailing Central Time**, at the offices of the Debtors' counsel, Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201.  At the conclusion of the Auction, the Debtors, in consultation with the Oversight Parties, will select the Winning Bidder (whose Bid is referred to as the Successful Bid) and a Backup Bidder (whose Bid is referred to as the Cover Bid).

PLEASE TAKE FURTHER NOTICE that, following the bidding and auction process, the Debtors' sale of the Assets, including the selection of the Winning Bidder/Successful Bid and Backup Bidder/Cover Bid, will be subject to the approval of the Court.  In this regard, the Court has set a hearing (the "**Sale Hearing**") on the Debtors' related *Motion for Order Authorizing Sale, Approving Model APA, Approving Assumption and Assignment, and Authorizing De Mnimus Sales* (the "**Sale Motion**") for **_____, 2010, at _____, prevailing Central Time**, before The Honorable Barbara J. Houser, U.S. Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242.

PLEASE TAKE FURTHER NOTICE that the Debtors, in consultation with the Oversight Parties, reserve the right, in their discretion and reasonable business judgment, to: (a) determine whether a Bidder has satisfied all of the requirements to qualify as a Qualified Bidder; (b) determine whether a Bid has satisfied all of the requirements to constitute a Qualified Bid; (c) determine which Qualified Bid or Increased Bid at the Auction (if applicable) is the highest and best offer received for a particular Asset or category of Assets; and (d) reject, at any time before entry of an order of the Court approving a Bid as the Successful Bid or Cover Bid, any Bid that the Debtors, in consultation with the Oversight Parties, has determined is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bid Procedures or the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors' estates and creditors; *provided, however*, that the Staking Horse Bidder is deemed to be a Qualified Bidder and the Stalking Horse Bid is deemed to constitute a Qualified Bid for all purposes under the Bid Procedures, and the Debtors may not reject the Stalking Horse Bid of the Stalking Horse Bidder except as provided within, and subject to the terms and conditions of, the Stalking Horse APA.

PLEASE TAKE FURTHER NOTICE that parties may obtain a copy of the Sale Procedures Order, the Sale Motion, and other related pleadings from the Debtors by requesting such documents from the Debtors' counsel at the following address and telephone number: Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, Attn: Michael R. Rochelle; (214) 953-0182.

PLEASE TAKE FURTHER NOTICE that any person or entity that is interested in becoming potentially submitting a Qualified Bid should contact the Debtors' counsel at the above address.

<u>EXHIBIT 3</u>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-34041 |
| | § | |
| REDWINE RESOURCES, INC., et al., | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## ASSUMPTION AND CURE NOTICE

**PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS WILL BE
AFFECTED AS SET FORTH BELOW.**

**PLEASE TAKE NOTICE** on June 4, 2010, each of Redwine Resources, Inc.; Badger Drilling Company, LLC; White Oak Resources, LLC; Redwine Oil and Gas Properties LLC; Redwine Rockies, LLC; Redwine Oil and Gas, LLC; Redwine Aviation Inc.; and Redwine Kinta Ranch, LLC (collectively, the "**Debtors**") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Court**"). By order of the Court, the Debtors' bankruptcy cases are being jointly administered under Case No. 10-34041 (the "**Bankruptcy Case**").

**PLEASE TAKE FURTHER NOTICE** that, in relation to the Bankruptcy Case, the Debtors are pursuing the sale of substantially all of their assets (the "**Assets**"), free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests. In connection with such sale(s) (the "**Sales**"), the Debtors are also pursuing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "**Assigned Agreements**") to the purchaser(s) of the Assets.

**PLEASE TAKE FURTHER NOTICE** that on _____, 2010, the Court entered an *Order (I) Approving Bid Procedures for the Sale of Primary Assets, Kinta Ranch Property and Residual Assets, (II) Scheduling Hearing to Consider Sale, (III) Approving Form of Notices; (IV) Establishing Procedures Related to the Assumption/Assignment and/or Transfer by Agreement of Certain Contracts, (V) Approving Bid Protections, and (VI) For Other Relief* (the "**Sale Procedures Order**"), pursuant to which the Court, among other things, has (i) approved procedures for the provision of notice to non-debtor counterparties to Assigned Agreements (collectively, the "**Contract Counterparties**") of the Debtors' intention to assume and assign the Assigned Agreements and all amounts (the "**Cure Amount**"), if any, that the Debtors believe must be paid to a particular Contract Counterparty pursuant to Section 365 of the Bankruptcy Code in order to assume and assign the Contract Counterparty's Assigned Agreement, and (ii) established a deadline (the "**365 Objection Deadline**") for the filing of objections to the assumption and assignment of Assigned Agreements and to the Cure Amounts proposed by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a listing (the "**Cure List**") of all potential Assigned Agreements (alphabetically sorted by Contract Counterparty name) that the Debtors may seek to assume and assign in connection with the Sales.  Among other things, the Cure List specifies for each particular Assigned Agreement the total amount of all cure, compensation, and reinstatement costs and expenses of or related to such Assigned Agreement that the Debtors believe must be paid to the Contract Counterparty under the Assigned Agreement pursuant to Section 365 of the Bankruptcy Code in order of the Debtors to assume and assign the Assigned Agreement (collectively, the "**Cure Amount**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Procedures Order, certain bidding and auction procedures in relation the Debtors' sale of the Assets have been approved.  Following the submission of bids and, if applicable, an auction in relation to those Assets for which competing qualified bids are received, the Debtors will identify the Winning Bidder(s) and Backup Bidder(s).  In relation thereto, and as part of the process, the Debtors will also identify which of the Assigned Agreements is proposed to be assigned to each particular Winning Bidder (or Backup Bidder in the event of that the Sale to the Winning Bidder fails to close) and, by no later than ____ business days prior to the 365 Objection Deadline, provide notice of same to all affected Contract Counterparties.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Procedures Order, the 365 Objection Deadline is **5:00 p.m., prevailing Central Time, on _____, 2010**.  Any objection by a Contract Counterparty to the assumption and assignment of its Assigned Agreement (an "**Assignment Objection**") or to the Cure Amount set forth on the Cure List in relation to such Assigned Agreement (a "**Cure Amount Objection**") must:

(a) be in writing;

(b) specify the specific grounds for objection;

(c) in the event of a Cure Amount Objection (i) specify the amount that the Contract Counterparty asserts is the correct Cure Amount, and (ii) include supporting documentation and other evidence substantiating the Contract Counterparty's asserted Cure Amount;

(d) be filed with the Court by no later than the 365 Objection Deadline; and

(e) be served on counsel for the Debtors, Rochelle McCullough, LLP, Attn: Michael R. Rochelle, Esq., 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, by no later than the 365 Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that in the absence of a Contract Counterparty's filing and service, on or before the 365 Objection Deadline, of a written Assignment Objection, such Contract Counterparty shall be deemed to have consented to the assumption and assignment of the Contract Counterparty's Assigned Agreement in connection with the Sales.

**PLEASE TAKE FURTHER NOTICE** in the absence of a Contract Counterparty's filing and service, on or before the 365 Objection Deadline, of a written Cure Amount Objection in compliance with the above procedures: (i) the Cure Amount set forth on the Cure List with respect to such Contract Counterparty's Assigned Agreement shall be binding on such Contract Counterparty; (ii) the Contract Counterparty shall be forever barred and estopped from asserting against the Debtors, their estates, and the assignee of the Contract Counterparty's Assigned Agreement that any amount in excess of the Cure Amount identified on the Cure List is due, that

any other defaults exist under the Assigned Agreement, or that any other conditions to the assumption and assignment of the Assigned Agreement exist; and (iii) payment to the Contract Counterparty of the Cure Amount identified on the Cure List in connection with the assumption and assignment of the Assigned Agreement shall be deemed to constitute satisfaction in full of all obligations required under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Agreement, following which the Debtors and the their estates shall have no further or continuing liability to the Contract Counterparty under the Assigned Agreement.

PLEASE TAKE FURTHER NOTICE that in the event that a Contract Counterparty files and serves an Assignment Objection or Cure Amount Objection on or before the 365 Objection Deadline, such objection (if not consensually resolved) will be heard and determined at the Sale Hearing (as defined below) unless ordered otherwise by the Court.

PLEASE TAKE FURTHER NOTICE that the Court has set a hearing (the "**Sale Hearing**") on the Debtors' *Motion for Order Authorizing Sale, Approving Model APA, Approving Assumption and Assignment, and Authorizing De Mnimus Sales* (the "**Sale Motion**") for **_____, 2010, at _____, prevailing Central Time**, before The Honorable Barbara J. Houser, U.S. Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242.

PLEASE TAKE FURTHER NOTICE that, following the assumption and assignment of an Assigned Agreement to the relevant Winning Bidder (or Backup Bidder), the Assigned Agreement shall remain in full force and effect in accordance with its terms, and be fully enforceable by the assignee Winning Bidder (or Backup Bidder), notwithstanding any provision within the Assigned Agreement that purports to prohibit, restrict or otherwise condition such transfer and assignment.

PLEASE TAKE FURTHER NOTICE that parties may obtain a copy of the Sale Procedures Order, the Sale Motion, and other related pleadings from the Debtors by requesting such documents from the Debtors' counsel at the following address and telephone number: Rochelle McCullough, LLP, 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201, Attn: Michael R. Rochelle; (214) 953-0182.