# ASSET PURCHASE AND SALE AGREEMENT

**dated as of**

**June 8, 2010**

**among**

**Redwine Oil & Gas Properties, LLC
Redwine Resources, Inc.
Redwine Rockies, LLC
Redwine Oil & Gas, LLC
Redwine Kinta Ranch, LLC**

**Collectively as "Seller"**

**and**

**Longroad Capital Partners III, L.P.**

**as "Purchaser"**

# TABLE OF CONTENTS

ARTICLE I Defined Terms ......................................................................................................... 1
    Section 1.01. Definitions............................................................................................................ 1

ARTICLE II The Transaction.................................................................................................... 14
    Section 2.01. Purchase and Sale of the Purchased Assets and Kinta Ranch Property.......... 14
    Section 2.02. Excluded Assets.................................................................................................. 17
    Section 2.03. Assumption of the Assumed Liabilities............................................................. 18
    Section 2.04. Excluded Liabilities. ......................................................................................... 19
    Section 2.05. Assigned Agreements. ...................................................................................... 21
    Section 2.06. Employees.......................................................................................................... 21
    Section 2.07. Benefits .............................................................................................................. 22
    Section 2.08. "AS IS" and "WHERE IS" Transaction ......................................................... 22

ARTICLE III Consideration ...................................................................................................... 23
    Section 3.01. Consideration ..................................................................................................... 23
    Section 3.02. Adjustment to Purchase Price and Payment Amount ....................................... 23
    Section 3.03. Allocation of Purchase Price for Tax Purposes ............................................... 26
    Section 3.04. Deposit............................................................................................................... 26

ARTICLE IV The Closing; Conditions to Closing ................................................................. 29
    Section 4.01. The Closing........................................................................................................ 29
    Section 4.02. Conditions Precedent to the Obligations of the Seller...................................... 29
    Section 4.03. Conditions Precedent to the Obligations of the Purchaser............................... 30
    Section 4.04. Efforts to Close; Consents ............................................................................... 32

ARTICLE V Representations and Warranties of the Seller ...................................................... 33
    Section 5.01. Existence and Power .......................................................................................... 33
    Section 5.02. Authorization; Binding Effect........................................................................... 33
    Section 5.03. Contravention..................................................................................................... 34
    Section 5.04. Consents............................................................................................................. 34
    Section 5.05. Financial Information......................................................................................... 34
    Section 5.06. Litigation............................................................................................................ 35
    Section 5.07. Permits; Compliance with Laws. ...................................................................... 35
    Section 5.08. Employment Matters.......................................................................................... 36
    Section 5.09. Title to Purchased Assets .................................................................................. 36
    Section 5.10. Real Property, Leases and Leaseholds.............................................................. 37
    Section 5.11. Equipment, Non-Production-Based Inventory, and Fixtures............................. 38
    Section 5.12. Material Contracts; Liens.................................................................................. 38
    Section 5.13. Intellectual Property........................................................................................... 39
    Section 5.14. Insurance ........................................................................................................... 39
    Section 5.15. Environmental Matters....................................................................................... 40
    Section 5.16. Employees; ERISA. .......................................................................................... 42

Section 5.17. Brokers, Finders ................................................................................ 43
Section 5.18. No Material Misstatements or Omissions .......................................... 43
Section 5.19. Conduct of Business ......................................................................... 43

ARTICLE VI Representations and Warranties of the Purchaser ............................. 43
Section 6.01. Existence and Power ......................................................................... 43
Section 6.02. Authorization; Binding Effect .......................................................... 43
Section 6.03. Contravention ................................................................................... 43
Section 6.04. Consents ........................................................................................... 44
Section 6.05. Litigation .......................................................................................... 44
Section 6.06. Financial Resources ......................................................................... 44
Section 6.07. Acknowledgments ............................................................................ 44

ARTICLE VII Pre-Closing Covenants of the Seller and the Purchaser .................. 44
Section 7.01. Conduct of Business Pending Closing ............................................. 44
Section 7.02. Access to Information; Cooperation. ............................................... 45
Section 7.03. Bankruptcy Actions. ........................................................................ 46
Section 7.04. Disclosure Schedules. ...................................................................... 47
Section 7.05. Notice ............................................................................................... 48
Section 7.06. No Solicitation of Purchase or Sale ................................................. 48

ARTICLE VIII Covenants of the Seller and the Purchaser ..................................... 48
Section 8.01. Name Change ................................................................................... 48
Section 8.02. Books and Records. .......................................................................... 49
Section 8.03. Insurance .......................................................................................... 49
Section 8.04. Notice ............................................................................................... 49

ARTICLE IX Termination and Expenses ............................................................... 50
Section 9.01. Termination ...................................................................................... 50
Section 9.02. Effect of Termination ....................................................................... 51
Section 9.03. Fees and Expenses. .......................................................................... 51

ARTICLE X Miscellaneous .................................................................................... 53
Section 10.01. Notices ........................................................................................... 53
Section 10.02. Counterparts ................................................................................... 54
Section 10.03. Amendment of Agreement .............................................................. 54
Section 10.04. Successors and Assigns; Assignability .......................................... 54
Section 10.05. Governing Law ............................................................................... 54
Section 10.06. Integration ...................................................................................... 54
Section 10.07. Severability ..................................................................................... 54
Section 10.08. Further Assurances .......................................................................... 54
Section 10.09. No Third-Party Rights ..................................................................... 55
Section 10.10. Enforcement .................................................................................... 55
Section 10.11. Submission to Jurisdiction ............................................................. 55
Section 10.12. WAIVER OF JURY TRIAL ........................................................... 55
Section 10.13. No Waiver; Remedies ..................................................................... 55

Section 10.14. Interpretation ................................................................................................ 56
Section 10.15. Ambiguities .................................................................................................... 56
Section 10.16. Incorporation of Schedules and Exhibits ....................................................... 56
Section 10.17. No Survival of Representations and Warranties ............................................. 56

## Schedules
## all schedules subject to further review by Purchaser

| | |
|---|---|
| Schedule 1.01(a) | Permitted Liens |
| Schedule 1.01(b) | Surface Use Agreements |
| Schedule 2.01 | Oil, Gas and Mineral Leases and Leaseholds |
| Schedule 2.01(c) | Wells |
| Schedule 2.01(e) | Operating Contracts |
| Schedule 2.01(k) | Security Deposits, Deposits and Prepaid Expenses |
| Schedule 2.02(e) | Excluded Assets |
| Schedule 2.02(j) | Excluded Leases, Wells and Other Properties/Items |
| Schedule 2.02(k) | Excluded Refunds and Refund Rights |
| Schedule 2.05(a) | Assigned Agreements |
| Schedule 3.03 | Allocation of Purchase Price |
| Schedule 5.04 | Required Consents |
| Schedule 5.05 | Exceptions to Reserve Report and Interim Financial Statements |
| Schedule 5.05(a) | Reserve Report |
| Schedule 5.05(b) | Interim Financial Statements |
| Schedule 5.06 | Litigation |
| Schedule 5.07 | Required Permits |
| Schedule 5.08(a) | Labor Disputes |
| Schedule 5.08(b) | Immigration Law Disputes |
| Schedule 5.08(c) | Restrictions |
| Schedule 5.10(a)(i) | Purchased Real Property and Leaseholds |
| Schedule 5.10(a)(ii) | Kinta Ranch Property |
| Schedule 5.10(b) | Liens, Encumbrances and Leases on Real Property and Leaseholds |
| Schedule 5.10(c) | Liens and Encumbrances Against Leases |
| Schedule 5.10(e) | Condemnation and Eminent Domain |
| Schedule 5.11(a) | Equipment, Non-Production-Based Inventory, and Fixtures |
| Schedule 5.12 | Liens |
| Schedule 5.13(a)(i) | Required Intellectual Property |
| Schedule 5.13(a)(ii) | Other Intellectual Property |
| Schedule 5.14 | Insurance |
| Schedule 5.15 | Environmental Matters |
| Schedule 5.16 | Benefits Plans |
| Schedule 5.16(c)(iv) | COBRA Covered Employees and Beneficiaries |
| Schedule 6.04 | Purchaser Required Consents |
| Schedule 7.01(c) | Sales |

## Exhibits

| | |
|---|---|
| Exhibit A | Bidding Procedures Order |

This ASSET PURCHASE AND SALE AGREEMENT (the "**Agreement**") is entered into as of June 8, 2010, by and between Redwine Oil & Gas Properties, LLC, Redwine Resources, Inc., Redwine Rockies, LLC, Redwine Oil & Gas, LLC, and Redwine Kinta Ranch, LLC, each a Texas corporation or Texas limited liability company, as debtors and debtors-in-possession (hereinafter collectively "**Seller**"), and Longroad Capital Partners III, L.P., a Delaware Limited Partnership (together with any successors and assigns, the "**Purchaser**").

## RECITALS

A.     On June 4, 2010 (the "**Petition Date**"), Seller commenced proceedings (the "**Proceedings**") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**") by filing voluntary petitions for relief under Title 11, Chapter 11 of the United States Code (the "**Bankruptcy Code**"), Case Nos. 10-34041, 10-34050, 10-34052, 10-34053, and 10-34051. Seller has filed a motion with the Bankruptcy Court to request the joint administration of the Proceedings along with separately-filed bankruptcy proceedings of certain of its Affiliates.

B.     The Seller owns the Purchased Assets and the Kinta Ranch Property (both as defined below).

C.     On the terms and subject to the conditions set forth in this Agreement, the Purchaser desires to acquire from the Seller, and the Seller wishes to sell to the Purchaser, the Purchased Assets and the Kinta Ranch Property.

## AGREEMENT

In consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

### Defined Terms

Section 1.01. <u>Definitions</u>.   As used in this Agreement, the following terms have the meanings stated:

"**Accounts Receivable**" shall mean accounts receivable of Seller, other than accounts receivable from any Affiliate of Seller.

"**Action**" means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"**Affiliate**" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"**Alternative Transaction**" means any one or more transactions involving the sale of all or any of the Purchased Assets by the Seller, to one or more purchasers other than the Purchaser, or a reorganization or restructuring of Seller.

"**Assets**" means all of Seller's properties and assets, tangible or intangible, including, without limitation, all Accounts Receivable, Purchased Real Property, Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), Leases, Leaseholds, Wells, Equipment, Fixtures, Inventory, Non-Production-Based Inventory, Securities, Contract rights (except to the extent related to the Excluded Assets), Intellectual Property, general intangibles (except to the extent related to the Excluded Assets) and Personal Property.

"**Assigned Agreements**" has the meaning stated in Section 2.05(a).

"**Assignment and Assumption Agreements**" has the meaning stated in Section 2.03.

"**Assumed Liabilities**" has the meaning stated in Section 2.03.

"**Auction**" means, if applicable, the auction conducted for sale of the Purchased Assets and/or Kinta Ranch Property pursuant to the terms and conditions of the Bidding Procedures Order.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*

"**Benefit Plan**" means any employee health or medical benefits plan, any pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code, and  any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, restricted stock, stock appreciation rights, phantom stock, retirement, supplemental retirement, severance, termination, death benefit, retiree medical or other post employment benefits to any current or former employee, officer, director or shareholder of the Seller.

"**Bidding Procedures Order**" has the meaning stated in Section 7.03(a).

"**Bill of Sale**" means one or more documents or instruments that has the legal effect of conveying good and indefeasible title to the Purchased Assets to the Purchaser.

"**Bodily Injury**" means the physical injury, sickness, disease, mental anguish, fear or emotional distress sustained or suffered by any person, including death resulting therefrom.

2

"**Business**" means the activities and operations of Seller as conducted by the Seller on the date of this Agreement.

"**Business Day**" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized by Law to be closed in Dallas, Texas.

"**Claim**" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Cleanup**" means all actions required to (a) identify, investigate, contain, characterize, cleanup, monitor, remove, transport, treat or otherwise remediate Hazardous Materials or Environmental Conditions present in the indoor or outdoor environment, (b) prevent, pursuant to Law, the Release of Hazardous Materials so that they do not enter the Environment, migrate, endanger or threaten to endanger public health or welfare or the Environment, (c) perform pre-remedial studies and investigations and post remedial monitoring and care, or (d) respond to and comply with any government rules, regulations, directives, orders, or other mandates relating to cleanup, removal, treatment, plugging, capping or remediation or potential cleanup, removal, treatment, plugging, capping, abandonment or remediation of the Environment.

"**Closing**" has the meaning stated in Section 4.01(a).

"**Closing Date**" has the meaning stated in Section 4.01(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Transaction**" means any (a) merger, consolidation, recapitalization, reorganization or other business combination involving the Seller, (b) acquisition in any manner, directly or indirectly, of an interest in fifty percent (50%) or more of the Securities of the Seller or (c) acquisition in any manner, directly or indirectly, of all or a substantial (any amount in excess of twenty percent (20%) of the book value of such assets) portion of the Assets, other than the Transactions.

"**Consents**" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"**Contract**" means any agreement, contract, license, lease, instrument, document, note, bond, mortgage, indenture, guarantee, purchase order, letter of credit, undertaking, obligation, commitment, or other legally binding commitment or obligation, whether or not written, each as amended or modified from time to time.

"**Controlled Group**" for any Person at any date means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Person, are treated as a single employer under Sections 414(b) or 414(c) of the Code.

3

**"Cure Amounts"** means, with respect to the Assigned Agreements, the aggregate of the amounts required to be paid under Section 365 of the Bankruptcy Code to permit the assumption and assignment of the Assigned Agreements to the Purchaser. For the avoidance of doubt, the term Cure Amounts includes, but is not limited to, unpaid joint interest billings arising under any of the Leases or Operating Contracts that constitute Purchased Assets.

**"Debt"** of a Person at any date means all "Debt" as defined in Section 101(12) of the Bankruptcy Code, including without limitation, (a) all obligations of the Person (i) for borrowed money, (ii) evidenced by bonds, debentures, notes or other similar instruments, (iii) conditional sale, title retention or other similar agreements or arrangements creating an obligation with respect to the payment of the deferred purchase price of property or services, (iv) as lessee under capitalized leases, (v) under letters of credit or guarantees issued for the account of the Person and (vi) arising under acceptance facilities, (b) all obligations of the type referred to in clause (a) above of others guaranteed by the Person, (c) all obligations of the type referred to in clause (a) above of others secured by a Lien on any asset of the Person whether or not such obligation is assumed by the Person, (d) interest rate, currency and total return swaps, hedges and similar arrangements, and (e) the aggregate Unfunded Vested Liabilities under each Benefit Plan of the Person.

**"Deeds"** means the Purchased Real Property Deeds and the Kinta Ranch Property Deed.

**"Deposit"** has the meaning stated in Section 3.04(a).

**"Deposit Amount"** has the meaning stated in Section 3.04(a).

**"Dollars"** and **"$"** refer to United States dollars and other lawful currency of the United States of America from time to time in effect.

**"Effective Time"** means 7:01 a.m. New York City time on the Closing Date.

**"Environment"** means surface or subsurface soil or strata, surface waters and sediments, navigable waters, wetlands, groundwater, sediments, drinking water supply, ambient air, plants, wildlife, animals and natural resources. The term also includes indoor air, structures and building materials to the extent regulated under Environmental Laws.

**"Environmental Claim"** means a claim or demand by, or notice from, a third party, including any Governmental Body or citizen group, seeking a remedy or alleging liability or responsibility for or with respect to any Environmental Condition or violation of or liability under Environmental Law or Environmental Permits, whether due to negligence, strict liability or otherwise. The term includes administrative investigations, hearings and proceedings, court actions, orders, notices of violation, notice of potential responsibility, claims, actions, demands and notices by third parties for or with respect to Bodily Injury, Environmental Property Damage, Cleanup, Cleanup costs, hydrocarbon

4

well plugging and/or capping, remediation of property, and violations of Environmental Laws.

"**Environmental Condition**" means the intentional or unintentional presence, Release or threatened Release of any Hazardous Materials at or into the Environment. The term includes the presence of abandoned or discontinued above or below ground containers, wells, wellbores, tanks or receptacles that contain or formerly contained Hazardous Materials and exposure or alleged exposure of the Environment, persons, or property to Hazardous Materials.

"**Environmental Laws**" means all federal, state and local laws, common law, rules, regulations, statutes, codes, ordinances, directives, orders, judgments, standards and policies of any Governmental Body and permits, licenses, registrations or other authorizations issued by any Governmental Body which pertain to, regulate or impose liability or standards of conduct concerning the Environment, Hazardous Materials and/or the health and safety of persons (including employees) or which relate to the manufacture, processing, distribution, use, sale, treatment, storage, release, threatened release, disposal, Cleanup, transportation, management, labeling, distribution, testing, exposure to or handling of Hazardous Materials.

"**Environmental Permits**" means any Permits, plans or other authorizations and plans required by or issued pursuant to Environmental Laws.

"**Environmental Property Damage**" means physical damage, injury to or destruction of tangible real or personal property or the Environment caused by an Environmental Condition, Hazardous Materials, or a Release.

"**Equipment**" means (except to the extent related to the Excluded Assets) all tangible personal property other than inventory, farm products and consumer goods, in all of its forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing.

"**Equity Securities**" of a Person means (a) shares of capital stock, limited liability company membership interests, partnership interests, joint venture interests or other equity securities, stock or shares of any kind of such Person, (b) securities directly or indirectly convertible into or exercisable or exchangeable for any of the securities referred to in (a) above, (c) rights, warrants, options, calls, subscriptions or commitments of any kind or character relating to, or entitling any Person directly or indirectly to purchase or otherwise acquire, any of the securities or rights referred to in (a) or (b) above, and (d) equity equivalents, interests in the ownership or earnings of, or equity appreciation, phantom stock or other similar rights of, or with respect to, such Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the related regulations and published interpretations.

"**Escrow Agent**" means Bank of America, N.A., as escrow agent.

5

"**Escrow Agreement**" has the meaning stated in Section 3.04(a).

"**Excluded Assets**" has the meaning stated in Section 2.02.

"**Excluded Liabilities**" has the meaning stated in Section 2.04(a).

"**Expense Reimbursement**" means the amount of Purchaser's fees, costs, and expenses, up to a maximum of $180,000.00, incurred in (a) investigating and analyzing the Seller's Business, the Purchased Assets, the Operating Contracts, the Kinta Ranch Property, the Contracts considered for assumption and assignment as Assigned Agreements, the nature and extent of Assumed Liabilities, all Schedules and exhibits supplied by Seller in connection with this Agreement, and all other matters relating to this Agreement, the Sale Documents and the Transactions, (b) negotiating, preparing, and reviewing, as applicable, this Agreement, all other Sale Documents, and all motions, orders (including, without limitation the Bidding Procedures Order and Sale Order), and other papers related to this Agreement, the Sale Documents and the Transactions, and (c) pursuing and otherwise facilitating the approval of this Agreement and the Transactions.

"**Fees and Expenses**" has the meaning stated in Section 9.03(a).

"**Final Order**" means an order for which the time for appeal has passed and there are no further proceedings.

"**Fixtures**" means, to the extent not covered by the definition of Equipment (and except to the extent related to the Excluded Assets), all goods and personalty appurtenant to Real Property or Leaseholds in all of their forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"**Governmental Body**" means any government or any agency, bureau, commission, court, department, official, political subdivision, tribunal, board or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign.

"**Hazardous Materials**" means any hazardous or toxic substance, waste, contaminant, pollutant, gas, solid, liquid or material, including, without limitation, radioactive materials, oil, hydrocarbons, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (a) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under the Federal Water Pollution Control Act and/or the Comprehensive Environmental Response

6

Compensation and Liability Act of 1980, as amended, and/or the Emergency Planning and Community Right To Know Act, as amended, (b) designated or classified as a "hazardous waste" or "regulated substance" pursuant to the Resource Conservation Recovery Act (a/k/a Solid Waste Disposal Act), (c) designated or classified as a "hazardous material" under the Hazardous Material Transportation Act, as amended, (d) designated or classified as a "toxic substance" under the Toxic Substances Control Act, or (e) regulated in any way under the Environmental Laws of any jurisdiction where the Seller conducts the Business or where any Real Property, Lease, Leasehold, Well or Relevant Property is located.

"**Intellectual Property**" means, except to the extent used in connection with the Excluded Assets, all copyrights, uncopyrighted works, trademarks, trademark rights, trademark registrations, service marks, patents, including, without limitation, all reissues, divisions, continuations and extensions thereof, patent rights, unpatented inventions, computer software licenses, data, software, permits, trade secrets, know-how, protected models, designs, methods, concepts, plans, specifications, schematics, formulas, inventions, technology, processes and intellectual property rights and other proprietary rights, whether or not subject to statutory registration, together with applications and licenses for, and the goodwill of the Business relating to, any of the foregoing.

"**Intellectual Property Assignment Agreement**" means one or more agreements, documents or instruments that has the legal effect of transferring and assigning all of Seller's right, title and interest in and to the Required Intellectual Property to the Purchaser.

"**Interim Financial Statements**" has the meaning stated in Section 5.05(b).

"**Inventory**" means all goods, hydrocarbons and minerals extracted, severed or produced from the Leases and the Wells for which title is held by Seller, whether held or stored on Seller's property, in transit, or held or stored on customer premises.

"**Kinta Ranch Mineral Interest Quitclaim Deed**" has the meaning stated in Section 3.02(a).

"**Kinta Ranch Property**" means all of Seller's right, title and interest in and to that certain real property identified and otherwise described in Schedule 5.10(a)(ii), together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to such interests and improvements and fixtures on or to those interests.

"**Kinta Ranch Property Deed**" has the meaning stated in Section 4.03(c)(iv).

"**Knowledge of Seller**" means the actual knowledge, after reasonable inquiry, of Gary Redwine, Lyndon James, Cory Meister and John Burke.

"**Law**" means each applicable treaty, statute, law, rule, regulation, order, guidance or recommendation (or any change in its interpretation or administration) by any Governmental Body, central bank or comparable agency and any request or directive

7

(whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"**Leaseholds**" has the meaning stated in Section 5.10(a).

"**Leases**" means the oil, gas and/or mineral leases described in Schedule 2.01 and any other oil, gas and/or mineral leases or rights associated with the Purchased Assets and Kinta Ranch Property, regardless of whether such leases are described on Schedule 2.01 or inadvertently omitted therefrom, together with tenements, hereditaments, easements, rights of way, privileges and appurtenances to such Leases and improvements on or to those interests.

"**Lien**" means any security interest, lien (statutory or otherwise), claim, pledge, mortgage, deed of trust, hypothecation, charge, easement, deposit arrangement, preference, priority, license, lease, conveyance of any right, option, right of first refusal or offer, restriction or encumbrance of any kind, including, without limitation, any claims of interest of royalty owners in or against any of the Purchased Assets or in proceeds of oil, gas and mineral production from any of the Purchased Assets, restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction to evidence any of the foregoing.

"**Material Adverse Effect**" means (a) a material adverse effect, whether short or long term, upon (i) any of the Business, the Seller's operations, the Assets, the Operating Contracts, the Leaseholds, the Assumed Liabilities, the Seller's condition (financial or otherwise), or prospects of the Seller taken as a whole or (ii) the legality, validity or enforceability of the Sale Documents, or (b) a material adverse effect, whether short or long term, on the value of the Business, the Purchased Assets or the Kinta Ranch Property, or on the amount or extent of the Assumed Liabilities, in each case except for any result, occurrence, change, effect, event or circumstance relating to: (1) the economy or the financial markets in general, except to the extent specifically related to or disproportionately impacting Seller, the Business, the Purchased Assets, the Kinta Ranch Property, or the Assumed Liabilities, (2) the industry in which the Business operates in general and not specifically relating to the Business, except to the extent disproportionately impacting Seller, the Business, the Purchased Assets, the Kinta Ranch Property, or the Assumed Liabilities, or (3) the announcement or disclosure of this Agreement, the Transactions contemplated hereby, or the identity of the Purchaser. For the avoidance of doubt, and without limiting the foregoing, the Seller agrees that it shall be a Material Adverse Effect if: (i) There are one or more Environmental Conditions or Environmental Claims respecting the Purchased Assets and/or the Kinta Ranch Property involving remediation costs that, in the aggregate, are, or are estimated to be, in excess of $175,000.00; (ii) Seller loses the ability to transport or market production comprising more than 3% of Seller's cumulative production from the Purchased Assets for a period of more than fifteen (15) days; (iii) the sum of Seller's production from the Purchased Assets declines in any given month at a rate exceeding by 2.5% the declines projected in

8

the Reserve Report; (iv) At any time prior to Closing, the NYMEX settlement price for Henry Hub natural gas September 2010 futures falls below $4.54; or (v) Seller is unable to, or is prohibited for any reason, whether legal, contractual or otherwise, from transferring and assigning to Purchaser any one or more of the Material Contracts that Purchaser seeks to assume.

"**Material Contract**" means:

(i)     The Leases;

(ii)    The Operating Contracts;

(iii)   Contracts under which the Seller has, directly or indirectly, made any advance, loan, extension of credit or capital contribution to, or other investment in, any Person;

(iv)    Contracts under which the Seller: (A) is lessee of, or holds or operates, any Equipment, vehicle or other tangible personal property, or (B) has a Leasehold interest, or (C) is, or is entitled to become, the lessor or sublessor of real property or any interests therein, or (D) is or is entitled to become the owner or holder of any oil, gas or mineral estate or interest, or (E) is, or is entitled to become, the operator of any owned or leased property for oil and gas production, or (F) is or is entitled to become a working interest owner, or (G) is or is entitled to become the owner of any production payment, royalty, overriding royalty, or right of conversion from a royalty interest or overrriding royalty to a working interest;

(v)     Contracts (A) for the sale or Transfer by Seller or for the purchase or other acquisition by Seller, of assets, including, without limitation, purchase orders, goods, materials, supplies, machinery, capital assets or services or capital expenditures or research and development, (B) for the distribution or sale of any of the Seller's Inventory, (C) granting any Person any right of first refusal, right of first offer, buy/sell or economically preferential right or other similar rights, to purchase any of the Purchased Assets or the Kinta Ranch Property, (D) granting a working interest, back-in, participation or royalty interest to any Person in relation to the Purchased Assets; or (E) granting a working interest, back-in, participation or royalty interest to the Seller;

(vi)    Contracts relating in whole or in part to the Required Intellectual Property;

(vii)   Contracts which (A) require the Seller to deal on an exclusive basis with any Person, (B) restrict or purport to restrict the Seller from doing any kind of business or from doing business with any Person or in any geographic area or from competing with any Person, (C) require the Seller to maintain the confidentiality of any matter, or (D) require the Seller to indemnify any Person;

9

(viii)  (A) employment, retainer, severance, separation, non-competition, non-solicitation and consulting Contracts with current and former employees, officers, directors, consultants and independent contractors and collective bargaining agreements and any other Contracts with any labor union or other collective bargaining group, (B) Contracts setting forth the terms of or otherwise relating to Benefit Plans, and (C) Contracts with any shareholder, member, manager, director or officer of the Seller;

(ix)  Contracts with any Governmental Body;

(x)  Contracts not made in the ordinary course of business consistent with past practice; and

(xi)  other Contracts to which Seller is a party or by or to which Seller or any of the Purchased Assets, the Kinta Ranch Property, or the Business is bound or subject.

"**Newly-Hired Employees**" means any current or former employee of the Seller who becomes an employee of the Purchaser on or after the Closing Date.

"**Non-Production-Based Inventory**" means, except to the extent related to the Excluded Assets, all goods, other than farm products and the Inventory, that (a) are leased by a Person as lessor, (b) are held by a Person for sale or lease or to be furnished under a contract of service, (c) are furnished by a Person under a contract of service, or (d) consist of raw materials, work in process, or materials used or consumed in a business, in each case in all of its forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing.

"**Other Employees**" has the meaning stated in Section 2.06(c).

"**Operating Contracts**" has the meaning stated in Section 2.01(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"**Payment Amount**" means an amount equal to (a) $13,362,423.00, less (b) the Deposit Amount, less (c) the amount of all adjustments made to the Payment Amount on or prior to the Closing Date in accordance with the provisions of Section 3.02.

"**Permit**" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance, variance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Law for purposes of conducting the business of Seller.

"**Permitted Liens**" Liens set forth on Schedule 1.01(a) hereto, in each case that Purchaser expressly has agreed in writing will survive Closing of the Transactions.

10

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint venture, trust or any other entity or organization, including, without limitation, any Governmental Body.

"**Personal Property**" has the meaning set forth in Section 2.01(d).

"**Petition Date**" has the meaning set forth in Recital A to this Agreement.

"**Pre-Closing Environmental Liabilities**" means any accrued or unaccrued, absolute or contingent claim, liability (whether due to negligence, strict liability or otherwise), responsibility, obligation or economic loss arising from or associated with (i) actual or alleged violations of or liability under any existing or former lease or other contract, any Environmental Laws and any Environmental Permits, (ii) any Environmental Claims (regardless of when asserted or initiated), and (iii) any Environmental Conditions at, on, under, or emanating to or from the Real Property, any Leasehold or any Relevant Property; in each case (i) through (iii) arising from facts, conditions or events first existing or first occurring on or before the Closing Date, whenever, however and by whomever the fact, condition, or event giving rise to any such claim, liability, responsibility, obligation or economic loss is caused, and whether or not the fact, condition, event, claim, liability, responsibility, obligation or economic loss is, at the time of this Agreement or the Closing Date, known, suspected or unknown, disclosed or undisclosed, latent or patent and whether or not arising pursuant to or in connection with any existing or future Environmental Law or common law. The term includes, but is not limited to, any such claim, liability, responsibility, obligation or economic loss arising from or associated with (a) the transportation, treatment or disposal of Hazardous Materials by or on behalf of Seller at any time at any property; (b) the failure of Seller to obtain and comply with any Environmental Permits; and (c) the exposure of the Environment, any Persons, or any real or personal property to Hazardous Materials. Pre-Closing Environmental Liabilities are Excluded Liabilities under Section 2.04 of this Agreement.

"**Proceedings**" has the meaning set forth in Recital A to this Agreement.

"**Purchased Real Property**" means all of Seller's right, title and interest in and to any and all real property interests, other than as a lessee and other than the Kinta Ranch Property, together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements and fixtures on or to those interests, including, but not limited to, the real property identified and otherwise described in Schedule 5.10(a)(i).

"**Purchased Real Property Deeds**" has the meaning stated in Section 4.03(c)(iv).

"**Purchase Price**" means the sum of (a) the Deposit Amount, (b) the Payment Amount and (c) the amount of the Assumed Liabilities, subject to adjustment in accordance with the provisions of Section 3.02.

"**Purchased Assets**" has the meaning stated in Section 2.01.

11

"**Purchaser**" has the meaning stated in the heading of this Agreement, and its successors and assigns.

"**Purchaser Breach**" has the meaning stated in Section 3.04(c)(i)(B).

"**Purchaser Required Consents**" means the Consents set forth on Schedule 6.04.

"**Real Property**" means the Purchased Real Property and the Kinta Ranch Property.

"**Release**" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the Environment including the movement of Hazardous Materials through or in the Environment and (b) the abandonment or discontinuance of wells, wellbores, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Materials.

"**Relevant Property**" means all sites, properties, structures, facilities, locations, Real Property and Leaseholds (a) presently or formerly owned, operated, leased or otherwise used by or on behalf of the Seller (whether or not such properties are currently owned, leased, used or operated by the Seller), (b) at which any Hazardous Material has been transported, disposed, treated, stored or Released by or on behalf of the Seller, or (c) that are adjacent to any sites, facilities, properties, structures, locations, Real Property or Leaseholds presently or formerly owned, operated, leased, or otherwise used by or on behalf of the Seller.

"**Required Consents**" means the Consents set forth on Schedule 5.04.

"**Required Intellectual Property**" has the meaning stated in Section 5.13(a).

"**Required Permits**" has the meaning stated in Section 5.07(a).

"**Reserve Report**" means the Cawley Gillespie Associates, Inc. revised reserve report dated May 10, 2010, effective July 1, 2010.

"**Sale Documents**" means this Agreement (including, without limitation, all of the Schedules and exhibits to this Agreement), the Bill of Sale, the Purchased Real Property Deeds, the Kinta Ranch Property Deed (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), the Assignment and Assumption Agreements, the Intellectual Property Assignment Agreement, the Purchaser Required Consents, the Required Consents, the Escrow Agreement, the Surface Use Agreement-Kinta Ranch (if the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), the Kinta Ranch Mineral Interest Quitclaim Deed (if the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), each other assignment, bill of sale, deed, consent, permit, document, agreement and instrument to be executed and delivered by the Seller or the Purchaser pursuant to this Agreement, and all other documents and

12

instruments by which the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) are transferred by the Seller to the Purchaser.

"**Sale Hearing**" has the meaning stated in Section 7.03(c).

"**Sale Order**" has the meaning stated in Section 7.03(b).

"**Schedule Updates**" has the meaning stated in Section 7.04(a).

"**Securities**" means, except to the extent constituting Excluded Assets, (a) Equity Securities, (b) notes, bonds, debentures, certificates of deposit and all other evidences of indebtedness or Debt, (c) securities directly or indirectly convertible into or exercisable or exchangeable for any of the securities referred to in (b) above, (d) rights, warrants, options, calls, subscriptions or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire, any of the securities or rights referred to in (b) or (c) above, and (e) all other securities of any type.

"**Seller**" has the meaning stated in the heading of this Agreement.

"**Subsidiary**" of any Person means any Person (a) of which such first Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than 50% of the Equity Securities of such other Person, the holders of which are generally entitled to vote for the election of the board of directors, general partner, the manager or other governing body of, or otherwise control the business and affairs of, such other Person, or (b) the operations of which are consolidated with such first Person, pursuant to GAAP, for financial reporting purposes.

"**Surface Use Agreements**" means those certain Contracts between Seller and various landowners governing access, easements, servitudes and rights of any character useful or appropriate in developing, operating, producing, marketing or transporting hydrocarbons, including, but not limited to those Contracts set forth on Schedule 1.01(b).

"**Surface Use Agreement-Kinta Ranch**" has the meaning stated in Section 3.02(a).

"**Target Date**" means July 23, 2010.

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, duties, imposts, deposits, withholdings, restrictions, fines, interests, penalties, additions to tax or other tax, assessment or charge of any kind, including, without limitation, income, excise, personal property, real property, withholding, sales, use, gross receipts, value added, franchise, profits, capital, premium, occupational, production, severance, ad valorem, occupancy, stamp, transfer, employment, payroll, unemployment insurance, social security, disability, workers compensation, custom duties, license recording, documentation and registration fees imposed by any Governmental Body, and all interest and penalties thereon and additions thereto.

13

"**Tax Return**" means any federal, state, local or foreign return, report, claim for refund, declaration, statement or other form relating to Taxes, including, without limitation, any schedule thereto or amendment thereof.

"**Termination Date**" means August 20, 2010 or such later date as Purchaser and Seller may agree upon in writing.

"**Termination Fee**" means Two and One-Half Percent (2.50%) of the Purchase Price.

"**Transactions**" means the transactions contemplated by, or described in, the Sale Documents, including, without limitation, the sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) by the Seller to the Purchaser.

"**Transfer**" means a direct or indirect offer, transfer, sale, assignment, pledge, conveyance, hypothecation, license, sublicense or other disposition of all or any interest.

"**Unfunded Vested Liabilities**" of a Person means, with respect to any Benefit Plan at any time, the excess, if any, of (a) the present value of all vested non-forfeitable benefits under the Benefit Plan, over (b) the fair market value of all Benefit Plan assets allocable to those benefits, all determined as of the then most recent valuation date for the Benefit Plan, but only to the extent that the excess represents a potential liability of the Person or any member of its Controlled Group to the PBGC or the Benefit Plan under Title IV of ERISA.

"**Updated Financial Statements**" has the meaning stated in Section 5.05(b).

"**Wells**" has the meaning stated in Section 2.01(c).

## ARTICLE II

### The Transaction

Section 2.01. <u>Purchase and Sale of the Purchased Assets and Kinta Ranch Property</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, for the consideration payable by the Purchaser to the Seller and otherwise agreed upon in accordance with Article III, the Seller will sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser will purchase, accept and acquire from the Seller, all of the Seller's right, title and interest in, to and under (a) all of the Purchased Assets, free and clear of any and all Liens, Claims, encumbrances and interests, save and except Permitted Liens and Assumed Liabilities, and (b) unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a) below, all of the Seller's right, title and interest in, to and under the Kinta Ranch Property, free and clear of all Liens, Claims, encumbrances interests, save and except Permitted Liens and Assumed Liabilities. Purchaser shall be entitled to assign all or a portion of its rights under this Agreement to one or more of Purchaser's Affiliates.

14

In relation to the foregoing, the term **"Kinta Ranch Property"** has the meaning stated in Section 1.01 of this Agreement.

The term **"Purchased Assets"** means all of Seller's right, title and interest in, to and under the Business and Assets, and all properties, interests and rights owned, leased, licensed or used by Seller of every kind and wherever situated and related thereto as of the Effective Time, including, without limitation, the following, but excluding the Excluded Assets:

(a)     All right, title and interest of Seller in and to the Leases and any ratifications or amendments to such Leases;

(b)     All right, title and interest of Seller in and to, or otherwise derived from, all presently existing and valid unitization, pooling, and/or communitization agreements, declarations and/or orders (including, without limitation, all units formed under orders, rules, regulations, or other official acts of any federal, state or other authority having jurisdiction, and voluntary unitization agreements, designations and/or declarations) to the extent that they are derived from or relate to any of the Leases;

(c)     All right, title and interest of Seller in and to all oil, condensate, coalbed methane or natural gas wells, water source wells, and water and other types of injection wells located on, and/or used in connection with, the operation or development of the Leases, whether producing, operating, shut-in or temporarily abandoned, including but not limited to the Wells described in Schedule 2.01(c) (the **"Wells"**);

(d)     All right, title and interest of Seller in and to all Equipment, Fixtures and Non-Production-Based Inventory, including, without limitation, machinery, pipe, improvements, physical assets and facilities, and all such other personal, mixed, or movable property or interests related thereto, on or off of the lands covered by the Leases or with which the Leases or the lands covered thereby have been pooled, unitized, or communitized, to the extent used in connection with and directly attributable to the Leases (except for any such personal property leased from third Persons except to the extent such lease constitutes an Assigned Agreement), including without limitation the following: workover rigs, well equipment; casing; rods; tanks and tank batteries; boilers; tubing; pumps; pumping units and engines; platforms; Christmas trees; derricks; production facilities; compressors and compression equipment; dehydration units and facilities; heater-treaters; processing, fractionation, treatment, and separation plants and facilities; testing and sampling equipment; sulfur recovery units and facilities; valves; gauges; meters; generators; motors; gun barrels; flow lines; water lines; gas lines; gathering lines, laterals and trunk lines, and other pipe lines; gas systems (for gathering, treatment, and compression); chemicals; solutions; water systems (for treatment, disposal, and injection); power plants; poles; lines; transformers; starters and controllers; tools; vehicles; trailers; boats; telegraph, telephone, remote telemetry, and other communication systems; loading docks, loading racks, and shipping facilities; spare parts; and any and all additions or accessions to, substitutions for, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (the **"Personal Property"**);

15

(e)     All of Seller's right, title and interest in and to all presently existing and valid production sales contracts, operating agreements, and other agreements and contracts to the extent that they are derived from or relate to any of the Leases, Wells, properties, rights and/or interests described in subsections (a)-(d) above, including but not limited to the Operating Contracts described on Schedule 2.01(e) (collectively, the "**Operating Contracts**");

(f)     All right, title and interest to all goods, hydrocarbons and minerals extracted, severed or produced, and all proceeds generated from the sale or disposition of any goods, hydrocarbons and minerals extracted, severed or produced, from and/or under the Leases and Wells on or after the Effective Time;

(g)     All of Seller's rights, titles and interests in and to any oil, gas and mineral working interests, royalty interests, overriding royalty interests, production payments, other Material Contracts, and other oil, gas and mineral interests of every kind, insofar as the same cover or relate to the Leases, lands or properties described or referred to in Schedule 2.01, even though such rights, titles and interests be incorrectly or insufficiently described or referred to in, or a description thereof be omitted from Schedule 2.01;

(h)     All of Seller's rights, titles and interests in and to all agreements, easements, permits, licenses, servitudes, Surface Use Agreements, and rights of every character that are useful or appropriate in exploring for, developing, operating, producing, treating, storing, marketing or transporting oil, gas and other hydrocarbons in, under and that may be produced from or to the credit of the Leases, Wells or other interests described or referred to in Schedule 2.01;

(i)     All right, title and interest of Seller now or hereafter existing, in, to and under the Assigned Agreements, as each of the Assigned Agreements may have been amended or otherwise modified prior to the date of this Agreement, including, without limitation, rights of Seller to receive moneys due and to become due under or pursuant to the Assigned Agreements;

(j)     All Accounts Receivable, Inventory, proceeds (net of applicable production, severance, and similar taxes) from sales of oil, gas and/or other minerals which are extracted, severed or produced from or attributable to the Leases and Wells, and all other rights of Seller to payment for goods or services sold, delivered or performed;

(k)     Security deposits, deposits and prepaid expenses of Seller, as set forth on Schedule 2.01(k);

(l)     All of Seller's rights, titles and interests in and to all Securities in which Seller has an interest (other than Securities representing an ownership interest in the Seller, Redwine Aviation, Inc. and White Oak Resources, LLC);

(m)     All of Seller's rights, titles and interests in and to Intellectual Property in which Seller has an interest;

(n)     All of Seller's rights, titles and interests in and to the Leaseholds;

16

(o) All other rights and assets of Seller, including, without limitation, all (i) tangible and intangible personal property, except to the extent related to the Excluded Assets, (ii) Permits associated with, appurtenant to, or necessary or desirable for the operation of the Purchased Assets, (iii) the right to carry on the Business, (iv) subject to Section 8.02(c), books of account, general, financial, accounting and personnel records, files, invoices, customer's, distributor's and supplier's lists, advertising and promotional materials, all to the extent necessary or appropriate for the conduct of the Business on a go-forward basis except to the extent related to the Excluded Assets, (v) warranty, guarantee or similar arrangements by any manufacturer, supplier, Seller, distributor or other Person except to the extent related to the Excluded Assets, and (vi) general intangibles, causes of action, claims and demands of whatever nature *other than* (A) causes of action or claims pursuant to Section 544, 547, 548, 549 or 550 of the Bankruptcy Code or any other state law regarding fraudulent transfers or transactions) arising from or in connection with the business and operation of Seller, (B) counterclaims presently asserted in connection with an Action listed on Schedule 5.06, and (C) to the extent arising out of or related to the Excluded Assets;

(p) All proceeds from or under any and all of the Seller's insurance policies relating to claims occurring, arising or accruing, in whole or in part after the Closing Date except to the extent related to the Excluded Assets;

(q) All of Seller's right, title and interest in and to the Purchased Real Property; and

(r) All proceeds, products, accessions or substitutions of any and all of the foregoing Purchased Assets (other than cash proceeds from Accounts Receivable collected prior the Closing Date, and any item listed in Excluded Assets).

Section 2.02. Excluded Assets. The Seller will retain (and the Purchased Assets will not include) the following (collectively, the "**Excluded Assets**"):

(a) All of the Seller's rights under the Sale Documents;

(b) The Purchase Price payable to the Seller pursuant to Article III;

(c) The articles of incorporation, minute books, stock books and other corporate records of the Seller having exclusively to do with the corporate organization and capitalization of the Seller;

(d) The books of account, general, financial, accounting and personnel records, tax returns, files and invoices of the Seller to the extent not assigned pursuant to Section 2.01(o)(iv);

(e) Those Assets (including but not limited to any Contracts that Purchaser does not wish to have Seller assume and assign to Purchaser) set forth on Schedule 2.02(e), which Schedule shall be submitted to Seller by Purchaser on or before the Closing Date;

(f)     All causes of action or claims pursuant to Section 544, 547, 548, 549 or 550 of the Bankruptcy Code or any other state law regarding fraudulent transfers or transactions and all counterclaims presently asserted in connection with an Action listed on Schedule 5.06;

(g)     All contracts and agreements of Seller that are not assumed and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code;

(h)     All cash in the Seller's debtor and debtor-in-possession accounts;

(i)     All Securities representing an ownership interest in the Seller, Redwine Aviation, Inc. and White Oak Resources, LLC;

(j)     The Leases, Wells and/or other properties or items listed on Schedule 2.02(j); and

(k)     Any refund of costs, taxes or expenses borne by Seller attributable to the period prior to the Closing Date and listed on Schedule 2.02(k).

Section 2.03.  Assumption of the Assumed Liabilities.  The Purchaser will not assume or become liable for the payment, performance or discharge of any liabilities or obligations of Seller, except that upon the terms and subject to the conditions of this Agreement, at the Closing, the Purchaser will execute and deliver to the Seller one or more agreements (the "**Assignment and Assumption Agreements**"), pursuant to which the Purchaser will, effective as of the Effective Time, assume, satisfy and perform only the Assumed Liabilities.

The term "**Assumed Liabilities**" means:

(a)     Expenses incurred in the operation of the Leases and Wells on and after the Closing Date, including, without limitation, all drilling costs, all capital expenditures, all appropriate overhead charges under applicable operating agreements (regardless of whether such operating agreements are with third parties or related entities and regardless of whether Seller was the operator or a non-operator prior to the Closing Date), and all other overhead charges actually incurred on and after the Closing Date and charged by and due to third parties;

(b)     Obligations arising on and after the Closing Date under Assigned Agreements;

(c)     Any obligations that are expressly assumed by Purchaser under the provisions of Section 3.02 and that are not paid out of the Residual Amount of the Payment Amount in accordance with Section 3.01(b); *provided, however*, that Purchaser shall be under no obligation, whatsoever, to assume any such obligations described in Section 3.02; and

(d)     Taxes attributable or chargeable to the period commencing on and after the Closing Date arising from or associated with the operation, use or ownership of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)).

IT IS EXPRESSLY AGREED THAT PURCHASER DOES NOT ASSUME, AND SHALL HAVE NO LIABILITY FOR, ANY CLAIM NOT EXPRESSLY ASSUMED BY PURCHASER

AS AN ASSUMED LIABILITY, AND THAT THE SALE HEREUNDER IS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS SAVE AND EXCEPT THE PERMITTED LIENS AND ASSUMED LIABILITIES.

Section 2.04. Excluded Liabilities.

(a) Purchaser Not Assuming Excluded Liabilities. Notwithstanding any provision of the Sale Documents to the contrary, the Purchaser will not accept, acquire, assume or become liable to pay, perform or discharge, and the Assumed Liabilities expressly will not include, the Excluded Liabilities.

The term "**Excluded Liabilities**" means the following liabilities and obligations unless included in Section 2.03:

(i) Any liability, indemnity or obligation owed by Seller to any of its Affiliates, officers, shareholders or insiders;

(ii) Any liability, indemnity or obligation with respect to any Debt of the Seller unless such Debt expressly is assumed by Purchaser in writing prior to the Effective Time;

(iii) Any liability, indemnity or obligation which arises out of, relates to or is otherwise attributable to any of the Excluded Assets, or arises out of or results from any income, sales, severance, use or other Tax or any expense arising from the distribution to, or ownership or operation by, the Seller of any of the Excluded Assets, or associated with the realization of the benefits of any of the Excluded Assets;

(iv) Any liability or obligation, other than the Assumed Liabilities described in Section 2.03(d) above, (A) which arises out of, relates to or results from any income, sales, severance, use or other Tax or any expense arising from or associated with the operation, use or ownership of the Purchased Assets, or (B) with respect to Taxes related to, or arising from, the operation of the Business by the Seller or ownership by the Seller of its assets prior to the Effective Time;

(v) Any liability or obligation of the Seller incurred on or after the Effective Time;

(vi) Any liability or obligation (A) for breach or nonperformance of any Contract on or prior to the Closing, including, without limitation, the Assigned Agreements, (B) under any Contract which is not specifically assumed by Purchaser, (C) under any Contract which the Purchaser shall not have received a correct and complete copy of prior to the date of this Agreement, or (D) under any Contract (I) with any shareholder, insider or Affiliate of the Seller, or (II) relating to any hedge, swap or similar transactions;

(vii) Any liability or obligation under or in connection with any Benefit Plan, including but not limited to any liability to a Benefit Plan subject to Title IV of ERISA or the PBGC;

(viii) Any liability or obligation of the Seller with respect to workers compensation claims arising or accruing in whole or in part prior to Closing;

(ix) Any liability or obligation of the Seller arising out of, relating to or otherwise attributable to any, Action, judgment, verdict, ruling, decree or settlement that is pending, or completed on or prior to the Effective Time, including, without limitation, (A) the Actions listed on Schedule 5.06 and (B) any discrimination, sexual harassment claims and any other claims arising out of or otherwise related to the employment or termination of employment by Seller;

(x) Any Pre-Closing Environmental Liabilities or Environmental Conditions;

(xi) Any other liability or obligation of any nature, type or description not expressly included in the Assumed Liabilities, including but not limited to (A) any administrative expense or priority expense claim under Section 503 or 507 of the Bankruptcy Code of the Seller as debtors-in-possession and (B) any claim by any vendor, contractor or other provider relating to services performed or goods delivered prior to the Closing Date;

(xii) Any Taxes attributable or chargeable to any period prior to the Closing Date;

(xiii) Expenses incurred in the operation of the Leases and Wells before the Closing Date including, without limitation, all drilling costs, all capital expenditures, all overhead charges under applicable operating agreements (regardless of whether such operating agreements are with third parties or related entities and regardless of whether Seller is the operator or a non-operator), and all other overhead charges actually incurred by Seller prior to the Effective Time;

(xiv) Any liability or obligation of the Seller, of any nature whatsoever, arising out of, related to or otherwise attributable to, the Kinta Ranch Property (A) incurred prior to the Effective Time, if the Kinta Ranch Property is not excluded from the Transactions contemplated hereby pursuant to Section 3.02(a), or (B) incurred prior to, at the time of, or subsequent to the Closing, if the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a); and

(xv) Any Claim relating to products sold or business conducted by the Seller prior to the Effective Time.

(b) Sellers to Perform Excluded Liabilities. The Purchaser will acquire the Purchased Assets and Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) free and clear of all Liens, Claims (including, without limitation, all liabilities and obligations of Seller), encumbrances

20

and interests except for the Assumed Liabilities and Permitted Liens. The Seller will remain solely and exclusively responsible for all Excluded Liabilities.

Section 2.05. Assigned Agreements.

(a) Assigned Agreement List. Set forth on Schedule 2.05(a) is a list of all Contracts entered into by Seller in connection with the Business. Under the caption "Cure Amounts" are the amounts of claims Seller represents are required by the Bankruptcy Code to be paid in order to permit the Seller's assumption and assignment of such Contracts to the Purchaser. Not later than 2 Business Days prior to the Closing Date, Purchaser shall deliver to Seller a schedule that lists those Contracts that Purchaser does not wish to have Seller assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code. Seller shall assume and assign to Purchaser all Contracts set forth on Schedule 2.05(a) that are not excluded by Purchaser (collectively, "**Assigned Agreements**").

(b) No Assumption of Cure Amounts. IT IS EXPRESSLY AGREED THAT PURCHASER DOES NOT ASSUME, AND SHALL HAVE NO LIABILITY FOR, ANY CURE AMOUNTS, WHETHER OR NOT LISTED ON SCHEDULE 2.05(a), AND THAT THE SALE HEREUNDER IS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS SAVE AND EXCEPT THE PERMITTED LIENS AND ASSUMED LIABILITIES.

Section 2.06. Employees.

(a) Employment Offers. The Purchaser, in its sole discretion, may (but shall under no circumstances be obligated to) extend employment offers to some or all of the current (as of the Closing Date) employees of the Seller. The terms of such employment offers (including work rules, benefits and salary and wage structure) will be as determined by the Purchaser in its sole discretion. Seller hereby consents to Purchaser's communication with its current employees regarding the possibility of such employment.

(b) Newly-Hired Employees.

(i) With respect to all Newly-Hired Employees, the Purchaser will be responsible solely for liabilities and obligations accruing after the Effective Time and in accordance with the Purchaser's employment offers to and employment of the Newly-Hired Employees.

(ii) Seller shall retain and shall assume, bear, and discharge all liabilities for claims of Newly-Hired Employees incurred prior to the Effective Time whether arising under the Benefit Plans or otherwise. For purposes of this Section, a claim will be deemed "incurred" on the date that the event that gives rise to the claim occurs (for purposes of life insurance, health insurance, severance, discharge and accident/disability programs).

(iii) Effective as of the Closing Date, any and all non-compete agreements and/or covenants executed for the benefit of the Seller by a current or former employee of

21

the Seller who becomes a Newly-Hired Employee shall be rendered null and void unless assumed and assigned to Purchaser as an Assigned Agreement, and Seller waives, as of such date, any and all Claims that it may have or hold against any Person on account of such a non-compete agreement and/or covenant unless assigned or otherwise transferred to Purchaser as part of the Purchased Assets.

(c)     Other Employees. The Purchaser will not assume or become responsible for any liability or obligations whatsoever to any current, former or inactive employees of the Seller (all such employees being the "**Other Employees**") other than the Newly-Hired Employees. The Seller will be responsible for all liabilities and obligations to the Other Employees, including but not limited to insurance coverage as required by § 4980B of the Code and §§601-608 of ERISA, as amended (COBRA).

(d)     Benefits. Purchaser shall be primarily responsible for providing insurance coverage as required by § 4980B of the Code and §§ 601-608 of ERISA, as amended (COBRA) on and after Closing with respect to any Newly-Hired Employee and any dependent of such employee, who after the Closing, becomes a "qualified beneficiary" (within the meaning of § 4980B(g)(1) of the Code) as the result of any "qualifying event" (within the meaning of § 4980B(f)(3) of the Code) that occurs after the Closing. In addition, Purchaser shall be responsible for complying with the legal requirements, if any, relating to group health plan coverage with respect to any Newly-Hired Employee or dependent of such employee, in each case who, after the Closing Date, becomes a "qualified beneficiary" (within the meaning of § 4980B(g)(1) of the Code) as the result of any "qualifying event" (within the meaning of § 4980B(f)(3) of the Code) that occurs under Purchaser's group health plan after the Closing Date.

(e)     No Rights of Officers, Employees or Labor Organizations. The parties hereto expressly acknowledge and agree that the matters and agreements set forth in this Section 2.06 are strictly agreements between the Seller and the Purchaser and no present or former officer or employee of the Seller or any labor organization, if any, representing such individuals, has any rights (directly, as a third party beneficiary or otherwise) under this Section 2.06 and shall not have any right to enforce any of the agreements set forth in such Section.

Section 2.07. Benefits. As of the Effective Time, the Purchaser will provide benefits to the Newly-Hired Employees which, taken as a whole, may be less favorable, comparable or superior to the benefits generally provided by other similarly situated companies in the same industry as the Seller as of the date of this Agreement. The Purchaser may, in its sole discretion, modify or amend any such benefits or the terms or benefits provided thereunder at any time after the Closing.

Section 2.08. "AS IS" and "WHERE IS" Transaction. Seller disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets, except as expressly set forth in this Agreement. Purchaser acknowledges that it has conducted an independent inspection and investigation of the physical condition of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the

22

Purchased Assets, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except as expressly set forth in this Agreement, Purchaser will accept the Purchased Assets on the Closing Date "AS IS" and "WHERE IS".

## ARTICLE III

## Consideration

Section 3.01. Consideration. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, as payment in full of the Purchase Price for the purchase of the Purchased Assets and the Kinta Ranch Property (a) the Purchaser will (i) pay, or cause to be paid, to the Seller, by wire transfer of immediately available funds, an amount in cash equal to the Payment Amount, subject to any pre-Closing adjustments in accordance with the provisions of Section 3.02 below, and (ii) assume the Assumed Liabilities, and (b) Seller shall obtain the right to receive all or that portion of the Deposit Amount in accordance with the provisions of Section 3.04 of this Agreement. With respect to the Payment Amount, the parties expressly agree as follows:

(a) Segregation of Cure Amounts. Of the total amount of the Payment Amount to be paid by Purchaser to Seller on the Closing Date, an amount equal to the Cure Amounts identified on Schedule 2.05(a) for the Assigned Agreements shall be paid by Purchaser to a segregated account established by the Seller for the express purpose of making payments of Cure Amounts to counter-parties to the Assigned Agreements (the "**Cure Amounts Account**"). On and after the Closing Date, the funds in the Cure Amounts Account shall be used by the Seller for the sole and exclusive purpose of making Cure Amount payments to counter-parties to Assigned Agreements in accordance with Schedule 2.05(a); and

(b) Residual Amount of Payment Amount. With respect to the amount of the Payment Amount that is not paid directly to the Cure Amounts Account in accordance with Section 3.01(a) (the "**Residual Amount**"), the Purchaser shall have the right, but not the obligation, at Closing to pay the amount of any post-petition payable obligation of the Seller directly to the appropriate third party(s), thereby reducing the amount of the Residual Amount required to be paid directly to the Seller at Closing. Correspondingly, the Seller shall have the right at Closing to direct Purchaser to pay a portion of the Residual Amount directly (i) to the Seller's payroll account and/or (ii) to vendors for accrued but unpaid post-petition payables as of Closing Date.

Section 3.02. Adjustment to Purchase Price and Payment Amount. The Purchase Price and Payment Amount, as applicable, shall be subject to adjustment as follows:

(a) Election to Exclude Kinta Ranch Property; Allocation of Consideration. Seller and Purchaser hereby agree that Five Hundred Thousand Dollars ($500,000.00) of the Payment Amount is deemed to be allocated for the purchase of the Kinta Ranch Property. If, pursuant to the bidding procedures approved under the Bidding Procedures Order, Seller timely receives a separate bid for the Kinta Ranch Property in an amount greater than $500,000.00, Seller may elect to sell its interest in the surface rights of the Kinta Ranch Property for such higher amount;

23

*provided, however*, that any conveyance of such interest in the surface rights of the Kinta Ranch Property to a Person other than the Purchaser shall be subject to (i) a written and recordable surface use agreement and lease granting Purchaser a perpetual cost-free easement for the possession and use of the surface and ingress and egress to the saltwater injection wells on the Kinta Ranch Property, and the perpetual cost-free right to utilize, and to dispose of water, saltwater and other fluids produced incident to the production of oil and gas into, such injection wells, all in accordance with current practices of Seller (the "**Surface Use Agreement-Kinta Ranch**"), and (ii) the Seller's execution and delivery to Purchaser of a quitclaim deed and assignment, in form and substance acceptable to Purchaser, conveying to Purchaser all of Seller's right, title and interest in and to all Leases, Wells and other mineral interests located on or otherwise associated with the Kinta Ranch Property, free and clear of all Liens, Claims, encumbrances and interests (the "**Kinta Ranch Mineral Interest Quitclaim Deed**"). Should Seller make such election to sell its interest in the surface rights of the Kinta Ranch Property to a Person other than Purchaser under such terms and conditions, then Seller shall promptly (and by no later than the date of the Sale Hearing) provide written notice to Purchaser of such election, whereupon (i) the Seller's interest in the surface rights of the Kinta Ranch Property shall be deemed excluded from the Transactions contemplated hereby and constitute an Excluded Asset, (ii) the property interests and rights conveyed to Purchaser under the Surface Use Agreement-Kinta Ranch and Kinta Ranch Mineral Interest Quitclaim Deed shall be deemed included within the Transactions contemplated hereby and constitute Purchased Assets, and (iii) the Payment Amount shall be reduced by $500,000.00. **Notwithstanding the foregoing, and for the avoidance of doubt, Purchaser shall have no obligation to purchase the Kinta Ranch Property separate and apart from the Purchased Assets, and Purchaser's obligation to purchase the Kinta Ranch Property is expressly conditioned upon, and subject to, the approval and consummation of Seller's sale of the Purchased Assets to Purchaser at the Closing.**

(b)     Taxes.     To the extent (i) any property, excise, severance or other Taxes are assessed or charged against the Purchased Assets or the production therefrom prior to the Closing Date or after the Closing Date and such Taxes were incurred or accrued prior to the Closing Date, and/or (ii) any property or other Taxes are assessed or charged against the Kinta Ranch Property prior to the Closing Date or after the Closing Date and such Taxes were incurred or accrued prior to the Closing Date, then in each case (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a), in which case this provision shall only apply to (i) above) Purchaser shall have the right, but not the obligation, to pay and satisfy such Taxes, and in such event and unless paid from the Residual Amount of the Payment Amount in accordance with Section 3.01(b), to (A) deduct from the Purchase Price a dollar for each dollar of the amount paid to satisfy the Taxes, and (B) receive a reimbursement from the Seller for such amount (such reimbursement to the extent possible to come from the Deposit Amount and thereafter from the general funds of Seller's estate as an administrative expense); *provided, however*, that nothing in this subsection shall relieve Seller of the obligation to pursue approval of the sale of the Purchased Assets and Kinta Ranch Property free and clear of all Liens, Claims, encumbrances and interests.

(c)     Post-Petition Payables.     Seller shall provide to Purchaser two (2) Business Days prior to the Closing Date a schedule (the "**Post-Petition Amount Schedule**") listing all post-

petition payables owed by Seller as of the Closing Date. Prior to the Closing, Purchaser shall have the right, but not the obligation, to assume and pay any of such post-petition payables and, unless paid from the Residual Amount of the Payment Amount in accordance with Section 3.01(b), to reduce the Payment Amount a dollar for each dollar of such post-petition payables assumed. Additionally, not later than 45 days after the Closing Date, Purchaser shall have the right, but not the obligation, to assume and pay any additional amount of post-petition payables owed by Seller that was not included on the Post-Petition Amount Schedule and Seller shall reimburse Purchaser for such amount (such reimbursement to extent possible to come from the Deposit Amount and thereafter from the general funds of Seller's estate as an administrative expense). To the extent Seller does not agree with Purchaser's calculation of the additional amount of post-petition payables so paid by Purchaser, then Purchaser and Seller shall work in good faith for a period of thirty (30) days to resolve the dispute. If Seller and Purchaser cannot agree on the amount, the dispute shall be submitted to arbitration in accordance with subsection (g) below.

(d)     Liens. To the extent (i) any mechanic's, materialman's or other Lien attaches to any of the Purchased Assets prior to the Closing Date or after the Closing Date and such Lien relates to claims against, or services or goods provided to Seller prior to the Closing Date, and/or (ii) any mechanic's, materalman's or other Lien attaches to the Kinta Ranch Property prior to the Closing Date or after the Closing Date and such Lien related to claims against, or services or goods provided to Seller prior to the Closing Date, then in each case (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a), in which case this provision shall only apply to (i) above) Purchaser shall have the right, but not the obligation, to pay and satisfy such Lien, and in such event and unless paid from the Residual Amount of the Payment Amount in accordance with Section 3.01(b), to (A) deduct from the Purchase Price a dollar for each dollar of the amount paid to satisfy the Lien, and (B) receive a reimbursement from the Seller for such amount (such reimbursement to the extent possible to come from the Deposit Amount and thereafter from the general funds of Seller's estate as an administrative expense); *provided, however*, that nothing in this subsection shall relieve Seller of the obligation to pursue approval of the sale of the Purchased Assets and Kinta Ranch Property free and clear of all Liens, Claims, encumbrances and interests.

(e)     Adjustments for Failures of Title. If any of the Leases (or any portion of Seller's interests therein) that are included in the Reserve Report cannot be conveyed to Purchaser, then the Purchase Price/Payment Amount shall be reduced by the proportionate amount that the NPV of the unconveyable interest bears to the NPV of total interests contained in the Reserve Report.

(f)     Adjustments for Revenues and Expenses. Purchaser and Seller shall further make appropriate adjustments to the Purchase Price so that:

(i) Purchaser will bear expenses that are incurred in the operation of the Purchased Assets after the Closing, including, without limitation, all drilling costs, all capital expenditures, all appropriate overhead charges under applicable operating agreements (regardless of whether such operating agreements are with third parties or related entities and regardless of whether Seller was the operator or a non-operator prior to the Closing), and all other overhead charges incurred after the Closing and charged and due to third parties; and

25

(ii)  Seller will bear all expenses which are incurred in the operation of the Purchased Assets before the Closing Date including, without limitation, all drilling costs, all capital expenditures, all appropriate overhead charges under applicable operating agreements (regardless of whether such operating agreements are with third parties or related entities and regardless of whether Seller was the operator or a non-operator prior to the Closing), and all other overhead charges incurred before the Closing and charged and due to third parties.

(g)  Dispute Resolution. The Purchaser and Seller hereby expressly agree to and shall submit any unresolved disputes regarding the amount of the Purchase Price, Consideration, Adjustments to Purchase Price, and Expense Reimbursement, and any unresolved disputes regarding release of the Deposit Amount, to binding arbitration before a mutually agreed upon accounting firm (the **"Neutral Accountant"**), which firm shall, within thirty (30) days of such submission, resolve such remaining disputes. In agreeing upon the Neutral Accountant, each party, on behalf of themselves and their respective Affiliates, shall represent in writing to the other that neither the party nor any of its Affiliates has in the past thirty six (36) months engaged the Neutral Accountant for any purpose. The fees and expenses of the Neutral Accountant shall be shared equally by Purchaser and Seller. Each party shall furnish to the Neutral Accountant such workpapers and other documents and information relating to the disputed issues as the Neutral Accountant may reasonably request and are available to that party, and each party will be afforded the opportunity to present to the Neutral Accountant any material relating to the item in dispute and to discuss the same with the Neutral Accountant. The decision of the Neutral Accountant shall be final and binding on the parties and may be entered in and enforced by any court of competent jurisdiction.

Section 3.03.  Allocation of Purchase Price for Tax Purposes. On or before the date that is one hundred twenty (120) days after the Closing Date or as soon thereafter as practicable, the Seller and the Purchaser will agree upon an allocation of the Purchase Price covering the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) for federal, state and local Tax purposes. Upon reaching such agreement, such allocation will be set forth on Schedule 3.03 hereto. The Seller and the Purchaser will implement, report and accept the allocation set forth on Schedule 3.03 for federal, state and local Tax purposes. The parties agree that such allocations will not in any way limit their respective rights and obligations under the Sale Documents in respect of representations, warranties, covenants and agreements and the breach thereof or damages therefor. With respect to the foregoing, and in accordance with Section 3.02(a), the Seller and Purchaser hereby agree that $500,000.00 of the Purchase Price shall be allocated to the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)).

Section 3.04.  Deposit.

(a)  Making of Deposit. Purchaser shall deposit, within one (1) Business Day after the entry of the Bidding Procedures Order, an amount in cash equal to $500,000 (the **"Deposit"**) (such Deposit, together with all interest earned thereon, being the **"Deposit Amount"**) to be held in escrow by the Escrow Agent in an interest bearing account in accordance with the

26

terms and provisions of this Agreement and that certain escrow agreement among the Escrow Agent, the Seller and Purchaser (the **"Escrow Agreement"**). The fees and expenses of the Escrow Agent shall be paid one half by Seller and one half by Purchaser. The parties agree that the Deposit Amount shall be held in escrow and shall not become, or be considered, part of the bankruptcy estate of the Seller unless and until it is released to the Seller.

(b) <u>Deposit Amount.</u> Purchaser shall be entitled to be indemnified and reimbursed from the Deposit Amount for (i) those amounts it is entitled to be reimbursed pursuant to the provisions set forth in this Agreement, (ii) any and all post petition amounts of Excluded Liabilities that Seller is required to pay pursuant to this Agreement but fails to pay, and (iii) any breach of any representation, warranty or covenant of the Seller set forth in this Agreement.

(c) <u>Release of Deposit</u>. The Deposit Amount shall be distributed by the Escrow Agent as follows:

(i) If the sale of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a) above) to Purchaser under the terms and conditions of this Agreement is approved by the Bankruptcy Court, then:

(A) After the Closing and upon agreement, the Purchaser and Seller will deliver to the Escrow Agent a written notice directing the Escrow Agent to either distribute (i) the Deposit Amount to the Seller or (ii) such portion of the Deposit Amount to the Purchaser to the extent necessary to satisfy Seller's obligations under this Agreement, including but not limited those pursuant to Section 3.02, with the balance, if any, to the Seller; or

(B) If (i) all of the conditions to Closing set forth in Section 4.03 have been satisfied on or prior to the Termination Date, (ii) the Seller shall have duly performed and complied with all obligations under the Sale Documents, and (iii) the Transactions would otherwise have been consummated on or prior to the Termination Date but for the breach by the Purchaser of any of its material obligations under this Agreement (each such breach, a **"Purchaser Breach"**), then the Seller may give written notice of a Purchaser Breach to the Purchaser and the Escrow Agent, and within ten Business Days after receipt of such notice, the Escrow Agent shall (unless the Purchaser shall object to the notice by the Seller within such ten Business Day period) deliver the Deposit Amount to the Seller in accordance with its written instructions; or

(C) If (i) this Agreement shall have been terminated in accordance with the provisions of Section 9.01, or (ii) the Transactions have not been consummated by the Termination Date, then the Purchaser shall give written notice thereof to the Seller and the Escrow Agent, and

27

within ten Business Days after receipt of such notice the Escrow Agent shall (unless the Seller shall object to the notice by Purchaser within such ten Business Day period) deliver the Deposit Amount to the Purchaser in accordance with its written instructions; or

(D) the Purchaser shall within 120 days from Closing give written notice to the Seller and the Escrow Agent of the amount to be distributed to Purchaser and Seller, as the case may be, and within ten Business Days after receipt of such notice the Escrow Agent shall (unless the Seller shall object to the notice by Purchaser within such ten Business Day period) deliver such portion of the Deposit Amount to the Purchaser or Seller, as the case may be, in accordance with Purchaser's written instructions.

(ii) If either (A) the sale of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) to Purchaser is not approved by the Bankruptcy Court, or (B) an Auction involving the Purchased Assets takes place, a Person other than the Purchaser is selected as the winning bidder under an Alternative Transaction or Competing Transaction, and the Purchaser is not the back-up bidder to the Alternative Transaction or Competing Transaction, then the Escrow Agent shall deliver the Deposit Amount to the Purchaser on the earlier to occur of (x) the date which is two Business Days after the conclusion of the Sale Hearing and (y) the date which is five Business Days after the Auction. If the Purchaser is the back-up bidder to any Alternative Transaction or Competing Transaction, then the Escrow Agent shall deliver the Deposit Amount to the Purchaser on the earlier of (I) within one Business Day after the closing of such Alternative Transaction or Competing Transaction, and (II) 30 days after conclusion of the Sale Hearing; *provided, however*, that if, prior to 30 days after conclusion of the Sale Hearing and prior to termination of the Agreement in accordance with Section 9.01, the Alternative Transaction or Competing Transaction fails to close and, as authorized by the Sale Order, the Seller provides written notice to Purchaser (as the back-up bidder) of its intention to close on the Transactions with Purchaser under the terms and conditions of this Agreement, then the Deposit Amount shall be distributed in accordance with the provisions of Section 3.04(c)(i).

(d) Sole Remedy. Notwithstanding any provision of this Agreement to the contrary, the Seller hereby agrees that in the event that the Seller is entitled to retain the Deposit Amount pursuant to the provisions of Section 3.04(c)(i)(B) above, the Deposit Amount shall be the Seller's sole remedy for such a Purchaser Breach as liquidated and stipulated damages. Except for so retaining the Deposit Amount as provided above, the Seller shall not have any other claim or remedy relating to the Transactions (or the failure thereof) (whether resulting from breach or otherwise). As acknowledged by the parties, the full extent of the Seller's damages in the event of a Purchaser Breach cannot be accurately anticipated or determined, and the amount of liquidated damages in the amount of the Deposit Amount does not constitute a penalty.

28

## ARTICLE IV

## The Closing; Conditions to Closing

Section 4.01. The Closing.

(a) Time and Place of Closing. The consummation of the Transactions (the "**Closing**"), will take place at the offices of Rochelle McCullough, 325 N. St. Paul, Suite 4500, Dallas, Texas 75201, on the Target Date, or at such other location or time as the parties may agree in writing; provided, however, that if any of the conditions to Closing contained in the Sale Documents (except for conditions which can only be satisfied at Closing) are not satisfied or effectively waived as of the Target Date or such other agreed-upon date, the Closing shall take place on the second Business Day after the date on which all of the conditions to Closing contained in the Sale Documents (except for conditions which can only be satisfied at Closing) are satisfied or effectively waived; provided, further, however, that in no event unless otherwise agreed in writing shall the Closing take place on a date which is after the Termination Date (the date of the Closing being hereinafter referred to as the "**Closing Date**").

(b) Effective Time. The sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), the assignment of all Assigned Agreements, and the assumption of the Assumed Liabilities described in the Sale Documents will be effective as of the Effective Time.

Section 4.02. Conditions Precedent to the Obligations of the Seller. The obligations of the Seller to consummate the Transactions under the Sale Documents are expressly subject to the fulfillment of each of the following conditions, unless waived by the Seller in writing, at or before the Closing:

(a) Representations and Warranties; Performance of Agreements. (i) All of the representations and warranties of the Purchaser set forth in the Sale Documents shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date unless another date is specified in such representation; (ii) the Purchaser shall have performed and complied in all material respects with all of its covenants and other obligations set forth in the Sale Documents required to be performed or complied with by the Purchaser at or before the Closing; and (iii) the Seller shall have received a certificate of an officer of Purchaser as to the fulfillment of the conditions set forth in clauses (i) and (ii) above, which certificate shall have the effect of a representation and warranty of the Purchaser as to the matters set forth therein, provided however, that the failure of any condition in this paragraph shall be deemed waived by Seller unless such failure will likely have a Material Adverse Effect on Seller's rights and obligations under this Agreement.

(b) Purchaser Required Consents; Sale Order. The Seller shall have received copies of all of the Purchaser Required Consents, and all such Purchaser Required Consents shall be in form and substance reasonably satisfactory to the Seller and shall be in full force and effect as of the Closing Date. The Seller shall have received the Sale Order entered by the

29

Bankruptcy Court approving the sale of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), free and clear of all Liens, Claims, encumbrances and interests other than Permitted Liens and Assumed Liabilities, by the Seller to the Purchaser, which Sale Order complies in all material respects with the terms and provisions of Section 7.03 hereof. Such Sale Order shall be in full force and effect as of the Closing Date in all material respects and shall not be subject to any stay, temporary restraining order or injunction.

(c) Consideration. The Seller shall have received the Payment Amount, as adjusted in accordance with the terms of this Agreement, by wire transfer of immediately available funds in accordance with the provisions of Section 3.01 hereof.

(d) Ancillary Agreements. The Seller shall have received the Assignment and Assumption Agreements from Purchaser, in form and substance reasonably satisfactory to Purchaser and Seller.

(e) Schedule Updates. The Schedule Updates, if any, delivered by the Seller to the Purchaser shall have been accepted by the Purchaser in accordance with the provisions of Section 7.04(b) hereof.

Section 4.03. Conditions Precedent to the Obligations of the Purchaser. The obligations of the Purchaser to consummate the Transactions under the Sale Documents are expressly subject to the fulfillment of each of the following conditions, unless waived by the Purchaser in writing, at or before the Closing:

(a) Representations and Warranties: Performance of Agreements. (i) All of the representations and warranties of the Seller set forth in the Sale Documents shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date unless otherwise specified in such representation; (ii) the Seller shall have performed and complied in all material respects with all of its covenants and other obligations contained in the Sale Documents required to be performed or complied with by it at or before the Closing; and (iii) the Purchaser shall have received a certificate executed by an officer of the Seller as to the fulfillment of the conditions set forth in clauses (i) and (ii) above, which certificate shall have the effect of a representation and warranty of the Seller as to the matters set forth therein.

(b) Required Consents and Permits. The Purchaser shall have received copies of all of (i) the Required Consents, (ii) the Required Permits and (iii) the Environmental Permits necessary to operate the Business in compliance with all Environmental Laws, and all such Required Consents, Required Permits and Environmental Permits shall be in form and substance reasonably satisfactory to the Purchaser and shall be in full force and effect as of the Closing Date.

(c) Ancillary Agreements. The Purchaser shall have received the following, each dated as of the Closing Date and in full force and effect as of the Closing Date, in form and substance reasonably satisfactory to the Purchaser and its counsel:

30

(i)    one or more Bills of Sale, duly executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller, transferring the Purchased Assets to the Purchaser;

(ii)    one or more Assignment and Assumption Agreements, duly executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller, assigning the Assigned Agreements to the Purchaser and for the Purchaser's assumption of the Assumed Liabilities;

(iii)    one or more Intellectual Property Assignment Agreements, duly executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller, transferring and assigning the Intellectual Property to the Purchaser;

(iv)    one or more Special Warranty Deeds, duly executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller, transferring the Purchased Real Property to the Purchaser (the "**Purchased Real Property Deeds**"), and a Special Warranty Deed, duly executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller, transferring the Kinta Ranch Property to the Purchaser (the "**Kinta Ranch Property Deed**") (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)); and

(v)    all other instruments of transfer, duly executed by the Seller and in form and substance reasonably satisfactory to Purchaser and Seller, as shall be reasonably necessary or appropriate to vest in the Purchaser good and indefeasible title to the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) and to permit the Purchaser to conduct the Business without interruption.

(d)    Sale Order.    The Purchaser shall have received a Sale Order entered by the Bankruptcy Court (i) approving the sale of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), free and clear of all Liens, Claims, encumbrances and interests other than Permitted Liens and Assumed Liabilities, by the Seller to the Purchaser in form and substance satisfactory to the Purchaser, which Sale Order complies in all material respects with the terms and provisions of Section 7.03 hereof; (ii) providing express findings that the Purchaser is not a successor entity of the Seller; (iii) enjoining all Persons that have or at any time in the future have Claims or causes of action (whenever such Claims or causes of action arose or may in the future arise) accruing or relating to events, facts or circumstances that occurred prior the Closing Date from bringing any such Claim or cause of action against Purchaser; and (iv) providing that the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2) and 1334, to, among other things, interpret, implement and enforce the terms and provisions of the Sale Documents and the Sale Order. Such Sale Order shall be in full force and effect as of the Closing Date without modification and shall not be subject to any appeal stay, temporary restraining order or injunction.

31

(e) No Termination. This Agreement shall not have been terminated pursuant to Section 9.01.

(f) FIRPTA. The Purchaser shall have received from the Seller one or more certificates, in form and substance acceptable to counsel for the Purchaser and duly executed by the Seller, pursuant to which Seller certifies, as of the Closing Date, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the regulations thereunder.

(g) Schedule Updates. The Schedule Updates, if any, delivered by the Seller to the Purchaser shall have been accepted by the Purchaser in accordance with the provisions of Section 7.04(b) hereof.

(h) No Material Adverse Effect. As of the Closing Date, no Material Adverse Effect in the financial condition, business operations, properties, assets or prospects of the Seller shall have occurred.

(i) Environmental Reports. The Purchaser shall have obtained current Environmental reports with respect to any Real Property, Lease or Leasehold which Purchaser, in its sole discretion, elects an Environmental study be performed (including but not limited to any Phase I Environmental report and/or Phase II report of Environmental testing) which indicate there is no potential Cleanup of any Environmental Condition required.

(j) Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order and such Bidding Procedures Order shall not have been amended, modified or stayed and shall have become a Final Order.

(k) Closing Date A/R. Seller shall have delivered to Purchaser two days prior to the Closing Date a statement setting forth its estimated Accounts Receivable as of the Closing Date along with an explanation of its computations for such Accounts Receivable.

(l) Surface Use Agreement-Kinta Ranch and Kinta Ranch Mineral Interest Quitclaim Deed. In the event Seller elects, in accordance with the provisions of Section 3.02(a), to sell its interest in the surface rights of the Kinta Ranch Property to a Person other than the Purchaser, Seller shall have delivered to Purchaser (i) the Surface Use Agreement-Kinta Ranch, executed by the Seller and/or purchaser of the Seller's interest in the surface rights of the Kinta Ranch Property, in form and substance reasonably satisfactory to Purchaser and Seller, and (ii) the Kinta Ranch Mineral Interest Quitclaim Deed, executed by the Seller, in form and substance reasonably satisfactory to Purchaser and Seller.

Section 4.04. Efforts to Close; Consents.

(a) Purchaser's Efforts; Consents. From and after the date on which the Sale Order has been entered, the Purchaser will use its commercially reasonable efforts to cause (i) the conditions to Closing set forth in Section 4.02 which are within the Purchaser's control to be satisfied on or prior to the Target Date, and (ii) the Transactions to be consummated on the

32

Target Date. In addition, the Purchaser will obtain the Purchaser Required Consents at its expense.

(b) Seller's Efforts; Consents. From and after the date on which the Bidding Procedures Order has been entered, the Seller will, and the Seller will cause each of the Seller's Subsidiaries to, (subject to any fiduciary obligations and duties as debtors-in-possession under the Bankruptcy Code) use its respective commercially reasonable efforts to cause (i) the conditions to Closing set forth in Section 4.03 which are within Seller's control to be satisfied on or prior to the Target Date, and (ii) the Transactions to be consummated on the Target Date. In addition, the Seller will obtain all Required Consents, Required Permits, and Environmental Permits at the sole cost and expense of the Seller.

## ARTICLE V

### Representations and Warranties of the Seller

The Seller hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows:

Section 5.01. Existence and Power. Seller (a) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified under the laws of, or is licensed to do business as a foreign company in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Assets or to operate or carry on the Business, and (c) except for any required approval of the Bankruptcy Court, has all necessary corporate or other organizational power and authority required to own, lease, operate or license its Assets, and to operate and carry on the Business. Subject to entry of the Sale Order, Seller has the power and authority to execute and deliver each of the Sale Documents, to consummate the Transactions and to perform its obligations under the Sale Documents. Seller will deliver to the Purchaser prior to the Closing Date correct and complete copies of its certificates of incorporation, certificates of formation, certificates of limited partnership, by-laws, operating agreements, partnership agreements and other organizational documents, as the case may be.

Section 5.02. Authorization; Binding Effect. The execution and delivery by Seller of each of the Sale Documents to which the Seller is a party, the performance by the Seller of its obligations under such Sale Documents and the consummation of the Transactions by the Seller has been duly authorized by all necessary corporate action on the part of the Seller. No other proceedings on the part of the Seller or any other Person are necessary to approve and adopt the Sale Documents or to approve the consummation of the Transactions, except for the approval of the Bankruptcy Court. Each of the Sale Documents to which the Seller is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

33

Section 5.03. Contravention. Other than the entry of the Sale Order by the Bankruptcy Court, neither the execution, delivery and performance of the Sale Documents by the Seller nor the consummation of the Transactions by the Seller will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of the Seller's certificate of incorporation, by-laws, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement or other similar organizational documents, (b) assuming the receipt of all of the Required Consents (as set forth in 5.04 below) and the Sale Order prior to the Closing, conflict with, violate or breach any Law by which the Seller, the Business or any of the Assets may be bound or affected, (c) assuming the receipt of all of the Required Consents (as set forth in 5.04 below) and the Sale Order prior to the Closing, conflict with, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any Material Contract, (d) result in or require the creation or imposition of any Lien (other than Permitted Liens) on any of the Assets or (e) otherwise result in a Material Adverse Effect.

Section 5.04. Consents. Except for the Sale Order and the Consents set forth on Schedule 5.04, no Consents are required on behalf of the Seller in connection with (a) the due execution and delivery by the Seller of the Sale Documents and the performance of the Seller's obligations thereunder and (b) the consummation of the Transactions by the Seller. As of the Closing Date, all of the Required Consents will have been obtained and will be in full force and effect.

Section 5.05. Financial Information.

(a) Reserve Report. The Reserve Report, a copy of which is attached hereto as Schedule 5.05(a), fairly and accurately presents the reserves of the Seller as of the respective dates set forth therein except as set forth in Schedule 5.05.

(b) Other Financial Statements. The unaudited balance sheets, statements of operations and statements of cash flows of the Seller for the months of March 2010, April 2010[1], and May, 2010[2] (collectively, the "**Interim Financial Statements**"), copies of which are attached hereto as Schedule 5.05(b), were prepared in accordance with GAAP (except, with respect to the unaudited statements, for the absence of footnotes and subject to normal recurring year end adjustments in accordance with GAAP which will not be material in amount) except as set forth in Schedule 5.05 and fairly present the assets and liabilities, results of operations and cash flows of the Seller for such periods. By no earlier than five (5) Business Days, and no later than two (2) Business Days, prior to the Closing Date, Seller shall provide to Purchaser an updated accounts payable schedule and updated accounts receivable schedule (collectively, the "**Updated Financial Statements**") which fairly present all existing and projected accounts payable and accounts receivable as of the Closing Date.

---

[1] To be supplemented.
[2] To be supplemented.

590081.3/1835-00042

(c) Accounts Payable and Accounts Receivable.

(i) All of the accounts payable of the Seller, as reflected in the Interim Financial Statements and Updated Financial Statements, were (or will have been as of the Closing Date) to the Knowledge of Seller, incurred in the ordinary course of the Seller's business consistent with past practice, and the Updated Financial Statements accurately reflect all amounts owed by the Seller with respect to trade accounts due and other payables as of the Closing Date.

(ii) All accounts receivable of the Seller (other than the intercompany receivables), as reflected in the Interim Financial Statements and Updated Financial Statements, (A) have arisen (or will have arisen as of the Closing Date) from bona fide transactions in the ordinary course of business of the Seller consistent with past practice and (B) arose (or will have arisen as of the Closing Date) from the sale of goods or services on customary trade terms in the ordinary course of business, and the Updated Financial Statements accurately reflect all Accounts Receivable of the Seller as of the Closing Date.

Section 5.06. Litigation. Except as set forth on Schedule 5.06, there is no Action pending, or to the Knowledge of Seller, threatened (a) against the Seller, or (b) that questions the validity of any of the Sale Documents or that involves or relates to any of the Transactions, or (c) that will or could reasonably be expected to materially adversely affect any of the Assets or the Business, or (d) that will or could reasonably be expected to materially adversely affect the Purchaser's ability to conduct the Business currently conducted by Seller or the ownership or use by the Purchaser of the Purchased Assets and the Kinta Ranch Property after the Closing. None of the matters disclosed on Schedule 5.06 has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.07. Permits: Compliance with Laws.

(a) Permits. Schedule 5.07 sets forth a correct and complete list and description of all material Permits (except for Environmental Permits, which are identified on Schedule 5.15) necessary to entitle or permit each Seller to use its corporate name, to own, lease, operate and use the Assets, and to carry on and conduct the Business as it has historically been conducted (such Permits being the "**Required Permits**"). Seller owns, holds or possesses all Required Permits and all such Required Permits are validly held and are in full force and effect. No Required Permit will be subject to suspension, modification, limitation, revocation, cancellation or non-renewal as a result of the consummation of the Transactions.

(b) Compliance with Laws. Seller, its operations, the Business and the Assets are materially in compliance with each Required Permit and each Law applicable to the Seller, its operations, the Business or the Assets. Neither the Seller nor any director, officer or employee of the Seller acting on behalf of Seller, has at any time made any bribes, kickback payments or other illegal payments. The Seller is in compliance with all orders entered by the Bankruptcy Court in the Proceedings.

35

Section 5.08. Employment Matters.

(a) Except as set forth in Schedule 5.08(a), since June 1, 2009, with respect to the Seller and the Transactions contemplated by this Agreement: (a) Seller has been in compliance in all material respects with all Laws, rules, regulations, and ordinances related to employment or termination of employment, employment practices, employment terms, conditions, and compensation, labor or employment relations, equal employment opportunities, and fair employment practices; (b) there is no grievance arising under any employment agreement, or contractor agreement which reasonably would be expected to have a Material Adverse Effect, nor are arbitration proceedings arising out of any such agreement pending; nor, to the Knowledge of Seller, have any grievance(s) or arbitrations(s) been threatened; and (c) there has been no investigation, claim, complaint, charge, action, or litigation before or by any federal, state or local court, administrative agency, governmental entity, or arbitration tribunal relating to employment, employment practices, terms, conditions, or compensation, employment termination, separation, or layoffs, employment discrimination or equal employment opportunity, fair employment practices, whistleblowing, retaliation, or employee safety or health; nor, to the Knowledge of Seller, is any threatened.

(b) Except as set forth in Schedule 5.08(b), since June 1, 2009, Seller has been in material compliance with and has not materially violated the terms and provisions of the Immigration Reform and Control Act of 1986, as amended, and all related regulations promulgated thereunder (the "**Immigration Laws**"). With respect to each Newly-Hired Employee, Seller has supplied, or shall supply on the Closing Date, to Purchaser, with regard to all applicable Newly-Hired Employees, Form I-9 (Employment Eligibility Verification Form) and all other records, documents or other papers which are retained with the Form I-9 by the Seller pursuant to the Immigration Laws. Since June 1, 2009, Seller has not been warned, fined or otherwise penalized by reason of its failure to comply with the Immigration Laws, nor is any such proceeding pending or, to the Knowledge of Seller, threatened.

(c) Except as set forth in Schedule 5.08(c) there is no order, decree, or judgment of any kind in existence enjoining or restraining Seller or any of its directors, officers, or employees (in their respective capacities as such) or requiring any of them to take or refrain from taking any action of any kind relative to the Seller, this Agreement, or any agreement, document, or instrument referred to herein, except prior judgments, which have been fully discharged. No action or proceeding shall be pending or, to the Knowledge of Seller, threatened by or before any court, administrative agency, or any other Person seeking to restrain or prevent or declare illegal, or seeking damages in connection with, any of the transactions contemplated by this Agreement or any aspect thereof.

Section 5.09. Title to Purchased Assets. The Seller has (or prior to Closing, will have obtained) good and marketable title to or leasehold interest in all of the Purchased Assets, free and clear of all Liens, except for Permitted Liens and the Liens of the Seller's pre-Petition Date secured creditors. Assuming the receipt of the Sale Order and all of the Required Consents (as set forth in Section 5.04 above) prior to the Closing, the Seller has good right, full power and lawful authority to sell, bargain, convey, transfer, deliver and assign to Purchaser all right, title and interest in, to and under each of the Purchased Assets. Assuming the receipt of the Sale

36

Order and all of the Required Consents (as set forth in Section 5.04 above) prior to the Closing, upon delivery to the Purchaser at the Closing by the Seller of the agreements, documents and instruments set forth in Section 4.03(c) and upon the Seller's receipt of the Payment Amount in accordance with Article III of this Agreement, good and marketable title to the Purchased Assets will pass to the Purchaser, free and clear of any and all Liens, Claims, encumbrances and interests, of whatever nature, except for Permitted Liens and Assumed Liabilities.

Section 5.10. Real Property, Leases and Leaseholds.

(a) Schedules. Schedule 5.10(a)(i) sets forth a correct and complete list, legal description and location of all Purchased Real Property and all non-mineral Leaseholds not covering or related to the Excluded Assets (all such non-mineral Leaseholds being the "**Leaseholds**") in which the Seller has an interest or which Seller uses in the operation of the Business. Schedule 5.10(a)(ii) sets forth the correct and complete legal description and location of the Kinta Ranch Property.

(b) Title to Real Property and Leasehold Interests. Seller has good, marketable and insurable title in fee simple to all of the Real Property, free and clear of all Liens, except for Permitted Liens and Liens set forth on Schedule 5.10(b). Except as set forth in Schedule 5.10(b), with respect to the Real Property: (i) Seller has no knowledge of any Person with any right of first refusal, option or similar rights to acquire any interest in the Real Property or any part thereof; (ii) the obligations of the Seller or the Real Property with regard to all applicable covenants, easements and restrictions against the property have been and are being performed in a proper and timely manner; (iii) Seller has paid all Taxes due and owing prior to the commencement of the Proceedings which if not paid could constitute a Lien on the Real Property or otherwise impose liability on the Purchaser or the Real Property; (iv) Seller has not received any notice or become aware of any proposed special assessment which would affect any of the Real Property; (v) Seller has received no notice of any violation of any zoning, subdivision, platting, building, fire, insurance, safety, health, environmental or other applicable Laws, ordinances or regulations (whether related to the Real Property or the occupancy thereof), and the Seller has received no notice of increased taxes, assessments or insurance premiums; (vi) to the Knowledge of Seller and except as set forth on Schedule 5.10(b), the physical condition of the Real Property, including without limitation the structural elements and mechanical systems of the Real Property, are in good operating condition and free from material defects; and (vii) there are no contracts or agreements, written or oral, affecting the Real Property that will survive the Closing and be binding upon the Purchaser thereafter (except for the Surface Use Agreement-Kinta Ranch in the event the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)). Except as set forth on Schedule 5.10(b), none of the Real Property is subject to any lease, sublease or other similar Contract or arrangement. Seller has valid title to all of the Leaseholds. Each of the Leaseholds is the subject of a written lease agreement, and there are no oral terms inconsistent with the written terms thereof. Except as set forth on Schedule 5.10(b), to the Knowledge of Seller, no work has been performed on, or materials supplied to, any of the Real Property or Leaseholds within the applicable statutory period that could give rise to any mechanic's or materialmen's Liens for any amount in excess of $5,000.

37

(c)  Title to Leases. Seller has valid title to all of the Leases. Each of the Leases is the subject of a written lease agreement, and there are no oral terms inconsistent with the written terms thereof. Except as specifically set forth on Schedule 5.10(c), with respect to the Leases, (A) all royalty payments, rent payments and delay rentals due and owing by Seller have been paid, (B) Seller has delivered to Purchaser any and all notices of default or other material notices relating to any of the Leases, and (C) Seller has paid all Taxes due and owing prior to the commencement of the Proceedings which if not paid could constitute a Lien or encumbrance on the Leases or proceeds therefrom, or otherwise impose liability on the Purchaser or the Leases. Except as set forth on Schedule 5.10(c), to the Knowledge of Seller, no work has been performed on, or materials supplied to, any of the Leases within the applicable statutory period that could give rise to any mechanic's or materialmen's Liens for any amount in excess of $4,500.

(d)  No Restrictions. Seller enjoys peaceful and undisturbed possession of the Real Property, the Leases and the Leaseholds. Except as set forth in Schedule 5.10(a), Schedule 5.10(b) or Schedule 5.10(c), no instrument of record, contract, easement, license, use restriction, grant or applicable zoning, building or urban redevelopment Law or other impediment of any kind prohibits, materially limits, impairs or interferes with, the use, operation, maintenance of, or access to the Real Property, Leases or Leaseholds in a manner inconsistent with Seller's past practice immediately prior to the Effective Time, and there are no recorded easements or encroachments by improvements on adjoining premises with respect to any of the Real Property, Leases or Leaseholds that could reasonably be expected to materially affect the ability of the Purchaser to conduct the Business.

(e)  Condemnation and Eminent Domain. Except as set forth on Schedule 5.10(e), there is no pending or, to the Knowledge of Seller, threatened condemnation or eminent domain proceedings or other Actions with respect to any of the Real Property or Leaseholds.

Section 5.11.  Equipment, Non-Production-Based Inventory, and Fixtures.

(a)  Schedules and Possession. Schedule 5.11(a) sets forth a correct and complete list and description of all Equipment, Non-Production-Based Inventory, and Fixtures in which the Seller has an interest, and the Seller has exclusive possession and control of all such Equipment, Non-Production-Based Inventory and Fixtures.

Section 5.12.  Material Contracts; Liens.

(a)  Material Contracts. To the Knowledge of Seller, as of the date of this Agreement the Seller is not in material breach of any Material Contract included in the Assigned Agreements.

(b)  Liens. Schedule 5.12 sets forth a correct and complete list and description of all of the Liens affecting or attaching to the Assets.

38

Section 5.13. <u>Intellectual Property</u>.

(a)   <u>Ownership or Right to Use</u>.  <u>Schedule 5.13(a)(i)</u> and <u>Schedule 5.13(a)(ii)</u> set forth a correct and complete list and description of, respectively, (i) all Intellectual Property (whether or not owned by the Seller) used by the Seller which is material to the conduct of the Business (the "**Required Intellectual Property**"), and (ii) all other Intellectual Property (whether or not currently used in the Business) with a minimum value in excess of $1,000 in which the Seller has an interest, whether as owner, licensee, licensor, sublicensee, sublicensor or otherwise; and in each case, including, without limitation, a correct and complete list of all jurisdictions in which all trademarks, copyrights and patents (whether owned or licensed) are registered, issued or applied for and all registration, grant and application numbers.  The Seller owns or has the legal and valid right to use, all Required Intellectual Property, free and clear of all Liens, except for Permitted Liens.  All Required Intellectual Property is valid, enforceable and in good standing.  Neither the Seller nor any other Person has entered into any Contract providing for any option, license, sublicense or other right to use, acquire or Transfer any Required Intellectual Property, other than those licenses or sublicenses that (A) have been granted to the Seller as licensee or sublicensee, and (B) are included in Material Contracts.

(b)   <u>No Infringement</u>.  To the Knowledge of Seller, neither the ownership or use of the Required Intellectual Property nor the operation of the Business has infringed, misappropriated or conflicted with and does not infringe, misappropriate or conflict with any Intellectual Property of any other Person, and any future conduct of the Business as presently contemplated would not infringe, misappropriate or conflict with any Intellectual Property of any other Person.  To the Knowledge of Seller, no unauthorized Person is using or engaging in any unauthorized use of any of the Required Intellectual Property.

Section 5.14. <u>Insurance</u>.  The Seller, all of the Purchased Assets and the Kinta Ranch Property, and the Business are covered by valid and currently effective insurance policies or binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of the Seller, in each case, with reputable insurance companies and in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of the Seller.  Seller is not in default with respect to its obligations under any insurance policy maintained by it, and all premiums thereunder will be timely paid in full for all periods up to and through the Effective Time.  <u>Schedule 5.14</u> sets forth a correct and complete list and description of all such policies of insurance, including (i) the name of the insurer and the names of the principal insured and each named insured, (ii) the period of coverage, (iii) the type and amount of coverage, and (iv) a list of the material claims paid out under such policies and claims that are pending.  <u>Schedule 5.14</u> sets forth a correct and complete list of all material risks against which the Seller is insured under a program of self insurance.

Section 5.15. Environmental Matters.

Except as set forth on Schedule 5.15, to the Knowledge of Seller:

(a) No Environmental Liability.

(i) Seller's operation of the Business has complied and is in compliance with all applicable Environmental Laws and contractual obligations (including lease provisions) concerning public health and safety, worker health and safety, Hazardous Materials and the Environment.

(ii) Seller has obtained and is in compliance with all Environmental Permits necessary for the lawful operation of the Business and the Real Property and Leaseholds, all such Environmental Permits are listed in Schedule 5.15, and no investigation or proceeding is pending or, to the Knowledge of Seller, threatened to modify, revoke or limit any Environmental Permit.

(iii) Seller has never received or been subject to any Environmental Claim, and has not received any written or oral notice, report, or other information regarding any pending or threatened Environmental Claim involving fines, penalties or remediation costs in excess of $4,000.00.

(iv) There are no Environmental Conditions at, on, under or emanating to or from the Real Property, any Leasehold, any formerly owned or operated property or any other property for which Seller could be liable or responsible under Environmental Laws, any lease, contract or otherwise.

(v) Seller has never treated, stored, manufactured, processed, distributed, disposed of, arranged for, caused or permitted Release or threatened Release of any Hazardous Materials at any Real Property, any Leasehold, any formerly owned, leased or operated property or at any other property that has or could give rise to any Environmental Claim or required Cleanup under Environmental Laws.

(vi) Seller has not, either expressly or by operation of law, assumed or undertaken any liability or responsibility of another Person (whether or not affiliated with Seller or its predecessors or Affiliates) for Cleanup, Cleanup costs, any Environmental Claim or other liability, cost or responsibility under Environmental Laws.

(vii) Neither this Agreement nor the consummation of the Transactions contemplated by this Agreement will trigger or result in (a) any responsibility or obligation for investigation, Cleanup or notification to or consent of a Governmental Body or any other Person; or (b) any requirement to assign or transfer any Environmental Permit.

(viii) There are no, nor have there been, any underground or above ground tanks containing, or previously containing Hazardous Materials at any Real Property or

40

Leasehold and Seller did not own or operate any such tanks at any property formerly owned, leased or occupied by Seller.

(ix)     There are no asbestos-containing materials, PCB-containing transformers, capacitors, hydraulic lifts or other equipment and no landfills, surface impoundments, or waste disposal areas, located at or on any Real Property or Leasehold.

(x)     There are no Pre-Closing Environmental Liabilities of Seller that are not identified on Schedule 5.15.

(xi)     There are no Liens filed or recorded against any Real Property or Leasehold arising under any Environmental Law and Seller has not received any notice that any such Lien is threatened to be recorded or filed against any Real Property or Leasehold.

(xii)     There are no recorded or unrecorded restrictions on activities or use of any Real Property or Leasehold or the groundwater beneath any Real Property or Leasehold and there are no recorded or unrecorded covenants or requirements to install or maintain engineered barriers (such as a concrete or asphalt cap over contaminated media) arising from any Environmental Condition or pursuant to Environmental Laws.

(b)     Basis for Environmental Claims. (i) The Seller has not been identified or listed as a potentially responsible party or a responsible party for Cleanup or Cleanup costs under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor has the Seller received any information request from a Governmental Body under any Environmental Law. No Relevant Property is listed or is proposed for listing on the federal National Priorities List or any other similar Law.

(c)     Notices. The Seller has not received any written or oral communication from a Governmental Body, Person or any citizens' group, employee or otherwise within the past five years, alleging (i) that Seller or any Relevant Property has violated or is in violation of any Environmental Law or is liable for any Cleanup of Hazardous Materials or (ii) that the Seller has any Pre-Closing Environmental Liabilities.

(d)     Environmental Reports. Seller has provided Purchaser with true and correct copies of all environmental assessments, audits (including compliance audits), evaluations, studies, and tests in its possession or within its custody and control relating to the Business, the Real Property, any Leaseholds, any real property previously owned, leased, or used by or on behalf of Seller or of which Seller has at any time had a legal or beneficial interest.

(e)     Filing of Reports. Seller has timely filed all material reports, obtained all material Consents and Permits and generated and maintained, and currently generates and maintains, all material Consents, Permits, data, documentation and records required under applicable Environmental Laws.

41

Section 5.16. <u>Employees: ERISA</u>.

(a) <u>Schedule of Employees</u>. Seller has provided to Purchaser a correct and complete list and description of all of the employees of, and consultants and independent contractors to, the Seller and each employee's place of employment, compensation, bonuses, deferred or contingent compensation, pension, accrued vacation, accrued sick pay, severance, "golden parachute" and other like benefits and term of employment, in effect as of the date of this Agreement.

(b) <u>Employment Agreements</u>. Seller has not entered into and is not bound by any (i) employment, consulting or severance Contract with any of its directors, officers or employees, or (ii) Collective Bargaining Agreements with its employees.

(c) <u>Plans</u>.

(i) <u>Schedule 5.16</u> sets forth a correct and complete list of all Benefit Plans of Seller, true, correct and complete copies of which will be delivered promptly to the Purchaser or its representatives after the date of this Agreement.

(ii) Neither Seller nor any other Person who is part of a Controlled Group with the Seller has at any time during the immediate past six years maintained a Benefit Plan that is subject to Title IV of ERISA or had any obligation (contingent or otherwise) with respect to any Benefit Plan that is subject to Title IV of ERISA. No condition or event currently exists or currently is expected to occur that could subject, directly or indirectly, Seller to any liability or the imposition of any Lien under Title IV of ERISA, whether to the PBGC or to any other Person or otherwise on account of the termination of any Benefit Plan.

(iii) Neither Seller nor any other Person who is part of a Controlled Group with the Seller contributes or has ever contributed or been required to contribute to a multiemployer plan as defined in Section 3(37) of ERISA.

(iv) <u>Schedule 5.16(c)(iv)</u> sets forth the number of former employees of Seller and dependents who qualify as a "qualified beneficiary" as defined in Code § 4980B(g)(1), who are actively receiving COBRA coverage (within the meaning of Code § 4980B), or are eligible to elect to receive COBRA coverage (as set forth in Code § 4980B(f)(5)) as of the date of this Agreement. Such schedule shall also set forth the periods of coverage and applicable premium (within the meaning of § 4980B(f)(4) of the Code) for each such former employee or dependent. Such schedule will be updated as of the Closing Date.

(d) <u>Workers' Compensation</u>. There are no liabilities to any of the Seller's current or former employees relating to workers' compensation benefits that are not fully insured against by third-party insurance carriers.

(e) <u>WARN Act</u>. Seller has no obligation under the WARN Act or any similar state or local law, regulation or ordinance.

42

Section 5.17. Brokers, Finders.    Seller has not retained any broker or finder in connection with the Transactions, and is not obligated and has not agreed to pay any brokerage or finder's commission, fee or similar compensation.

Section 5.18. No Material Misstatements or Omissions.  No representation or warranty of Seller set forth in any of the Sale Documents or in any of the certificates and schedules furnished by the Seller in connection therewith, contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

Section 5.19. Conduct of Business.  The Business of Seller has been conducted only by Seller.

## ARTICLE VI

### Representations and Warranties of the Purchaser

The Purchaser represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows:

Section 6.01. Existence and Power.  The Purchaser (a) is validly existing and in good standing under the laws of Delaware, and (b) has all necessary corporate or other organizational power to execute and deliver each of the Sale Documents and to consummate the Transactions and to perform its obligations under the Sale Documents.

Section 6.02. Authorization; Binding Effect.    The execution and delivery by the Purchaser of each of the Sale Documents to which the Purchaser is a party, the performance by the Purchaser of its obligations under such Sale Documents and the consummation of the Transactions by the Purchaser has been duly authorized by all necessary limited partnership action on the part of the Purchaser. Each of the Sale Documents to which the Purchaser is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 6.03. Contravention.  Neither the execution, delivery and performance of the Sale Documents by the Purchaser nor the consummation of the Transactions by the Purchaser will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of the Purchaser's organizational or governing documents, (b) assuming the receipt of the Sale Order and all of the Purchaser Required Consents prior to the Closing, conflict with, violate or breach any Law by which the Purchaser or any of its assets or properties, may be bound or affected, or (c) assuming the receipt of the Sale Order and all of the Purchaser Required Consents prior to the Closing, conflict with, breach or result in a default under, any material

43

Contract to which the Purchaser is a party or by which the Purchaser or any of its assets or properties, may be bound or affected.

Section 6.04. Consents. Except for the Sale Order and the Consents set forth on Schedule 6.04, no Consents are required on behalf of the Purchaser in connection with (a) the due execution and delivery by the Purchaser of the Sale Documents and the performance of the Purchaser's obligations thereunder, and (b) the consummation of the Transactions by the Purchaser. As of the Closing Date, all of the Purchaser Required Consents will have been obtained and will be in full force and effect.

Section 6.05. Litigation. There is no Action against the Purchaser that involves any of the Transactions or any material asset or property owned, licensed, leased or used by the Purchaser that, individually or in the aggregate, if determined adversely to the Purchaser, could reasonably be expected to materially and adversely affect the ability of the Purchaser to perform its obligations under the Sale Documents or to consummate the Transactions.

Section 6.06. Financial Resources. Purchaser has the financial resources to consummate the Transactions upon the terms and conditions set forth in this Agreement.

Section 6.07. Acknowledgments. Except as expressly set forth in this Agreement, Purchaser acknowledges that Seller shall sell and Purchaser shall purchase the Purchased Assets "as is, where is, and with all faults".

## ARTICLE VII

### Pre-Closing Covenants of the Seller and the Purchaser

Section 7.01. Conduct of Business Pending Closing. Seller agrees that from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 9.01 hereof, the Seller will:

(a) Conduct of Business. Use commercially reasonable efforts to conduct its business in a manner consistent with the past practices of the Seller and Seller will not engage in any transactions out of the ordinary course of business consistent with past practice, in each and every case subject to Seller's rights and responsibilities as debtors-in-possession under the Bankruptcy Code.

(b) Representations and Warranties; Conditions. Subject to Seller's rights and responsibilities as debtors-in-possession under the Bankruptcy Code, use commercially reasonable efforts, consistent with its fiduciary duties under the Bankruptcy Code in connection with the Proceedings, not to engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to (i) cause any of the representations and warranties of the Seller contained in the Sale Documents, including without limitation, those contained in Article V hereof, to be untrue, inaccurate or incorrect at any time, or (ii) result in any of the conditions set forth in Section 4.03 not being satisfied on or prior to the Termination Date.

44

(c)     Sale of Assets: Liens.  Not (i) Transfer any of the Purchased Assets, except Inventory sold in the ordinary course of business consistent with past practice, (ii) Transfer the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)), (iii) dispose of, or trade in, any of the Equipment, Non-Production-Based Inventory, or other Personal Property other than the sales set forth in Schedule 7.01(c), or (iv) create, incur, assume, or suffer to exist any Lien upon or with respect to any of the Purchased Assets or the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) other than any Permitted Lien.

(d)     Compensation.  Not increase the aggregate amount of compensation of the directors, officers or employees of, or consultants to, the Seller, including, without limitation, base salaries and bonuses of all types, whether paid or accrued other than in the ordinary course consistent with past practice or pursuant to a "Key Employee Retention Plan" proposed by the Seller and approved by the Bankruptcy Court in the Proceedings prior to the date of this Agreement.

(e)     Maintenance of Relationships.  Use commercially reasonable efforts as it is able to exercise as a result of their commencement of the Proceedings, and consistent with its rights, duties and obligations under the Bankruptcy Code and applicable federal bankruptcy law, to preserve current relationships with customers, suppliers, vendors, landlords, lessors, tenants and other Persons with which it has significant business relationships and inform them regarding the Transactions and Purchaser's agreement to assume the Assumed Liabilities under the terms and conditions of this Agreement.

Section 7.02.  Access to Information: Cooperation.

The Seller agrees that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 9.01 hereof, the Seller will, consistent with its rights, duties and obligations under the Bankruptcy Code and applicable federal bankruptcy law, cause its Affiliates, directors, officers, employees, accountants, counsel, consultants, investment bankers and other representatives to (A) give the Purchaser and its authorized representatives, including, without limitation, investors, lenders, environmental consultants and advisors, (I) access during regular business hours to all plants, offices, personnel, warehouses, facilities, properties, books, Contracts, commitments and records (including accountant's work papers) of or relating to the Seller, including, without limitation, the Assets and the Business, and (II) such financial and operating data and other information with respect to the Business and the Assets as any of them may from time to time reasonably request, and (B) permit the Purchaser and its authorized representatives, including, without limitation, investors, lenders, environmental consultants and advisors, to make such inspections thereof as any of them may reasonably request.

45

Section 7.03. Bankruptcy Actions.

(a) Motion for Bidding Procedures Order. On or before June 7, 2010, the Seller shall file with the Bankruptcy Court a motion and supporting papers seeking the entry of an order (the "**Bidding Procedures Order**"), in the form attached hereto as Exhibit A, by the Bankruptcy Court.

(b) Motion for Sale Order. On or before June 7, 2010, the Seller further shall file with the Bankruptcy Court a motion and supporting papers seeking the entry of an order (the "**Sale Order**"), in form and substance reasonably satisfactory to the Purchaser and its counsel, by the Bankruptcy Court providing for the approval of all of the Seller's obligations under the Sale Documents and the authorization of the Seller to perform all of its obligations under the Sale Documents. The Sale Order shall, unless otherwise agreed or waived by Purchaser and Seller, contain the provisions set forth in Section 7.03(c)(i) below.

(c) Sale Order. The Seller shall use commercially reasonable efforts to cause (x) a hearing on Seller's request for entry of the Sale Order (the "**Sale Hearing**") to be held as promptly as practicable after the later of (I) the date of entry of the Bidding Procedures Order, and (II) the date of the Auction (if applicable), and (y) the Bankruptcy Court to enter the Sale Order as promptly as practicable after the date of this Agreement but no later than August 4, 2010, which Order shall have become a Final Order on or before August 19, 2010.

(i) The Sale Order shall:

(A) provide that the Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code and shall not be deemed a successor entity of the Seller;

(B) provide that the sale of the Purchased Assets and the Kinta Ranch Property (unless the Kinta Ranch Property is excluded from the Transactions contemplated hereby pursuant to Section 3.02(a)) is free and clear of any and all Liens, Claims, encumbrances and interests, except for Permitted Liens and Assumed Liabilities, and does not require any Consents;

(C) provide that the Seller's execution, delivery and performance of the Sale Documents and the Transactions is approved;

(D) provide that the Seller is authorized to assume and assign the Assigned Agreements pursuant to Section 365(a) and (f) of the Bankruptcy Code, notwithstanding any provisions that restrict the assignability of the Assigned Agreements;

(E) provide either that (i) Seller has complied with the requirements of any applicable law relating to bulk sales and transfer or (ii) compliance with the requirement of any applicable laws relating to

46

bulk sales and transfers is not necessary or appropriate under the circumstances; and

(F) provide that the sole remedy for a breach of this Agreement by Purchaser is limited to Seller being entitled to retain the Deposit Amount.

Section 7.04. Disclosure Schedules.

(a) Updating of Disclosure Schedules. The Seller agrees that during the period from the date of the delivery of the Schedules through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 9.01 hereof, the Seller will promptly notify the Purchaser of (i) any and all information, facts, events, circumstances, issues or other matters that existed as of the date of this Agreement that should have been set forth or described in the Schedules required or provided for under this Agreement as of the date of this Agreement, and (ii) any and all information, facts, events, circumstances, issues or other matters arising after the date of this Agreement which, if existing on the date of this Agreement, would have been required to be set forth or described in the Schedules required or provided for under this Agreement as of the date of this Agreement, in each case by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters by no later than the earlier of two Business Days prior to the scheduled Closing Date or two Business Days after becoming aware of such matter (any such updates to the Schedules, or to the Seller's schedules of assets, liabilities and executory contracts or to the Seller's statement of financial affairs as they may file in the Proceedings, being referred to herein as "**Schedule Updates**").

(b) Effect of Schedule Updates. In the event that the Seller delivers any Schedule Updates to the Purchaser in accordance with the provisions of Section 7.04(a) above, then such Schedule Updates shall not be (i) deemed to be attached to this Agreement or become a part of this Agreement, or (ii) given effect for any purposes under this Agreement, unless such Schedule reflects the results of operation in the ordinary course consistent with past practice relating to such Schedule, or such Schedule Updates shall be accepted by the Purchaser in its sole discretion. In the event that the Schedule Updates are accepted by the Purchaser, then upon such acceptance, (i) such Schedule Updates shall be deemed to be attached to this Agreement and become a part of this Agreement, (ii) all references to the Schedules in this Agreement shall refer to the Schedules as updated by such Schedule Updates, and (iii) such Schedule Updates shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in Section 4.03 have been satisfied. In the event Purchaser does not accept any Schedule Update pursuant to this Section 7.04(b), Purchaser shall notify Seller in writing of such non-acceptance within three (3) Business Days after the delivery of such Schedule Update which notification shall be deemed a notice of termination under Section 9.01(c)(iii), subject to any right to cure pursuant thereto.

Section 7.05. <u>Notice.</u> Seller agrees that, within two (2) Business Days after the Bankruptcy Court enters the Bidding Procedures Order, it shall provide (i) a copy of this Agreement along with a copy of the Bidding Procedures Order to each Person who has filed a mortgage, deed of trust, or Uniform Commercial Code financing statement against the Seller, and (ii) notice of the Bidding Procedures Order, of the Seller's intention to assume and assign the Assigned Agreements to Purchaser, and of the Cure Amounts set forth on <u>Schedule 2.05(a)</u> to all relevant parties as required by Federal Rule of Bankruptcy Procedure 6006.

Section 7.06. <u>No Solicitation of Purchase or Sale.</u> The Seller agrees that during the period from (a) the date hereof to the date on which the Bidding Procedures Order is entered and (b) the date on which the Sale Order is entered through the earlier to occur of (i) the Closing Date, and (ii) the date on which this Agreement is terminated in accordance with the provisions of Section 9.01 hereof, the Seller will not, directly or indirectly (A) solicit, initiate, assist or accept any offer, inquiry or proposal for, entertain any offer, inquiry or proposal to enter into, take any other action designed to facilitate or encourage (including by way of furnishing any information), any inquiries or the making of any proposal, in any case, which constitutes an Alternative Transaction or Competing Transaction, (B) provide information to any other Person regarding the Seller, the Purchased Assets, the Kinta Ranch Property, the Business, or the Seller's liabilities (except as required under the Bankruptcy Code or applicable Federal Rules of Bankruptcy Procedure in connection with the Proceedings), (C) provide information to any other Person regarding any potential Alternative Transaction or Competing Transaction, (D) permit any other Person to conduct a due diligence review of the Seller, the Purchased Assets, the Kinta Ranch Property, the Business or the Seller's liabilities (except as required under the Bankruptcy Code or applicable Federal Rules of Bankruptcy Procedure in connection with the Proceedings), (E) initiate, participate in, continue or conduct any discussions or negotiations regarding any Alternative Transaction or Competing Transaction, or (F) enter into any Contract, arrangement, understanding or commitment with respect to any Alternative Transaction or Competing Transaction. It is understood that any breach or violation of the restrictions set forth in this Section by Seller shall be deemed to be a breach of this Agreement by the Seller, **provided, however, that the limitations set forth in this Section 7.06 for the period prior to entry of the Bidding Procedures Order shall only apply with respect to Seller's activities to solicit a "stalking horse" bidder for the Purchased Assets and/or Kinta Ranch Property and not to any other potential bidders for the Purchased Assets or Kinta Ranch Property.**

## ARTICLE VIII

### Covenants of the Seller and the Purchaser

Section 8.01. <u>Name Change.</u> Seller shall not sell, lease, license or otherwise permit another entity to use any corporate names or trade names that include "Redwine Resources, Inc." or any substantially similar name. Within two Business Days after the Closing, all of the entities comprising the Seller shall change their names, respectively, to ROGP Liquidating Company, LLC; RRI Liquidating Company, Inc.; RR Liquidating Company, LLC; and ROG Liquidating Company, LLC (or substantially similar names).

48

Section 8.02. <u>Books and Records</u>.

(a) To the extent permitted by law, the Purchaser shall allow the Seller and any of its directors, officers, employees, legal counsel, financial advisors, representatives, accountants and auditors and any party asserting derivative claims or otherwise acting on behalf of the Seller (collectively, "**Seller's Representatives**") access to all business records and files of the Seller or the Business that are transferred to the Purchaser in connection herewith, that are reasonably required by a Seller's Representative in the administration of the Proceedings or in anticipation of, or preparation for, any existing or future legal proceeding involving Seller, tax return preparation, litigation, or Excluded Liabilities, during regular business hours and upon reasonable notice at the Purchaser's principal place of business or at any location where such records are stored, and the Seller's Representatives shall have the right to make copies of any such records and files; provided, however, that any such access or copying should be had or done in such manner so as not to interfere with the normal conduct of the Purchaser's business or operations. Notwithstanding anything herein to the contrary, Purchaser's obligation under this Section 8.02(a) shall survive beyond the Closing Date until the sooner of (i) the six-month anniversary of the Closing Date or (ii) Seller notifies Purchaser in writing that Seller no longer require Purchaser's services required under this Section 8.2(a).

(b) <u>Employee Records</u>. To the extent permitted by law, on the Closing Date or as soon as practicable thereafter, Seller shall deliver to Purchaser a copy of all historical personnel and medical records of each of the Newly Hired Employees, including but not limited to, INS Forms I-9, confidentiality agreements and non-competition agreements; provided, however, that Seller shall provide Purchaser access to the original of any document contained in any such employee files if Purchaser has a reasonable business need therefore.

(c) <u>Seller Access</u>. Notwithstanding anything herein to the contrary, Seller may retain any books and records of the Seller for so long as or to the extent required by Seller to prepare tax returns or related financial statements; provided, however, that, subject to applicable law, Seller shall grant Purchaser access to such books and records and upon reasonable request of Purchaser, Seller shall provide copies to Purchaser.

Section 8.03. <u>Insurance</u>. Seller shall maintain in full force and effect for the remainder of their existing term all existing policies of insurance covering property, casualty, environmental and liability and related risks (the "**Liability Insurance Policies**"). Seller agrees to notify the insurers providing coverage under the Liability Insurance Policies in writing promptly upon becoming aware of any Claim or potential Claim that is or may be covered by such insurance, including notifying all insurers providing "claims made" coverage prior to the last date for which claims may be made under such policies.

Section 8.04. <u>Notice</u>. On or within two (2) Business Days after entry of the Bidding Procedures Order, Seller shall provide notice of the Bidding Procedures Order, this Agreement and the motion relating to the Sale Order to (i) all creditors of Seller, (ii) all parties that have filed a notice of appearance and/or a request for the service of notices, pleadings, papers or other documents in the Proceedings, and (iii) all counsel of record on any known or threatened

49

litigation against Seller, including but not limited to counsel involved in any litigation listed on Schedule 5.06.

## ARTICLE IX

### Termination and Expenses

Section 9.01. <u>Termination</u>. The obligations of the parties to consummate the Transactions under the Sale Documents may be terminated at any time prior to the Closing by:

(a)    the mutual written consent of the Seller and the Purchaser;

(b)    the Seller if (i) the Closing shall not have occurred on or prior to the Termination Date, unless such failure to consummate the Transactions is the result of a material breach of any Sale Document by Seller, or (ii) if the Purchaser shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents;

(c)    the Purchaser, if (i) the Closing shall not have occurred on or prior to the Termination Date, unless such failure to consummate the Transactions is the result of a material breach of any Sale Document by the Purchaser, or (ii) if Seller shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents, or (iii) there has been a Material Adverse Effect;

(d)    the Purchaser or Seller if (i) any Law shall have been enacted, adopted, issued or promulgated which prohibits the Transactions, or (ii) any Governmental Body shall have issued an order, decree or ruling or taken any other action, which permanently restrains, enjoins or otherwise prohibits the Transactions, and such order, decree, ruling or other action shall have become a Final Order;

(e)    the Purchaser if the Sale Order approving the Transactions with the Purchaser, in form and substance satisfactory to the Purchaser, without modification, is not entered by the Bankruptcy Court on or prior to 5:00 p.m. New York City Time on August 4, 2010, or the Sale Order is subject to a stay, temporary restraining order or injunction as of 5:00 p.m. New York City time on August 19, 2010;

(f)    the Purchaser, if Seller (or any trustee appointed in the Proceedings) shall (i) reject or file a motion to reject any of the Sale Documents in connection with the Proceedings, (ii) convert or attempt to convert any of the Proceedings to a Chapter 7 proceeding or other liquidation proceeding, or (iii) file a plan of reorganization that excludes, prohibits or does not provide for the consummation of the Transactions with the Purchaser;

(g)    the Purchaser, if (i) (A) the Purchaser is not selected as the winning bidder or the second highest bidder in any Auction of the Purchased Assets and (B) five Business Days have elapsed since the Auction, or (ii) the Seller consummates an Alternative Transaction or Competing Transaction;

50

(h) the Purchaser, if the Bidding Procedures Order is not entered by the Bankruptcy Court on or prior to 5:00 p.m. New York City Time on June 18, 2010 or the Bidding Procedures Order is subject to a stay, temporary restraining order or injunction as of 5:00 p.m. New York City Time on July 5, 2010; or

(i) the Purchaser if the Bankruptcy Court disapproves or materially modifies the amount of the Termination Fee, the amount of the Expense Reimbursement, or the terms and conditions under which the Termination Fee and the Expense Reimbursement are due and payable to Purchaser in accordance with this Agreement or the form of Bidding Procedures Order attached hereto.

Any such termination shall be in writing delivered to the other parties hereto in accordance with the provisions of Section 10.01 hereof.

Section 9.02. Effect of Termination. In the event of a termination of this Agreement under Section 9.01, this Agreement will become void and of no further force or effect, except for the provisions of (a) Section 9.03 relating to the payment of fees and expenses, (b) this Section 9.02, (c) Section 3.04(b)-(d) relating to disbursement of the Deposit Amount, and (d) Section 3.02(g) relating to the resolution of certain disputes. Notwithstanding any provision of the Sale Documents to the contrary, except as otherwise provided in Sections 3.04(d) and 9.03(e) of this Agreement, neither the termination of this Agreement, nor anything contained in this Section 9.02, will be deemed to release any party from any liability due to, or prevent the other party from exercising its rights and remedies under the Sale Documents with respect to, the breach by any such party of the covenants or agreements of such party in the Sale Documents, in each case, prior to the date of such termination, provided, however, that such right to terminate shall be Purchaser's sole and exclusive remedy for any breach of representation or warranty by Seller prior to the Closing.

Section 9.03. Fees and Expenses.

(a) Payment of Fees and Expenses. Subject to clauses (c) and (d) below, each of the parties hereto will be responsible for and pay its own legal, accounting, engineering, environmental, survey and title charges and other fees and expenses, including, without limitation, reasonable attorneys' and accountants' fees and expenses and the fees and expenses of financial consultants, investment bankers, lenders and environmental consultants, incurred in connection with the Transactions, including, without limitation, the due diligence review, and the negotiation, preparation and execution of the Sale Documents (collectively, all such fees and expenses being the "**Fees and Expenses**").

(b) Transaction Fees and Taxes. The Seller will be responsible for and will duly and timely pay any and all (i) filing fees, including, without limitation, recording charges, registration costs and expenses, and (ii) Taxes, including, without limitation, stock transfer Taxes, sales and use Taxes and real property gains Taxes, in each case, directly or indirectly attributable to the Transactions. Except as otherwise required by applicable Law, the Seller will be responsible for filing any Tax Returns with respect to Taxes payable by Seller and complying with any procedures required in connection with all Taxes resulting from the

51

Transactions, other than those Taxes that are Assumed Liabilities as set forth in Section 2.03(d).

(c) Expense Reimbursement. In the event that the Transactions are not consummated on or prior to the Termination Date for any reason other than as a result of a material breach of this Agreement by the Purchaser, then in addition to the return of the Deposit Amount to the Purchaser as provided in Section 3.04, Purchaser shall recover the full amount of the Expense Reimbursement from Seller, and the Seller hereby agrees, and shall not object, to the payment of such amount to the Purchaser. In determining the amount of the Expense Reimbursement, Purchaser shall provide to Seller such invoices and other information, subject to the preservation of Purchaser's privileges, that adequately document and itemize the amount of the Expense Reimbursement. In the absence of the Seller's delivery to Purchaser of a written objection to the amount of the Expense Reimbursement within three (3) Business Days of Purchaser's provision of such invoices and other information (the "**Expense Objection Deadline**"), detailing the amount and nature of all objectionable items, the amount of the Expense Reimbursement submitted by the Purchaser shall be deemed approved. In the event of Seller's delivery of a written objection to Purchaser on or prior to the Expense Objection Deadline, Purchaser and Seller shall, in good faith, attempt to promptly resolve the areas of objection, but if such disputes cannot amicably and promptly be resolved, then the dispute shall be submitted to arbitration in accordance with the provisions of Section 3.02(g) of this Agreement; *provided, however*, that all non-objectionable amounts shall be promptly reimbursed to Purchaser in accordance with the provisions set forth below. The Expense Reimbursement shall be paid to Purchaser as follows: (i) in the event of a termination of this Agreement pursuant to Section 9.01(g) as a result of the selection of a bidder(s) other than the Purchaser at the Auction, then Purchaser shall have the right upon and subject to the consummation of the Alternative Transaction or Competing Transaction to recover the Expense Reimbursement directly from the escrow account holding the bid deposit made by the selected bidder(s); *provided, however*, that if and to the extent such payment is not made from such escrow account, for any reason whatsoever, such payment shall be made in accordance with Section 9.03(c)(ii) below; or (ii) in the event of a termination for any other reason (other than a material breach of this Agreement by Purchaser), or in the event the Expense Reimbursement, in whole or in part, is not paid to Purchaser in accordance with Section 9.03(c)(i) above, then within three (3) Business Days of the Expense Objection Deadline (or, only with respect to those amounts, if any, that are timely objected to by Seller, the date on which any such disputes are resolved in accordance with the procedures set forth above), Seller shall pay to the Purchaser an amount in cash equal to the Expense Reimbursement by wire transfer of immediately available funds. The Seller acknowledges and agrees that the Expense Reimbursement constitutes an allowed claim in the Proceedings under Section 503(b) of the Bankruptcy Code.

(d) Termination Fee. In the event either (i) this Agreement is terminated pursuant to Section 9.01(g) or (ii) both (A) the Transactions are not consummated on or prior to the Termination Date for any reason other than as a result of a material breach of this Agreement by the Purchaser, and (B) within twelve months after the date of termination of this Agreement the Seller shall consummate an Alternative Transaction or Competing Transaction with a third party (the "**Third Party Acquiror**") at a sale price equal to or in excess of the Purchase Price

52

(whether or not such Alternative Transaction or Competing Transaction was proposed, contemplated or announced before or after the date of termination of this Agreement), then, in addition to the return of the Deposit Amount to the Purchaser as provided in Section 3.04, Purchaser shall recover the full amount of the Termination Fee from Seller, and the Seller agrees, and shall not object, to the payment of such amount to the Purchaser. The Termination Fee shall be paid to Purchaser as follows: (I) in the event of a termination of this Agreement pursuant to Section 9.01(g) as a result of the selection of a bidder(s) other than the Purchaser at the Auction, then Purchaser shall have the right upon and subject to the consummation of the Alternative Transaction or Competing Transaction to recover the Termination Fee directly from the escrow account holding the bid deposit made by the selected bidder(s); *provided, however*, that if and to the extent such payment is not made from such escrow account, for any reason whatsoever, such payment shall be made in accordance with Section 9.03(d)(III) below; or (II) in the event of the consummation of a transaction with a Third Party Acquiror as described in Section 9.03(d)(ii) above, then the Seller shall require the Third Party Acquiror, as part of the Alternative Transaction or Competing Transaction, to pay to the Purchaser an amount in cash equal to the Termination Fee by wire transfer of immediately available funds on the date of consummation of such transaction; *provided, however*, that if and to the extent such payment is not made by the Third Party Acquiror, for any reason whatsoever, such payment shall be made in accordance with Section 9.03(d)(III) below; or (III) if and to the extent the Termination Fee is not paid in accordance with Section 9.03(d)(I) or (d)(II) above, then within three (3) Business Days of the closing of such Alternative Transaction or Competing Transaction, Seller shall pay to the Purchaser an amount in cash equal to the Termination Fee by wire transfer of immediately available funds. The Seller acknowledges and agrees that the Termination Fee constitutes an allowed claim in the Proceedings under Section 503(b) of the Bankruptcy Code.

(e) Acknowledgement. The parties acknowledge and agree that (i) payment of the Expense Reimbursement and Termination Fee shall constitute liquidated and stipulated damages, (ii) the full extent of the Purchaser's damages in the event the Transactions are not consummated cannot be accurately anticipated or determined, (iii) the amount of liquidated damages represented by the Expense Reimbursement and Termination Fee does not constitute a penalty, (iv) the agreements contained in this Section 9.03 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the Purchaser would not enter into this Agreement, and (v) the Expense Reimbursement and Termination Fee shall be the Purchaser's sole remedy under the Sale Documents for the termination of this Agreement pursuant to Article IX.

## ARTICLE X

### Miscellaneous

Section 10.01. Notices. All notices, requests, demands and other communications to any party or given under any Sale Document will be in writing and delivered personally, by overnight delivery or courier, by registered mail or by telecopier (with confirmation received) to the parties at the address or telecopy number specified for such parties on the signature pages hereto (or at such other address or telecopy number as may be specified by a party in writing

given at least five Business Days prior thereto). All notices, requests, demands and other communications will be deemed delivered when actually received.

Section 10.02. Counterparts. This Agreement may be executed in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed will be deemed an original, but all of which taken together will constitute one and the same instrument.

Section 10.03. Amendment of Agreement. This Agreement may not be amended, modified or waived except by an instrument in writing signed on behalf of each of the parties hereto.

Section 10.04. Successors and Assigns; Assignability. This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto. This Agreement may not be assigned by any party hereto without the prior written consent of all other parties hereto, except for the assignment of all or any part of the rights and obligations of the Purchaser under this Agreement, which may be freely assigned by the Purchaser to an Affiliate of the Purchaser either prior to or after the Closing Date. Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement

Section 10.05. Governing Law. This Agreement will be governed by, and construed in accordance with, the laws of the state of Texas applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

Section 10.06. Integration. The Sale Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 10.07. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 10.08. Further Assurances. Promptly upon the reasonable request by the Purchaser, the Seller (with the expenses paid by the party responsible as provided in this Agreement) shall (a) correct any defect or error that may be discovered in any Sale Document or in the execution, delivery, acknowledgment or recordation of any Sale Document and (b) execute, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments, in each case, as Purchaser may require from time to time.

54

Section 10.09.  No Third-Party Rights.  This Agreement is not intended, and will not be construed, to create any rights in any parties other than the Seller and the Purchaser, and no Person may assert any rights as third-party beneficiary hereunder, including, without limitation, the directors, officers and employees of the Seller, or any labor organization, if any, representing Seller's employees, except that any rights, obligations or remedies of the Purchaser hereunder may be exercised by an Affiliate of the Purchaser as provided in Section 10.04.

Section 10.10.  Enforcement.  Each of the Seller and Purchaser hereby acknowledges and agrees that the provisions of this Agreement are of a special and unique nature, the loss of which cannot be accurately compensated for in damages by an action at law, and that the breach or threatened breach of the provisions of this Agreement would cause the Purchaser or Seller as the case may be, irreparable harm and that money damages would not be an adequate remedy (except as otherwise provided herein) for any breach or threatened breach of the provisions of this Agreement by the Seller or Purchaser as the case may be.  Therefore, the parties hereto agree that the Purchaser or Seller, as the case may be, shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Agreement by the Seller or the Purchaser as the case may be and to specifically enforce the terms and provisions of this Agreement, this being in addition to any other remedy to which the Purchaser or Seller, as the case may be, is or may be entitled at law or in equity.

Section 10.11.  Submission to Jurisdiction.  Each of the Seller and the Purchaser hereby (a) agrees that any Action with respect to any Sale Document may be brought in the Bankruptcy Court, (b) accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of such court, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any Action in such jurisdiction, and (d) irrevocably consents to the service of process of any of the courts referred to above in any Action by the mailing of copies of the process to the parties hereto as provided in Section 10.01.  Service effected as provided in this manner will become effective ten calendar days after the mailing of the process.

Section 10.12.  WAIVER OF JURY TRIAL.  EACH OF THE SELLER AND THE PURCHASER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION TO ENFORCE OR DEFEND ANY RIGHT UNDER ANY SALE DOCUMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH ANY SALE DOCUMENT AND AGREES THAT ANY ACTION WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 10.13.  No Waiver; Remedies.  No failure or delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of the right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the Sale Documents will be cumulative and not exclusive of any rights or remedies provided by law.

590081.3/1835-00042

Section 10.14. <u>Interpretation</u>. As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate. Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, schedule and exhibit references are references with respect to this Agreement unless otherwise specified. Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 10.15. <u>Ambiguities</u>. This Agreement was negotiated between legal counsel for the parties and any ambiguity in this Agreement shall not be construed against the party who drafted this Agreement.

Section 10.16. <u>Incorporation of Schedules and Exhibits</u>. The Schedules and Exhibits hereto are incorporated into this Agreement and will be deemed a part hereof as if set forth herein in full. References to "this Agreement" and the words "herein", "hereof" and words of similar import refer to this Agreement (including the Schedules and Exhibits) as an entirety. In the event of any conflict between the provisions of this Agreement and any Schedule or Exhibit, the provisions of this Agreement will control. Capitalized terms used in the Schedules have the meanings assigned to them in this Agreement. The Section references referred to in the Schedules are to Sections of this Agreement, unless otherwise expressly indicated.

Section 10.17. <u>No Survival of Representations and Warranties.</u> The parties hereto agree that, except for representations regarding title to the Purchased Assets and the Kinta Ranch Property, the representations and warranties contained in this Agreement and in any certificate delivered pursuant hereto by any Person shall not survive the Closing Date hereunder and none of the parties shall have any liability to each other after the Closing Date for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing Date shall survive the Closing Date hereunder.

**[Remainder of page intentionally left blank; signature page follows]**

56

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.

**SELLER:**

Redwine Resources, Inc.

By: _____
    Name:  Gary Redwine
    Title:   President

Redwine Oil & Gas Properties, LLC

By: _____
    Name:  Gary Redwine
    Title:   Manager

Redwine Rockies, LLC

By: _____
    Name:  Gary Redwine
    Title:   Manager

**PURCHASER:**

Longroad Capital Partners III, L.P.
By Longroad Asset Management, LLC, its
Manager

By: _____
    Name:  Richard L. Latto
    Title:  Managing Member

Redwine Oil & Gas, LLC

By: _____
    Name:  Gary Redwine
    Title:   Manager

Redwine Kinta Ranch, LLC

By: _____
    Name:  Gary Redwine
    Title:   Manager

Address for Notices to Seller:

8214 Westchester Dr., Suite 740
Dallas, TX 75225
(214) 691-5800

Address for Notices to Purchaser:

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.

**SELLER:**

Redwine Resources, Inc.

Redwine Oil & Gas, LLC

By:_____
    Name:  Gary Redwine
    Title:   President

By:_____
    Name:
    Title:

Redwine Oil & Gas Properties, LLC

Redwine Kinta Ranch, LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Redwine Rockies, LLC

Address for Notices to Seller:

By:_____
    Name:
    Title:

**PURCHASER:**

Longroad Capital Partners III, L.P.
By Longroad Asset Management, LLC, its
Manager

Address for Notices to Purchaser:
177 Broad Street, Suite 1150
Stamford, CT 06901
(203) 967-1400

By:_____
    Name:  Richard L. Latto
    Title:   Managing Member